UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

**WorldQuant, LLC**                                         ____ Civ. ___ (       )
                           Plaintiff,

                  - against -

**Matthew Ober**                                          December 1, 2016
                    Defendant.

-----------------------------------------------------------------x

### MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Pursuant to Fed. R. Civ. P. 65, plaintiff WorldQuant, LLC ("WorldQuant") hereby submits this memorandum of law in support of its motion for temporary restraining order and preliminary injunction.

### Preliminary Statement

WorldQuant is an international, private, institutional investment management firm consisting of a team of researchers, traders and technologists who engage in the quantification and automation of investment processes to buy and sell securities. Matthew Ober ("Ober") was one of WorldQuant's most valuable employees serving as its Co-Head of Data Strategy. On November 7, 2016, Ober tendered his resignation, providing thirty days' notice and announced his intention to leave WorldQuant and join a direct competitor, Third Point LLC ("Third Point"). Third Point is a multi-billion dollar financial market participant that buys and sells securities, and like WorldQuant, uses quantitative processes to determine how to invest. WorldQuant and Third Point are competitors.

1

Ober executed an employment agreement with WorldQuant in which he agreed to certain reasonable post-employment covenants that prevent him from working for a competitor for one year post-employment or disclosing WorldQuant's trade secrets indefinitely.   Ober is in possession of confidential information which if disseminated to, or used by, a competitor, such as Third Point, would inflict irreparable harm upon WorldQuant.   Under the terms of the employment agreement, WorldQuant has agreed to pay Ober his salary during the one year noncompete period.

Ober has already accepted employment with Third Point, thereby breaching his post-employment restrictive covenants that he promised to WorldQuant.   In light of that breach, as well as the imminent, irreparable harm of having its trade secrets and other highly confidential information exposed to a competitor, WorldQuant has filed this suit to enforce the post-employment covenants, the benefits of which Ober and WorldQuant specifically contracted. WorldQuant now seeks a temporary restraining order and preliminary injunction compelling Ober to honor his contractual obligations.

## Statement of Facts

WorldQuant has submitted, contemporaneously with this memorandum, a Complaint verified by a detailed affidavit from its Chief Operating Officer, Michael DeAddio ("DeAddio Aff."), setting forth the facts supporting its motion for temporary restraining order and preliminary injunction.  WorldQuant incorporates the content of that affidavit, in its entirety, into this memorandum by reference.  For the Court's convenience, the most salient facts are briefly set forth below.

A.      **WorldQuant**

WorldQuant consists of an international[1] team of researchers, traders and technologists who employ quantitative or statistical arbitrage strategies, which, in their simplest form, are a computational approach to buying and selling financial instruments utilizing automated systems which make use of data mining, statistical methods and artificial intelligence techniques. DeAddio Aff. at ¶¶ 3-4.  To accomplish this, WorldQuant collects an enormous amount of data from many sources, financial and otherwise, and then its highly trained and expert staff use innovative technology to develop and use proprietary investment processes to deploy systematic model-based investment strategies on a global basis to determine which financial instruments to buy and sell.  *Id.* at ¶ 4. Its customized investment processes produce Alphas (a combination of mathematical expressions, computer source code, and configuration parameters that can be used, in combination with historical data) to direct WorldQuant's investment strategy.  *Id.*

WorldQuant's proprietary infrastructure allows it to leverage large numbers of diverse datasets, sourced from traditional and nontraditional vendors, to create statistical models to profitably buy and sell financial instruments. DeAddio Aff. at ¶ 4.  The ability to leverage such a large number of datasets and identify nontraditional sources of data is a key proprietary element for WorldQuant to profitably navigate the financial markets. *Id.* More specifically, WorldQuant's researchers focus on developing a database of production Alphas using various datasets from which to derive predictive signals.  *Id.* at ¶ 5. These datasets are created from WorldQuant's investigation of numerous sources, but the real task is deciding which of the scores of available datasets will be most valuable for developing the most profitable predictive models or Alphas.

---

[1] WorldQuant operates through offices throughout the United States, England, Russia, Bulgaria, Romania, Thailand, India, China, Taiwan, Vietnam, Singapore, South Korea, Switzerland, Hungary, Hong Kong and Israel.

*Id.* The output of this research is provided to WorldQuant's product portfolio managers who combine Alphas from the Alpha database into strategies that create target portfolios. *Id.*

Since WorldQuant's inception, it has spent an enormous amount of money and resources, and has dedicated extensive efforts, towards developing the predictive signals described above. It is beyond dispute that WorldQuant relies on these trade secrets and confidential information to power its business and gain an advantage over other companies in the highly competitive investment equity market.

### B.    Ober's Career at WorldQuant.

Ober was a highly valued and trusted employee at WorldQuant. DeAddio Aff. at ¶ 25. He joined WorldQuant on May 27, 2011, as a Data Product Analyst, was promoted to Co-Head of Data Strategy, and was responsible for overseeing a team of skilled employees responsible for data analysis and procurement. *Id.* at ¶ 15.  Over the course of his tenure with WorldQuant, Ober has acquired extensive experience in the field of quantitative investment strategies. *Id.* at ¶¶ 15-19.  He was responsible for the development of WorldQuant's above-described proprietary infrastructure used to efficiently consume large quantities of datasets from proprietary data sources. *Id.*

Most importantly, Ober is familiar with, and had access to, highly confidential proprietary WorldQuant information pertaining to, among other things, the following:

- How WorldQuant onboards, consumes and processes data for use in its quantamental investment strategies;

- Which of WorldQuant's datasets are most profitable and which datasets are not profitable;

- The costs of purchasing datasets;

- The value of WorldQuant's proprietary and confidential Alphas; and

- WorldQuant's confidential, proprietary plans to further expand its business using datasets in a strategic way.

DeAddio Aff. at ¶ 16.

In addition, Ober is familiar with, and had access to, highly confidential information pertaining to WorldQuant's interaction with its vendors.  Ober's knowledge of WorldQuant's interaction with its vendors is unique, and includes the following:

- What information WorldQuant buys from such vendors;

- Which vendors have the most promising information for data consumption; and

- What information the vendors offer for sale but do not actively promote.

DeAddio Aff. at ¶ 17-19.

This information is the lifeblood of WorldQuant's business strategy, and WorldQuant considers it proprietary, highly confidential and a trade secret under federal law and at common law ("Trade Secret").

### C.     Ober's Employment Agreement.

Ober and WorldQuant entered into an employment agreement dated May 27, 2011, which was amended by letter dated September 28, 2016. *See* Exhibits C and D of DeAddio Aff.   The Employment Agreement contains two unambiguous provisions that are relevant to this case: (1) a post-employment covenant prohibiting Ober from working for a WorldQuant competitor for a period of twelve months, in exchange for which WorldQuant promised to pay Ober his salary for the entire duration ("Noncompetition Covenant"); and (2) a confidentiality provision that

prevents Ober from making use of, divulging or disclosing WorldQuant's proprietary and confidential information or Trade Secrets to any third party ("Nondisclosure Covenant").[2]

With respect to the Noncompetition Covenant, Ober specifically agreed that:

> [WorldQuant] may, at its option, continue your salary during the Restrictive Period (as defined below), less any amounts you may earn from other employment permitted hereunder ("Salary Continuation"), and if the Company so elects to continue your salary, then you will be precluded during such Restricted Period from (i) engaging in a Competitive Activity (as defined below) or (ii) accepting or performing services of any kind directly or indirectly (including as an employee, director, officer, principal, member, shareholder, partner, consultant, or independent contractor) with or for a Competitor (as defined below) in an employment position,  or rendering consulting services to a Competitor (as defined below) relating to such subjects.

Exhibit D, § C(1)(b) of DeAddio Aff.  The "Restricted Period" is defined as "a period lasting up to twelve (12) months following the termination of [] employment."  *Id.*

It is important to note that Ober originally agreed to a two-year Restricted Period. However, just less than six weeks before Ober tendered his resignation, WorldQuant agreed to reduce that term by half. DeAddio Aff. at ¶ 26.  It is also important that this covenant is a "garden leave" provision – WorldQuant agreed to pay Ober his salary for the entire Restrictive *Id.* at ¶ 27.

The term "Competitive Activity" is narrowly defined as "setting up infrastructure and systems capable of use by a Competitor, and/or working for or consulting with a firm or individual(s) intended to establish a business that will be a Competitor."  The term "Competitor" includes, in relevant part, "any entity worldwide that (i) engages in or employs, intends to engage in or employ or is preparing to engage in or employ Quantitative Trading or Investment

---

[2]  Ober also agreed to two nonsolicitation covenants in the Employment Agreement; however, WorldQuant is not currently aware of Ober's intention to breach those covenants.

Strategies." DeAddio Aff. at ¶ 29.   "Quantitative Trading or Investment Strategies" are "strategies or techniques which make trading and/or investing decisions primarily  based upon computer-driven processes, and which are commonly categorized, known and/or referred to in the financial services industry as, among other things, 'statistical arbitrage', 'systematic trading', 'algorithmic trading', 'algo trading', 'computer-driven trading', 'technical trading', 'artificial intelligence-based trading', 'automated trading', 'black box trading', and/or 'high frequency trading.'"   Finally, the provision adds that "[f]or the avoidance of doubt, a business or person that uses quantitative models to trade shall be considered a Competitor irrespective of the products traded by such business or person." *Id.*

Additionally, Ober agreed to a Nondisclosure Covenant, as follows:

> Upon execution of [the Agreement] and solely by reason of your employment by the Company, you may come into possession of, have knowledge of or contribute to [] Confidential Information.

> All of the Confidential Information is a valuable asset of the Company and is, will be, and shall at all times, including subsequent to your employment, remain, the sole and exclusive property of the Company.

> You shall, at all times, hold the Confidential Information as secret.

> During the term of your employment by the Company and following termination thereof for any reason, you shall not, directly or indirectly, individually or in combination or association with any person or entity, make use of, divulge or disclose to any third party any of the Confidential Information without, in each instance, the prior written consent of the Company.

DeAddio Aff. at ¶ 30.  The term "Confidential Information" is defined as

> all information or material not generally known to the public or the industry in which the Company is or may be engaged which is owned by the Company or in which the Company has an interest, including but not limited to all work product; techniques; plans; designs; programs; customer information; identity and job descriptions of Company personnel; the Company's organizational structure; commission rates; financing relationships or terms; service provider or vendor relationships

> or terms; investment performance or results (including any "track record" information); financial data; trading strategies including without limitation regions, instruments or styles; databases; database criteria; trading algorithms; processes; methodologies; compensation or bonus data; the terms of this employment agreement; or other information not in the public domain pertaining to the business or affairs of the Company or of any of its affiliates. Information shall not be considered to be in the public domain if revealed or disclosed in contravention of this agreement or the agreements made between the Company and other parties.

DeAddio Aff. at ¶ 31.

Finally, in the Employment Agreement, as amended, Ober made several important acknowledgements. Among others, Ober expressly acknowledged that:

> …it may be **impossible to measure monetarily the damages** that the Company will incur if you should breach or be in default of any of your representations or agreements set forth in the Agreement. Accordingly, if you breach or are in default of any of the representations and agreements set forth in the Agreement, the Company shall be **entitled to injunctive relief** (without posting any bond or security). If any action or proceeding is instituted on behalf of the Company to enforce the terms of the restrictive covenants in the Agreement, you hereby waive any claim or defense thereto that the Company has an adequate remedy at law or that the Company has not been, or is not being, **irreparably injured** by your breach or default.

(Emphasis added). DeAddio Aff. at ¶ 32.

### D.   Ober's Decision to Join WorldQuant's Direct Competitor.

Ober tendered his resignation on November 7, 2016, and informed WorldQuant that he had accepted a position with Third Point, apparently as Third Point's Chief Data Scientist. DeAddio Aff. at ¶¶ 33, 37. Third Point is purportedly paying Ober in excess of $2,000,000.00 to work in a positon that is undoubtedly similar to, or the same as, Ober's role at WorldQuant. *Id.* at ¶¶ 37-38, 40. Third Point's offer to Ober is a significant increase in pay – about *ten times Ober's WorldQuant salary* – made in order to entice him to join the company. *Id.* at ¶¶ 25, 37-38.

8

It is no surprise that Third Point would want to hire someone with Ober's skills, knowledge and experience – and pay well beyond market-price to entice him – since Third Point needs Ober to amplify its quantitative trading and investment capabilities. DeAddio Aff. at ¶¶ 9-19.  While Third Point describes itself as a "fundamental investor," meaning it researches and invests in companies based on certain fundamental features attributable to that particular company, it begins its investment process by applying quantitative techniques to reduce the universe of companies in which it might choose to invest or increase or decrease its holdings. *Id.* at ¶¶ 9-10.  Indeed, Third Point has recently stated that it is expanding its use of data analytics tools to support its investment strategy. *Id.* at ¶ 9.  As Third Point's Chief Executive Officer, David Loeb, has stated, the company is hiring staff to utilize statistical arbitrage trading strategies, research and investment tools, "to support our existing fundamental strategy." *Id.* at ¶ 11.  The reason it is doing so is because there are literally millions of investment options available to trade.  In order to identify those that might be most fruitful, quantitative techniques are the most efficient methods to narrow the field.  *Id.* at ¶ 10.

The result of combining quantitative and fundamental strategies is something the industry now calls a "quantamental" technique. DeAddio Aff. at ¶ 11.  Mr. Loeb noted in Third Point's most recent Investment Letter that the use of datasets and "quantamental" techniques are becoming increasingly important to remain competitive at stock investing. *Id.*

In sum, Third Point is now actively seeking to expand the quantification of its trading processes. DeAddio Aff. at ¶ 13.  As a result, the application of that quantitative strategy will likely result in Third Point purchasing or selling its position in the same companies in which WorldQuant trades. *Id.*  That action will affect the price at which WorldQuant can purchase or sell that same security, thus having a profoundly negative affect on the profitability of

WorldQuant's trades. *Id.* This is because a key tenet of statistical arbitrage investing is that there are market inefficiencies which may be capitalized on by identifying their associated statistically-based predictive signals, and developing trading strategies in response. *Id.* at ¶ 6. Naturally, the global market for statistical arbitrage investing, while inherently dynamic, is for any given period of time, finite. *Id.* Profits may be reaped only to the extent which market inefficiencies over the given period exist. *Id.* Therefore, any entity which engages in the same or similar investment activity and/or which buys and sells the same financial instruments, will be in direct competition with WorldQuant. *Id.*

Without a doubt, WorldQuant and Third Point compete with one another and Third Point will be able to use WorldQuant's unique information – gleaned through Ober – to buy and sell securities which will influence the prices of the securities in which WorldQuant trades. This will have a dramatic, deleterious impact on WorldQuant's business.

**E.    WorldQuant's Efforts to Persuade Ober to Comply with His Contractual Obligations.**

By letter dated November 8, 2016, WorldQuant respectfully reminded Ober of the terms of his Employment Agreement (that he signed twice, most recently on October 4, 2016) and informed Ober that it considered his joining Third Point to be a breach of the covenants contained within that Agreement. DeAddio Aff. at ¶ 39. Pursuant to the terms of that Agreement, WorldQuant offered to and intends to pay Ober his salary of $200,000.00 for the 12 months during which he could not work at Third Point so long as he complies with the noncompetition and nondisclosure covenants contained therein. *Id.* Despite WorldQuant's best efforts to persuade Ober to comply with his contractual obligations, Ober indicated that he would proceed with his plan to join Third Point. Unless enjoined by this Court, Ober is expected to begin his employment with Third Point in early 2017.

## Argument

### I.      Standard of Law

It is well settled that the objective of a preliminary injunction is to maintain the status quo until a decision is reached on the merits. *Grier v. Bowker*, 314 F. Supp. 624, 625 (S.D.N.Y. 1970).  To prevail on a motion for a preliminary injunction, the moving party must show (1) that it will suffer irreparable harm absent such relief; and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the party seeking the injunctive relief. *Johnson v. Burge*, 506 Fed. Appx. 10, 11 (2d Cir. 2012).  Because WorldQuant readily meets this burden, preliminary injunctive relief is appropriate.

### II.     WorldQuant Will Suffer Irreparable Harm Absent Injunctive Relief.

Ober's breach of the Noncompetition and Nondisclosure Covenants will cause WorldQuant irreparable harm.   In the Nondisclosure Covenant, Ober acknowledged, among other things, that

> Upon execution of [the Employment Agreement] and solely by reason of your employment by the Company, you may come into possession of, have knowledge of or contribute to [] Confidential Information.

> All of the Confidential Information is a valuable asset of the Company and is, will be, and shall at all times, including subsequent to your employment, remain, the sole and exclusive property of the Company.

> You shall, at all times, hold the Confidential Information as secret.

> During the term of your employment by the Company and following termination thereof for any reason, you shall not, directly or indirectly, individually or in combination or association with any person or entity, make use of, divulge or disclose to any third party any of the Confidential Information without, in each instance, the prior written consent of the Company.

DeAddio Aff. at ¶ 30.  Ober further acknowledged that WorldQuant would have no "adequate remedy at law" and would be "irreparably injured" if he failed to comply with any of the terms set forth in the Employment Agreement, and that it would be "impossible to measure monetarily the damages" of such breach.  *Id.* at ¶ 32.  These important acknowledgements in the Employment Agreement that Ober is seeking to breach are entitled to significant weight, and fully support an award of injunctive relief.  *See Ticor Title Ins. Co. v. Cohen,* 173 F.3d 63, 68-9 (2d Cir. 1999) (relying on employment contract clause acknowledging irreparable harm caused by breach thereof for purposes of upholding grant of injunctive relief); *N. Atl. Instruments, Inc. v. Haber,* 188 F.3d 38, 49 (2d Cir. 1999) (same).

In addition, where, as here, the plaintiff faces a danger of trade secret misappropriation, irreparable harm may properly be presumed. *See Estee Lauder Companies Inc. v. Batra*, 430 F. Supp. 2d 158, 174 (S.D.N.Y. 2006) ("[i]rreparable harm is presumed where a trade secret has been misappropriated because, as the Court of Appeals for the Second Circuit has explained, '[a] trade secret once lost is, of course, lost forever' and, therefore, such a loss 'cannot be measured in money damages'" (quoting *FMC Corp. v. Taiwan Tainan Giant Indus. Co.,* 730 F.2d 61, 63 (2d Cir.1984)).

There is no question that Ober is in possession of WorldQuant's Trade Secrets and confidential information.  Federal and New York law recognizes that "a trade secret is 'any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.'" *Softel, Inc. v. Dragon Med. & Sci. Commc'ns, Inc.*, 118 F.3d 955, 968 (2d Cir. 1997) quoting Restatement of Torts § 757 cmt. b, at 5 (1939); *see also* the Defend Trade Secrets Act, 18 U.S.C.

§ 1839.[3]   New York courts consider several factors in determining whether information constitutes a trade secret, including: (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *N. Atl. Instruments,* 188 F.3d at 44.

The type of information that Ober is in possession of – the disclosure of which WorldQuant seeks to prevent – bears all the indicia of a trade secret.  As discussed above (*supra* at pages 4-5), Ober knows how WorldQuant onboards, consumes and processes data for use in its quantamental investment strategy; which of WorldQuant's datasets are most profitable and which datasets are not profitable; the costs of purchasing datasets; the value of WorldQuant's confidential Alphas; WorldQuant's confidential, proprietary plans to further expand its business using datasets in strategic ways;  what information WorldQuant buys from its vendors; which vendors have the most promising information for data consumption; and what information the vendors offer for sale but do not actively promote.

Ober's knowledge of the datasets WorldQuant uses to produce its desired trading results is of critical importance in this case. DeAddio Aff. at ¶¶ 20-21.  The volume, selection and content of the datasets are key determinants of the quality of the strategy and of the investment results that it will produce, and thus essential points of competition among quantitative traders.

---

[3] The Defend Trade Secrets Act, 18 U.S.C. §1839(3), defines "Trade Secret" in pertinent part as: "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing."

*Id.* at ¶ 5.   Ober knows, among other things, which data points are gathered to make up the sets – a proprietary recipe of WorldQuant's own – the mathematical formulae and computer processes WorldQuant uses to digest the data, and perhaps most importantly, which data and which vendors have proven empirically to be profitable, and which have not – essentially, which ones reveal the correlation and noncorrelation among various assets and economic indicators that are the *sine qua non* of any algorithmic trading strategy. *Id.* at ¶¶ 16-19.   Knowing these correlations when others do not is the key to identifying the market inefficiencies that allow quantitative traders to buy relatively undervalued assets while they remain such, and thus generate investment return. *Id.* at ¶ 4-6.

The proprietary information known by Ober is in demand throughout the quantamental trading world, and is highly valuable.   If one investment manager  has the same datasets as another, they will buy and sell financial instruments in similar fashions and dilute the value of those investments. DeAddio Aff. at ¶ 6. These companies compete directly with every other investment manager that employs quantamental strategies throughout the world, seeking to keep their investment strategies current, cutting-edge, and secret, and to apply them on behalf of a limited pool of investors having the capital and the sophistication to use such strategies. *Id.* at ¶ 4, 6.  For obvious reasons, this sensitive information, which is vital to WorldQuant's success, is carefully safeguarded.  The information at issue is highly valuable to WorldQuant, and equally so to the companies with which WorldQuant competes.  WorldQuant has spent extraordinary resources to develop that information; indeed, WorldQuant's entire business strategy is built around it.

Moreover, WorldQuant's competitors cannot easily identify and utilize the information at issue from public sources.  This is presumably why Third Point is willing to pay in excess of

$2,000,000.00 for Ober's services – to gain access to his knowledge of the datasets and vendors that it otherwise would not have.  Without Ober's insider knowledge regarding which datasets are most profitable, a competitor (like Third Point) would have no way of leveraging WorldQuant's success for its own investment purposes absent its own substantial investment in dataset procurement and analysis.

It is beyond question that the information WorldQuant seeks to protect qualifies as a trade secret and should be afforded protection under New York and federal law.  *See Payment Alliance Int'l v. Ferreira,* 530 F. Supp. 2d 477, 479 (S.D.N.Y. 2007) (granting trade secrets protection where former employee possessed knowledge of new program, sales contracts and marketing strategies all of great importance to former employer's business and where competitor would benefit from knowledge); *Estee Lauder,* 430 F. Supp. 2d at 176 (affording protection to information regarding confidential brand strategies, confidential pipeline products, planned products innovations and stage of development of pipeline products); *Earthbound Corp. v. MiTek USA, Inc.*, No. C16-1150 RSM, 2016 WL 4418013, at *10 (W.D. Wash. Aug. 19, 2016) (affording trade secret protection to information regarding employer's current and prospective customers, pending projects, bids, pricing, product design, and other elements of its business under Washington's Uniform Trade Secrets Act and the U.S. Defend Trade Secrets Act);  *Henry Schein, Inc. v. Cook,* No. 16-CV-03166-JST, 2016 WL 3212457, at *1, *3, *5 (N.D. Cal. June 10, 2016) (affording trade secret protection to customer practice reports, equipment inventory report, price quotations for prospective customers, and equipment proposals under California's Trade Secrets Act and U.S. Defend Trade Secrets Act).

More to the point, WorldQuant's Trade Secrets are entitled to protection because Ober will disclose – indeed he *must* disclose – these Trade Secrets to Third Point in order for him to

perform his job as Chief Data Scientist for Third Point.  For example, when Ober is called upon to identify which vendors will supply the best data to support Third Point's top 40 U.S. holdings, Ober will have to use the knowledge he gained from his tenure at WorldQuant, because he will not have any other source of information to provide to Third Point.  There is no reasonable explanation for paying Ober $2,000,000.00 to perform his job – the same job that he performed at WorldQuant for significantly less money – unless he is offering Third Point a way to circumvent the incredible expense in manpower, knowledge and experience of procuring, analyzing and ultimately selecting datasets.  There is simply no other way for Ober to perform his job as Chief Data Scientist than to call upon his knowledge of the vendors and datasets that WorldQuant has spent an inordinate amount of time and money developing.  If Third Point had some other means to get this information, it would have already attained it.  And if Ober claims that he has some new information that he will be able to provide to Third Point, he had an obligation to provide that information to WorldQuant while he was employed there.[4]

Even if Ober has no intention of disseminating WorldQuant's Trade Secrets to his new employer, such a disclosure is inevitable.[5] *See Payment All. Int'l*, 530 F. Supp. 2d at 482.  Factors that guide a court in making the determination that disclosure of trade secrets is inevitable include: "(1) the extent to which the new employer is a direct competitor of the former employer; (2) whether the employee's new position is nearly identical to his old one, such that he could not reasonably be expected to fulfill his new job responsibilities without utilizing the trade secrets of

---

[4] Indeed, this is one of the primary reasons that the Court should grant WorldQuant's motion for a preliminary injunction – so that it has the benefit of the passage of time that will allow the current datasets of which Ober is intimately familiar to possibly become stale in a year.

[5] While it is true that in seeking a preliminary injunction, WorldQuant bears the burden of proving its case, it need not prove with specificity how Ober might use WorldQuant's Trade Secrets in his new job.  *See, e.g., Intl. Bus. Machines Corp. v. Visentin*, 31 IER Cases 1586 (SDNY Feb. 16, 2011), affd, 437 Fed Appx 53 (2d Cir 2011). WorldQuant need not demonstrate exactly how Ober might use such information at his new job, it merely must demonstrate that the nature of Ober's new job makes it "inevitable" that he will disclose WorldQuant's Trade Secrets.  *See Id.*

his former employer; (3) the extent to which the trade secrets at issue would be valuable to the new employer; and (4) the nature of the industry and its trade secrets." *Payment Alliance Int'l,* 530 F.Supp.2d at 482 (internal quotation marks and citations omitted); *EarthWeb, Inc. v. Schlack,* 71 F.Supp.2d 299, 310 (S.D.N.Y.1999). As WorldQuant has exhaustively demonstrated, all four of these criteria are easily satisfied.[6]

When combined with real, immediate business competition considerations, this type of inevitable disclosure constitutes irreparable harm and must be taken into account in an injunction calculus. *E.g.*, *Estee Lauder*, *supra*, 430 F. Supp. 2d at 174 ("where a trade secret has not yet been disclosed, irreparable harm may be found based upon a finding that trade secrets will inevitably be disclosed where … the movant competes directly with the prospective employer and the transient employee possesses highly confidential or technical knowledge concerning [ ] marketing strategies, or the like … [I]t would be very difficult to calculate the monetary damages that would successfully redress the loss, … given the difficulty in ascertaining empirically how much of a competitive advantage such information [the prospective employer]"); *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (irreparable harm may be established "where there is a danger that, unless enjoined, a misappropriator of trade secrets will disseminate those secrets to a wider audience or otherwise irreparably impair the value of those secrets").

Accordingly, WorldQuant will suffer irreparable harm absent an injunction.

---

[6] It should be noted that with respect to the so-called "inevitable disclosure doctrine," the existence of a noncompetition covenant is highly relevant. *See Innoviant Pharmacy, Inc. v. Morganstern,* 390 F.Supp.2d 179, 188–89 (N.D.N.Y.2005) ("In cases such as this, involving a person competing with his or her former employer, particularly when such activity is prohibited by a restrictive covenant or is facilitated by the misappropriation of trade secrets or customer information, courts have often taken a somewhat relaxed approach to the irreparable harm inquiry, and in certain circumstances have found it appropriate to presume the existence of such an injury").

III.   **WorldQuant Is Likely to Succeed on the Merits of its Claim for the Specific Performance of the Noncompetition Covenant.[7]**

New York law governs the noncompetition agreement at issue. See Exhibit D, § 3 of DeAddio Aff.  In New York, "properly scoped noncompetition agreements are enforceable to protect an employer's legitimate interests so long as they pose no undue hardship on the employee and do not militate against public policy." *International Business Machines Corp. v. Visentin*, No. 11 Civ. 399(LAP) 31 IER Cases 1586 (SDNY 2011), citing to *BDO Seidman v. Hirshberg*, 712 N.E.2d 1220, 1223 (N.Y.1999).   To determine whether a noncompetition agreement is specifically enforceable, New York courts have adopted the prevailing common law reasonableness standard. *BDO Seidman*, 712 N.E.2d at 1223; *see also Ticor Title Ins. Co.*, 173 F.3d at 70.  The New York Court of Appeals expounded the reasonableness standard as follows:

> The modern, prevailing common-law standard of reasonableness for employee agreements not to compete applies a three-pronged test. A restraint is reasonable only if it: (1) is no greater than is required for the protection of the legitimate interest of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public.

*BDO Seidman*, 712 N.E.2d at 1223. In applying this standard, "[c]ourts must weigh the need to protect the employer's legitimate business interests with the employee's concern regarding the possible loss of livelihood, a result strongly disfavored by public policy in New York." *Estee Lauder*, 430 F.Supp.2d at 177 (citation omitted). "A violation of any prong renders the covenant [not to compete] invalid." *BDO Seidman* 712 N.E.2d at 1223; s*ee also Ticor Title Ins.*, 173 F.3d at 69.  The Court must therefore evaluate each of the three prongs in order to determine whether

---

[7] For purposes of judicial economy, WorldQuant submits that it has already demonstrated a likelihood of success on the merits of its claims with respect to misappropriation of WorldQuant's Trade Secrets under both the Defend Trade Secrets Act, 18 U.S.C. § 1832, et seq., and under New York common law. *See* Section II pp 11 – 17.

WorldQuant has carried its burden to demonstrate that it has a likelihood of success on the merits.

1. **The Noncompetition Covenant Is No Greater Than Necessary to Protect WorldQuant's Legitimate Interest.**

The place to start in analyzing the enforcement of a noncompetition covenant is whether the agreement is no greater than required for the protection of WorldQuant's legitimate interests. In this case the restrictive covenant meets this test.

First, the covenant is limited to twelve months, and Ober will be paid his salary[8] for those twelve months. That is undoubtedly reasonable. Under New York law, "there are no per se lines demarcating what constitutes an unreasonable durational or geographic scope." *Estee Lauder Companies Inc. v. Batra*, 430 F. Supp. 2d 158, 179 (S.D.N.Y. 2006) quoting *Seidman*, 712 N.E.2d at 1220, 93 N.Y.2d at 390. The "durational reasonableness of a non-compete agreement is judged by the length of time for which the employer's confidential information will be competitively valuable." *Id.* As explained in the DeAddio Affidavit, the Trade Secrets and otherwise confidential information that Ober has in his possession are extensive, and the value of such information extends far beyond the twelve month duration of the Noncompetition Covenant. DeAddio Aff. at ¶¶ 16-20. For that reason, the twelve month duration of the Noncompetition Covenant is reasonable. *See Int'l Bus. Machines Corp. v. Papermaster*, No. 08-CV-9078, 2008 WL 4974508, at *11 (S.D.N.Y. Nov. 21, 2008) (finding one-year restriction in Noncompetition Covenant to be "very limited in time"); *Alside Dev. of Associated Materials Inc. v. Leclair,* 743 N.Y.S.2d 898, 898-99 (3d Dep't 2002) (two-year limitation on noncompete provision "temporally reasonable");  *see also Payment Alliance Intl,* 530 F. Supp. 2d at 485

---

[8] See discussion, infra at page 22 regarding court's favoring "Garden Leave" agreements.

(upholding 2-year restrictive covenant); *Battenkill Veterinary Equine P.C. v. Cangelosi,* 768 N.Y.S.2d 504, 505-06 (3d Dep't 2003) (upholding 3-year restrictive covenant).

The geographical restriction of the Noncompetition Covenant, which precludes Ober from working for a "Competitor" which includes "any entity worldwide" that, in relevant part, "engages in or employs, intends to engage in or employ or is preparing to engage in or employ Quantitative Trading or Investment Strategies" is reasonable as well.[9] DeAddio Aff. at ¶ 29. Ober acknowledged in the Employment Agreement that "the Company's business is international in scope[10] and therefore the geographic application of the noncompetition restrictive covenants is also international in scope." *See* Exhibit D, § C(1)(6) of Deaddio Aff. Moreover, it is well established that "[a]rea limitations are reasonable if restricted to the area in which the employee was engaged in the course of his or her employment." 17A C.J.S. Contract § 266.  Where warranted by the nature and scope of the employer's business, broad geographical limitations, even worldwide, have been deemed reasonable. *See Estee Lauder,* 430 F. Supp. 2d at 181 (upholding worldwide limitation); *Bus. Intelligence Servs. v. Hudson,* 580 F. Supp. 1068, 1073 (S.D.N.Y. 1984) (upholding worldwide limitation); *Int'l Bus. Machines Corp. v. Papermaster*, No. 08-CV-9078(KMK), 2008 WL 4974508, at *11 (S.D.N.Y. Nov. 21, 2008) (finding the nature of IBM's business "requires that the restriction be unlimited in geographic scope").[11]

---

[9] Under New York law, the issue of whether a noncompetition covenant is enforceable also depends upon "whether the covenant is reasonable in time and geographic area." *Ticor Title Ins.,* 173 F.3d at 69 citing *Reed, Roberts Assocs. v. Strauman,* 40 N.Y.2d 303, 307, 386 N.Y.S.2d 677, 353 N.E.2d 590 (1976).  "Assuming a covenant by an employee not to compete surmounts its first hurdle, that is, that it is reasonable in time and geographic scope, enforcement will be granted to the extent necessary (1) to prevent an employee's solicitation or disclosure of trade secrets…" *Ticor Title Ins.,* 173 F.3d at 70 citing *Purchasing Assocs. v. Weitz,* 13 N.Y.2d 267, 272–73, 246 N.Y.S.2d 600, 196 N.E.2d 245 (1963).

[10] There is no doubt that WorldQuant operates worldwide.  *See* DeAddio Aff. at ¶ 3; Footnote 1.

[11] If the Court finds that a worldwide restriction is overly broad, WorldQuant would not object to limiting the geographic restriction to New York and Connecticut.

The scope of the Noncompetition Covenant is likewise narrowly tailored in three ways. First, Ober's restrictions is limited to "Competitive Activity" which is narrowly defined as "setting up infrastructure and systems capable of use by a Competitor, and/or working for or consulting with a firm or individual(s) intended to establish a business that will be a Competitor." DeAddio Aff. at ¶ 29. This merely limits Ober to setting up data or working for a Competitor who engages in or intends to engage in quantamental investing strategies.

Second, the term "Competitor" only incudes a business that: "(i) engages in or employs, intends to engage in or employ or is preparing to engage in or employ Quantitative Trading or Investment Strategies." DeAddio Aff. at ¶ 29. And as the Employment Agreement specifies, "[f]or the avoidance of doubt, a business or person that uses quantitative models to trade shall be considered a Competitor irrespective of the products traded by such business or person." *Id.* This restriction therefore prohibits Ober from working for only one type of business for one year after his employment with WorldQuant ends: one that engages in or employs Quantitative Trading or Investment Strategies. All other financial institutions, insurance companies, etc. are fair game.

Third, the type of business must employ "Quantitative Trading or Investment Strategies" which by definition is extremely limited to "strategies or techniques which make trading and/or investing decisions primarily based upon computer-driven processes, and which are commonly categorized, known and/or referred to in the financial services industry as, among other things, 'statistical arbitrage', 'systematic trading', 'algorithmic trading', 'algo trading', 'computer-driven trading', 'technical trading', 'artificial intelligence-based trading', 'automated trading', 'black box trading', and/or 'high frequency trading.'" DeAddio Aff. at ¶ 29.

Thus, by its terms, the restrictions imposed by the Noncompetition Covenant are no greater than required for the protection of WorldQuant's legitimate interests:  it is limited to one year, and only applies to businesses that use "Quantitative Trading or Investment Strategies." There are literally thousands of businesses where Ober may ply his trade.

2.      **Whether the Agreement Imposes an Undue Hardship**

The balance struck in the Noncompetition Covenant between WorldQuant's interest in protecting its business strategies, profits, confidential information and trade secrets and Ober's right to pursue employment opportunities of his choosing is also reasonable. On the one hand, if Third Point is able to utilize Ober's unique knowledge of WorldQuant's vendors and datasets and quantamental strategies, as well as WorldQuant's Trade Secrets and other highly confidential information, this will cause WorldQuant incalculable damage and irreparable harm. On the other hand, if Ober is ordered to comply with the terms of the Noncompetition Covenant, Ober will suffer no discernable hardship.  Under the terms of the Noncompetition Covenant, Ober can work for any number of financial institutions without offending the terms of the agreement.  WorldQuant occupies just one small niche within the financial industry, and that leaves myriad options available to Ober.[12]

Even if Ober is unable – or unwilling – to find employment outside of the quantamental field, WorldQuant has offered to pay him his currently salary of $200,000.00 during the twelve month period that the Noncompetition Covenant is in force.  This "garden-leave" provision is favored in noncompetition agreements because the former employee is fully compensated while the former employer is able to ameliorate the harm that the employee's departure has caused and which would be exacerbated if the employee were to go to a competitor.  Still, not every

---

[12] For example, Ober's skills would be valuable to a technology company such as Google, and the Noncompetition Covenant would not impose any prohibition on his employment at such a company.

noncompetition agreement contains such a provision, and WorldQuant's agreement therefore goes far beyond what the law requires. *See Payment Alliance Int'l,* 530 F. Supp. 2d at 485 (rejecting employee's argument that noncompetition covenant was "unreasonable because it fails to provide for payment of [the employee's] salary during the two year non compete period"). More importantly, WorldQuant's offer rebuts any argument that Ober will suffer any financial hardship during the twelve months of the Noncompetition Covenant. *See Estee Lauder*, 430 F. Supp. at 182 (finding that risk of employee's loss of livelihood "entirely mitigated by the fact that Estee Lauder will continue to pay [the employee] his salary . . . for the duration of the 'sitting out' period"). After the expiration of the twelve month period, Ober can commence employment for any company he wishes to work for, Third Point included, provided that he respects his nondisclosure, nonsolicitation and other obligations under the law and the Employment Agreement.

### 3.     Public Policy Considerations

There is no discernable harm to the public if Ober is ordered to comply with the terms of the Noncompetition Covenant.  Ober's absence from the quantamental financial market for a period of twelve months will not affect the public's access to financial investors or companies that engage in fundamental or quantitative investing.  Nor will enforcing the Noncompetition Covenant create a monopoly in those business arenas or have any antitrust implications.  These factors weigh against a conclusion that enforcement of the Noncompetition Covenant would cause injury to the public.  *See BDO Seidman*, 93 N.Y.2d 382, 393–94; Restatement (Second) of Contracts § 188, comment c (1981).  The public's interest in the free flow of capital is simply not impacted by one employee's absence from (one small segment of) the workforce in the limited field of quantamental investing.

On the other hand, enforcement of the Noncompetition Covenant is needed because there is a real danger that WorldQuant's business strategies, Trade Secrets and confidential information will be exposed to a competitor.  Under these circumstances, the Noncompetition Covenant falls well within prevailing notions of reasonableness and is no more restrictive than is necessary to protect WorldQuant's legitimate business interests.   Defendant's prospective employment with Third Point presents a real competitive threat that is properly barred by the Noncompetition Covenant for a period of twelve months.  Accordingly, WorldQuant is likely to succeed on the merits and is entitled to a preliminary injunction.

### III. Alternatively, WorldQuant Has Raised Sufficiently Serious Questions Going to the Merits, and the Balance of Hardships Decidedly Tips in WorldQuant's Favor.

As set forth above, WorldQuant has demonstrated that it is entitled to a preliminarily injunction enjoining Ober from violating the terms of the Noncompetition and Nondisclosure Covenants because (1) breach thereof will cause WorldQuant irreparable harm; (2) disclosure of WorldQuant's Trade Secrets will cause WorldQuant irreparable harm; and (3) WorldQuant is likely to prevail on the merits of its claims for specific performance and misappropriation of its Trade Secrets under state and federal law.

Even if the Court were not satisfied that WorldQuant is likely to prevail on the merits, WorldQuant has, at a minimum, raised sufficiently serious questions going to the merits of the dispute.  Because there is no question that the balance of the hardships tips decidedly in WorldQuant's favor (*see supra* at pages 21 - 22), preliminary injunctive relief is appropriate. *See Estee Lauder*, 430 F. Supp. 2d at 182.

**Conclusion**

For the reasons set forth above, WorldQuant respectfully requests that the Court issue a preliminary injunction enforcing the Noncompetition Covenant.

Plaintiff, WorldQuant, LLC

By:  */s/ James T. Shearin*
James T. Shearin (SDNY no. js9365)
Joshua A. Hawks-Ladds
Martha M. Royston
Pullman & Comley, LLC
90 State House Square
Hartford, CT  06103
(860) 424-4300
Its Attorneys