GCEAWOR1ps

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   WORLDQUANT, LLC,

4                    Plaintiff,

5            v.                          16 Civ. 9298 (DAB)

6   MATTHEW OBER,

7                    Defendant.

8   ------------------------------x

9                                       New York, N.Y.
                                        December 14, 2016
10                                      10:05 a.m.

11

12  Before:

                        HON. DEBORAH A. BATTS,
13
                                        District Judge
14

15                        APPEARANCES

16  PULLMAN & COMLEY, LLC
         Attorneys for plaintiff
17  BY:  JOSHUA A. HAWKS-LADDS, Esq.
         JAMES T. SHEARIN, Esq.
18
    SUSMAN GODFREY, LLP (NYC)
19       Attorneys for defendant
    BY:  JACOB W. BUCHDAHL, Esq.
20       LUCAS ESTLUND ISSACHAROFF, Esq.

21
    Also Present:  Jeffrey Blomberg
22                 WorldQuant, LLC

23

24

25

GCEAWOR1ps

```
 1                (Hearing resumed; in open court)

 2                THE COURT:  WorldQuant v. Matthew Ober.  Plaintiffs

 3    ready?

 4                MR. HAWKS-LADDS:  Yes, your Honor.

 5                THE COURT:  We have Mr. Hawks-Ladds, Mr. Ronan.

 6                MR. SHEARIN:  Good morning, your Honor.  Mr. Ronan

 7    can't be here today.  My name is James Shearin, and I have an

 8    appearance in the file.  Thank you.

 9                THE COURT:  You look like you shouldn't be here

10    either.

11                MR. SHEARIN:  I've been told that, your Honor.  Thank

12    you.

13                THE COURT:  Welcome.

14                And Mr. Blomberg.

15                MR. BLOMBERG:  Yes, Blomberg.

16                THE COURT:  And on behalf of the defendants we have

17    Mr. Buchdahl, Mr. Issacharoff.  Good morning.

18                MR. BUCHDAHL:  Good morning, your Honor.

19                THE COURT:  All right.  Now, I understand from very

20    reliable sources -- Mr. Delaney -- that there have been

21    additional exhibits added?

22                MR. HAWKS-LADDS:  Yes, four new exhibits from the

23    plaintiff, your Honor.

24                THE COURT:  And what are their numbers?

25                MR. HAWKS-LADDS:  They are 17, 18, 19, and 20.
```

GCEAWOR1ps

1              THE COURT:  And you're moving them into evidence.

2              MR. HAWKS-LADDS:  Yes.

3              THE COURT:  All right.  Received.

4              (Plaintiff's Exhibits 17, 18, 19, and 20 received in

5    evidence)

6              THE COURT:  Any new from the defendant?

7              MR. BUCHDAHL:  Your Honor, we may have some new

8    exhibits depending on what we need to do on cross, but I don't

9    have any that I need to move in now.

10             THE COURT:  All right.  Fine.

11             Are we ready for the witness?

12             MR. HAWKS-LADDS:  Yes, your Honor.

13             Plaintiff re-calls Michael DeAddio.

14    MICHAEL DeADDIO, Resumed.

15             THE COURT:  Let me remind you that you are still under

16   oath.  Please be seated.

17   DIRECT EXAMINATION (Cont'd)

18   GCEAWOR1ps                    DeAddio - direct

19   BY MR. HAWKS-LADDS:

20   Q.  Mr. DeAddio, do you have the exhibit books in front of you?

21   A.  No, I don't.

22             MR. HAWKS-LADDS:  May I approach?

23             THE COURT:  Certainly.

24             MR. HAWKS-LADDS:  Were you using a set?

25             THE LAW CLERK:  Yes.  I don't know what -- I think you

GCEAWOR1ps

```
1   all took the binders.

2              MR. HAWKS-LADDS:  OK.  Your Honor, I just have to

3   remove some sticky notes so that the witness doesn't see them.

4              (Pause)

5              MR. HAWKS-LADDS:  These are not punched.  Just put

6   them in the back.

7   Q.  All right.  Good morning, Mr. DeAddio.

8              (Pause)

9              THE COURT:  You could respond.

10  A.  Good morning.

11  Q.  When we left off on Monday, we had begun discussing the

12  confidentiality of certain information.  Do you recall --

13  A.  Yes.

14  Q.  -- where we left off?

15  A.  Yes.

16  Q.  Let's continue where we left off on Monday, and the

17  question is:  What types of information did Mr. Ober possess

18  that WorldQuant considers confidential?

19  A.   Certainly.  So the vendors that we use for data, in terms

20  of those that we have reviewed and decided not to pursue, those

21  we have trialed and then decided not to pursue, those that we

22  have trialed and then struck agreements with to actually

23  on-board and use their data, and also those that we use and how

24  much money we allocate or attribute, how much profit we

25  attribute to each of the vendors.
```

1   Q.   OK.   And what other type of information does Mr. Ober

2   possess that WorldQuant would consider to be confidential?

3   A.   So the knowledge of our process, the process broadly

4   speaking goes in four big steps.   The first is identifying

5   vendors, if you think of the vendors as a phone book with

6   thousands of people in there, finding the ones that we might

7   find interesting.   That's the first step.   The second step is

8   using initial assessment criteria to decide if it's worth

9   pursuing these vendors, to try and trial them.   There are way

10  too many out there for us to trial every single one.   So the

11  initial assessment step and what we consider the criteria is

12  proprietary and confidential.

13          The third step, then, is negotiating with the vendors

14  for a trial.   We try to minimize the costs there, free if we

15  can get it.   And then bringing the data on-board and running it

16  through our internal assessment criteria, which is quite

17  proprietary, probably one of our most proprietary parts, to

18  identify which ones we should really both purchase and spend

19  the money -- and it's not an immaterial amount of money -- and

20  also, more importantly, the resources, because it can take

21  months and in some cases years to on-board and fully analyze

22  the data sets for the ideas it can bring.

23          The last part is then the contract, structuring the

24  contract, paying for it, settling on the price, that is.   And

25  then also the compliance aspects of whether or not we could use

GCEAWOR1ps

1    the data safely and make sure that it doesn't contain any

2    information that we're not supposed to use based on SEC and

3    other regulatory guidelines, such as personal private

4    information, material nonpublic information, quote, insider

5    information.

6    Q.   And these three things that you identified -- the vendor

7    information, the data information, and the process -- Mr. Ober

8    had knowledge of all of this?

9    A.   Mr. Ober had knowledge of it.  And to a great extent,

10   Mr. Ober was the author and the creator of much of this.

11   Q.   Take a look --

12           THE COURT:  What do you mean by "author and creator"?

13           THE WITNESS:  When Mr. Ober joined, four-plus years

14   ago, we had much left of this process.  He joined to build this

15   process, to define the process, to streamline it.  Back then we

16   probably were able to trial a couple of dozen of data sets a

17   year.  Now we can trial hundreds.

18           THE COURT:  You can trial?

19           THE WITNESS:  We can bring them on, try them out,

20   analyze them, and see if we want to buy them.

21           THE COURT:  OK.

22           THE WITNESS:  Trial them, yes.

23           So his goal when he came on was -- and he was quite

24   successful in doing so -- defining the process by which we can

25   streamline this and scale it.

GCEAWOR1ps

1   Q.   One of the new exhibits that is in front of you is no. 18.

2   Can you get that.

3            MR. HAWKS-LADDS:   I'm sorry.   Let me first tell

4   counsel which ones are which.

5            The one of September 30, that's 18.   The smaller, with

6   the picture on it, 17.   19 as well.

7   Q.   All right.   Mr. DeAddio, do you have Exhibit 18 in front of

8   you?

9   A.   Yes, I do.

10   Q.   Please identify this exhibit for the Court.

11   A.   This is an e-mail from Mr. Ober in September of 2015.

12            MR. BUCHDAHL:   Your Honor, we understand this exhibit

13   is going to be received in evidence.   I do want --

14            THE COURT:   It has been.

15            MR. BUCHDAHL:   Yes.   No, I understand, and I'm not

16   objecting to its receipt in evidence.   I do object, however, to

17   the fact that this was not produced to us before Mr. Ober

18   testified.   This is an e-mail from Mr. Ober.   This is not an

19   e-mail that this witness was even copied on.   And it is being

20   introduced into evidence.   So my objection is not -- is just

21   foundational and has to do with whether we have a competent

22   witness here.

23            We could have shown this to Mr. Ober on Monday.   He

24   could have told you what he was saying, what he meant by it.

25   Instead, I'm handed this for the first time on Wednesday.

GCEAWOR1ps

```
1    Mr. Ober is on vacation.  He's out of the state.  And we have a
2    witness who is being asked about a document he did not author
3    and he did not receive.  This is not a business record.  And I
4    know the hearsay rules don't apply here.  But I just want to
5    state at the outset that we do not have the right witness here.
6    And this was not given to us in time to even be able to show
7    Mr. Ober and ask him about.  And so I just offer that objection
8    to, kind of, the procedures here, even understanding the Court
9    has every right to receive this exhibit.
10             THE COURT:  OK.  But --
11             MR. HAWKS-LADDS:  Your Honor -- may I respond?
12             THE COURT:  Please.
13             MR. HAWKS-LADDS:  First, Mr. Ober is the author.  And
14   this was reviewed by Mr. DeAddio, his boss.
15             THE COURT:  No, no, no.  Mr. Ober was on the stand on
16   Monday.
17             MR. HAWKS-LADDS:  We didn't have this.  We just got it
18   yesterday.
19             THE COURT:  Where did you get it from?
20             MR. HAWKS-LADDS:  After Mr. Ober testified on Monday
21   in a way that surprised us, we went back to look for evidence
22   that would refute the things that he said on the stand,
23   including when he said, oh, it's just downloading and uploading
24   numbers and the on-boarding is just looking at numbers.  So
25   yesterday I asked my client to look through WorldQuant to see
```

GCEAWOR1ps

1    whether Mr. Ober, who was the head of strategy, said anything

2    that it's more than just uploading and on-boarding numbers.

3    And they found this document, in which Mr. Ober described the

4    entire process, in detail, of what Mr. DeAddio just discussed,

5    in detail.  This is authored by him.  It's a business record.

6    It's clearly a business record.  It's kept in the regular

7    course of business.  And it's used.  And this is an admission

8    by Mr. Ober.  As your Honor said on Monday, a party admission

9    is admissible.  So it's an admission.

10            MR. BUCHDAHL:  Again --

11            THE COURT:  It's being improperly used here.  If you

12    wish, Mr. Buchdahl, you can re-call next week Mr. Ober, if you

13    wish to do that.  Because quite frankly, Mr. DeAddio is not the

14    best source for explaining this.  If you are offering it, I

15    don't want him to explain it.  The document will speak for

16    itself.

17            MR. BUCHDAHL:  That's all, your Honor.  That's exactly

18    what we're asking for.  We don't have a problem with counsel

19    using this to argue that it undermines Mr. Ober's testimony.

20    That's all fair.  But asking a witness who was neither copied

21    nor authored it, I think, to comment on it is not appropriate.

22    So counsel can use this for argument; just I don't think he

23    should question this witness about it.

24            THE COURT:  So I have ruled.

25    BY MR. HAWKS-LADDS:

GCEAWOR1ps

1    Q.   Put that document aside, then, Exhibit 18.   And let me ask

2    you, from your own personal knowledge, is the process of data

3    procurement and the other items you just mentioned simply

4    uploading and on-boarding numbers?

5    A.   The process is extremely detailed and extremely arduous.

6    It's an expensive process both manpower- and dollar-wise.   It's

7    an expensive process legally.   It's an expensive process

8    compliance-wise.   It has many steps: just gathering the data,

9    getting into a format that can be reviewed, understanding if

10   the data has point-in-time accuracy, understanding the quality

11   of the data.   There are many, many steps to this process.   And

12   myself and others in our firm are very involved in this

13   process.

14   Q.   What was Mr. Ober's involvement in the process?

15   A.   Mr. Ober's involvement in the process was to identify,

16   negotiate with, initially assess, bring to us and the process

17   those vendors that he wanted to propose for trial, run them

18   through the compliance process and get approval from compliance

19   in the gray areas, and then to negotiate with the vendor based

20   on our analysis as to pricing, and then to continually assess

21   vendors based on their profitability versus their cost on an

22   ongoing basis.

23   Q.   What aspects of the process that you just summarized for

24   Judge Batts is proprietary and confidential?

25   A.   As I said earlier, the aspects that are very proprietary,

GCEAWOR1ps

 1    the ones I would focus on, are the assessment process initially

 2    and the decision to make us decide to trial them, to bring them

 3    on-board, because that's when resources start to be spent, and

 4    then the assessment process on how we actually assess the data

 5    we bring on-board to trial before we decide to purchase it and

 6    use it for our full analysis process to try and find the ideas

 7    inside of it.

 8    Q.   And Mr. Ober had full knowledge of the proprietary process

 9    that you just described?

10    A.   Mr. Ober had full knowledge of it.  He would not have

11    knowledge of every single little test that was run in terms of

12    detailed knowledge of every test in terms of the actual

13    underlying algorithms of every one.  But he saw every single

14    output of every single test, which helped him decide, in the

15    process, whether or not we should buy the data that we trialed.

16    Q.   Take a look --

17    A.   He had full discretion to propose which ones we bought and

18    which ones we didn't.

19              THE COURT:  Did anybody have any ability to contest

20    what he suggested?

21              THE WITNESS:  Certainly.  We would have conversations

22    regularly on, especially on price of the data, if we found it

23    to be valuable in the assessment process, the second-stage

24    assessment process, we would have regular debates on at what

25    price is the right price and at what price is too expensive for

GCEAWOR1ps

1    what we think we can get out of the data.  But after we bought

2    it, there was still a many-month/year process to really realize

3    the value of the data, and sometimes we bought data and it

4    turned out not to be valuable.  So it's an art, not a science.

5        THE COURT:  What role did he play in, after you bought

6    it, the many-month process to realize its value?

7        THE WITNESS:  After we bought it, the process of the

8    many months was turned over to our own data scientists and

9    analysts, our researchers.  So he played much more of a guiding

10   process, a guiding role in that.

11       THE COURT:  How did he guide?

12       THE WITNESS:  He guided in terms of his knowledge of

13   the data and what each field meant, and also as a bridge

14   between our researchers and the data vendors, the company

15   themselves, for questions, issues with the data, what have you.

16   We did not expose our researchers to interact with the company

17   directly, because it would just --

18       THE COURT:  You mean the vendors.

19       THE WITNESS:  The vendors, that's right.  We would

20   have Matt and that team in the middle, the IT team, to make

21   sure we didn't overwhelm them with too many people asking too

22   many questions, so we sent him.  And then he would review the

23   profitability of the data versus cost on a regular basis.

24   Q.  Mr. DeAddio, take a look at what's been entered into

25   evidence as Exhibit 17.

GCEAWOR1ps

1           MR. BUCHDAHL:  Your Honor, we have the same objection

2     to the use of this document with this witness, who is neither a

3     recipient nor an author of this document, as opposed to

4     Mr. Ober.

5           MR. HAWKS-LADDS:  Your Honor, Monday, defendant's

6     counsel used Third Point's general counsel to describe and talk

7     about an exhibit that we received Monday morning, never seen

8     before, that was drafted by Sheetal Sharma of Third Point.  And

9     both witnesses testified extensively regarding that exhibit.

10    So we received it that morning.  And it's true we gave these

11    exhibits to counsel this morning, that I received yesterday,

12    last night actually.  So I'm just pointing that out.  I

13    understand they're in evidence.  I understand they're

14    reviewing.

15          THE COURT:  Mr. Sharma is not a witness here.

16    Mr. Ober was.

17          MR. HAWKS-LADDS:  I'm sorry.  I didn't hear you.

18          THE COURT:  The individual from Third Point that

19    you're talking about who created documents that were examined

20    by general counsel and Mr. Ober, the creator was not a witness

21    here.  Mr. Ober was a witness here.

22          MR. HAWKS-LADDS:  Yes, your Honor.  Right.

23          THE COURT:  That's the distinction that I see.

24          MR. HAWKS-LADDS:  OK.  All right.  All right.  Well, I

25    made my point.  I have the same response, so whatever your

GCEAWOR1ps

1    Honor decides, obviously.

2         THE COURT:  There were four new exhibits.  What about

3    the other two?

4         MR. HAWKS-LADDS:  The other two were created by this

5    witness.

6         THE COURT:  Oh, good.  Let's get to those.

7         MR. HAWKS-LADDS:  OK.  And, your Honor, I'm going to

8    deal with those later.  I'm only on this --

9         THE COURT:  OK.  I don't want to tell you how to do

10   your examination.  But I just don't want to spend any more time

11   on documents that this witness has no personal knowledge of.

12        MR. HAWKS-LADDS:  OK.  Very well, your Honor.

13        MR. BUCHDAHL:  For completeness, for the record, the

14   presentation that we put in through Mr. Targoff, Mr. Targoff

15   testified that he received it from Mr. Sharma, that he reviewed

16   it with Mr. Sharma, that he used it in kind of helping to

17   decide who to hire at Third Point, is not the same as someone

18   who is not a recipient of the document, just for clarification.

19        MR. HAWKS-LADDS:  I can inquire of Mr. DeAddio whether

20   these are similar circumstances, as a voir dire.

21        THE COURT:  Even if they are similar circumstances,

22   again, I had the ability to have the witness who created it

23   answer questions, and I do not have that now.

24        MR. HAWKS-LADDS:  With Exhibit A, your Honor, that was

25   someone who was not ever called as a witness.  That was

GCEAWOR1ps

1    Mr. Sharma.  You're right with Exhibit D --

2              THE COURT:  That's what I'm saying.

3              MR. HAWKS-LADDS:  OK.  I'll move on.

4    BY MR. HAWKS-LADDS:

5    Q.  To your knowledge, did Mr. Ober know that the process you

6    just described was confidential and proprietary to WorldQuant?

7    A.  Mr. Ober was fully aware of the confidentiality and

8    proprietary nature of the process that he helped define, why it

9    made WorldQuant very competitive, why it had made us leading

10   edge in this.  He was -- we discussed it regularly.  We

11   discussed it when he would sit on panels, as to what was

12   appropriate to talk about and what wasn't.  He was fully versed

13   by legal, by compliance, and by ourselves in terms of what was

14   able to be shared and what wasn't, on a very regular basis.

15   Q.  OK.  Now, because the confidentiality of the information is

16   very important for the judge to know about, you mentioned in a

17   listing format of how the vendor information -- or what vendor

18   information, rather, is confidential.  One of the things you

19   mentioned was that certain vendor information is valuable.  Can

20   you explain what vendor information is valuable and

21   confidential and proprietary, to WorldQuant.

22   A.  Sure.  So, as I said earlier, the fact that the -- I think

23   I recall the exhibit from before where Mr. Ober had outlined a

24   whole bunch of vendors that he had experience with.

25   Q.  That's Exhibit D, I believe.

GCEAWOR1ps

1    A.   Right.   40 of the 41 vendors that he noted in the e-mail he

2    sent when he was interviewing are vendors we have, either we

3    have reviewed, trialed, or -- and/or used.

4    Q.   Can you get out Exhibit D, so that I can follow along.

5    A.   Certainly.

6    Q.   And the judge, more importantly, the judge.

7    A.   So on page 2 of Exhibit D, in response to question no. 1,

8    Mr. Ober lists 41 data vendors, all of which are, no doubt,

9    public, publicly known to sell data; that is correct.   However,

10   there are thousands of data vendors in the world, thousands.

11   Of these 41, 40 have been formally reviewed and/or trialed

12   and/or currently in production and being used by WorldQuant.

13   That is very hard to see being a coincidence.   The fact that we

14   have formally reviewed these, trialed them and/or used them is

15   filtering the world down to a small set where our assessment

16   process, which is very proprietary, both stages, have vetted

17   and already reviewed this small number of data providers out of

18   a very large phone book of possibilities.

19   Q.   So on Exhibit D, the attachment to the e-mail, which has

20   the list of those vendors, out of all of those vendors listed,

21   WorldQuant has reviewed and trialed 40 out of 41.

22   A.   We have reviewed 40 out of 41.   We have trialed fewer.   And

23   we have less than that in production.   But we have formally

24   reviewed, in the first stage of our assessment process, 40 of

25   the 41.

GCEAWOR1ps

1   Q.  So if there are thousands of possible vendors in the world

2   and these names --

3           THE COURT:  Can I just ask --

4           MR. HAWKS-LADDS:  Sure.

5           THE COURT:  Do you know of these vendors whether there

6   is only one data set that they sell?

7           THE WITNESS:  Some.  I don't know of every one

8   personally.  Some of I know, such as ███████, have multiple

9   data sets.  They are very well known and they have many.  Some

10  have single data sets.  Some are in between.  Right.  So

11  ███████, no doubt would have that.

12          THE COURT:  Do you know who on this list have single

13  data sets?

14          THE WITNESS:  That, your Honor, I could not tell you

15  offhand, but more than one.  ███████ has a data set.  I know

16  of that one because they're a portfolio company.  And some of

17  the other ones -- depends how you define it, but there are more

18  than one that have a single data set and more than one that

19  have multiple.

20          THE COURT:  Thank you.

21  Q.  So why is the vendor information confidential and valuable

22  to WorldQuant?

23  A.  The value is, as I said earlier, in the assessment process,

24  the fact that we have culled the universe of thousands of data

25  providers down to a small set that we deemed acceptable to even

GCEAWOR1ps

1   trial is very valuable information because that is the output

2   of a many-person team over many man-years of effort.

3   Q.  And, again, this was Mr. Ober's job to cull the thousands

4   of vendors, potential vendors, to this small set.

5   A.  That was his job, absolutely.

6   Q.  You said it took years to process this information from the

7   macro thousands of vendors to the limited set that you will

8   trial and review?

9        MR. BUCHDAHL:  I'm going to object to the leading,

10  your Honor.

11       THE COURT:  Yes, that's a good one.  Sustained.  Don't

12  answer it.  Ask him.  He is on direct examination.  I'm hoping

13  and understand that he knows his stuff.

14  Q.  How long does it take to process this vendor information

15  you just described?

16  A.  Certainly.  So at the first stage, it can take anywhere

17  from weeks to months to get to the OK by compliance and legal

18  to trial a data set, to even bring it on to test it for the

19  first assessment stage.  That can be quick sometimes.  It can

20  be complicated sometimes, usually because of compliance

21  concerns with what's inside the data.

22       Once we trial it, that's as many as several more

23  months.  Again, it varies because if the data itself is easy to

24  digest, the columns and the headings and it's just dates and

25  numbers and times and it's directly linked back to a stock

GCEAWOR1ps

1    ticker or a name of a company, then it can be shorter.  If it's

2    unstructured data, then it can take longer.

3           And then the final step, when we actually decide we

4    want to purchase the data and really analyze it with our

5    analysts broadly and deeply, we've had data sets that have

6    taken up to two years to do so, such as some of our news data

7    sets.  It's a very long process, months to years.

8    Q.  What is the cost of the process that you just described?

9    A.  So the cost starts with time spent, obviously.  The big

10   costs start to become evident when we trial a data set.  We

11   engage software developers to bring the data on and make it

12   into a format that we can actually test it.  Then we engage

13   initial analysts, researchers, who are tasked with the initial

14   assessment phase to run it through all of our internal tests to

15   say, is this worth buying, and if so, how valuable do we think

16   it is.

17          That, then, if we decide to buy it, the real cost

18   comes in, because we obviously then purchase the data sets.

19   The payment to the vendors themselves can be anywhere from tens

20   of thousands to hundreds of thousands to even millions of

21   dollars.  And then the time spent by our researchers, which can

22   be man-years on a data sets, man-months to man-years, really

23   begins.  So this cost for some data sets is easily in the tens

24   of thousands to millions of dollars, depending on the depth and

25   the complexity of the data set.

GCEAWOR1ps

Q.  When WorldQuant contracts with a vendor to buy from it the

data sets, does it have any security or secrecy protocols that

it includes in that contract or in that process?

A.  I can't speak for every one of our contracts, but I would

say that certainly our contracts that are within the last

several years all have provisions where vendors are not allowed

to, without our permission, note that we are a client.  We must

give our permission to do so.

Q.  Why?

A.  Because it's proprietary which data sets we use and which

ones we contract for.  We don't want our vendors using our name

in any way to market their product.

Q.  Well, how could WorldQuant be hurt if that information was

publicized?

A.  I would call this the fast-follower effect.  If every

vendor we bought was in mid -- initially or immediately put on

our website that WorldQuant then bought it, that would then be

an indicator to the rest of the market that they should go buy

it too, if you consider us successful in what we do.

Q.  Other than provisions that WorldQuant puts in its vendor

contracts, what other steps does WorldQuant take to protect the

secrecy of its confidential and/or proprietary information?

A.  Certainly.  So very few people at WorldQuant have access to

the overall list of vendors that we use.  It's limited to our

executive committee.  It's limited to our global research

GCEAWOR1ps

1    directors, of which there are a handful.  And then it's limited

2    to the developers, the software developers, who must have

3    access to all the data sets to be able to operate on them and

4    run the process.  Everyone else, our researchers, our

5    portfolios managers, the rest of WorldQuant only has access to

6    the data sets that they are assigned to do research on or work

7    on, or that they must operate on for some other reason.

8    Q.  Turn to Exhibit 1 in the plaintiff's exhibit book.  Do you

9    know what this document is?

10   A.  This is Matt's initial employment agreement, Matt Ober,

11   Mr. Ober's initial employment agreement.

12   Q.  And is there anything contained within that agreement that

13   serves to protect WorldQuant's confidential or proprietary

14   information?

15   A.  There are confidentiality clauses in here and other

16   restrictive covenants to that effect.

17   Q.  Turn to page 5 of Exhibit 1.

18   A.  Yes.

19   Q.  Do you see that on page 5 of Exhibit 1 there is a section

20   entitled "Confidential Information"?

21   A.  Yes.

22   Q.  Is that what you just described to the Court?

23   A.  Yes, it is.

24          MR. HAWKS-LADDS:  Your Honor, this is in evidence.  So

25   I won't have the witness publish it, but it's clear here that

GCEAWOR1ps

1    there is a robust confidential-information provision on pages 5

2    into 6 of Mr. Ober's employment agreement.

3    Q.   Does WorldQuant take any other steps to protect the secrecy

4    of its confidential and proprietary information?

5    A.   We take, on a regular basis, we remind people in our

6    compliance review process that this is -- that they are under

7    these confidential-information restrictions, and we do it as

8    well with anybody who speaks publicly on panels or in any other

9    way.  It's a regular reminder before each one of these, which

10   Mr. Ober has spoken on many, and who was very well trained from

11   compliance and our own legal.

12   Q.   So you have training on this as well.

13   A.   We have training on this, and Mr. Ober was one of the most

14   trained people at the firm.

15   Q.   Turn to Exhibit 7.  Do you recognize that document?

16   A.   Yes.  This is our -- the WorldQuant employee handbook.

17   Q.   Turn to page 33 of that handbook.

18   A.   Yes.

19   Q.   What's on the bottom of that page?

20   A.   Confidentiality clause in our handbook.

21   Q.   So is this another method that WorldQuant uses to let

22   employees know what it deems to be confidential?

23   A.   Yes, it is.  And this would be the part that we remind

24   people when they speak publicly about specifically.

25            MR. HAWKS-LADDS:  Your Honor, again, each of the

1    handbooks are in evidence.  I'm not going to go through each of

2    them with this witness unless you want me to.  And Mr. Ober --

3         THE COURT:  No, no, no.  You seem to shift the burden

4    to me.  Are you suggesting that you expect me to read every

5    page of every exhibit that you have put in here, before I make

6    a ruling, because, quite frankly, I'm going to throw out stuff

7    that hasn't been referred to.  What is the purpose of me

8    reading three 30-page documents?

9         MR. HAWKS-LADDS:  Your Honor, I do not want you to

10   read three 30-page documents, only the confidentiality

11   provisions at pages 33 through 36 of the handbooks that

12   Mr. Ober testified to on cross-examination.  I was just going

13   to say, Mr. Ober already testified on Monday that he was

14   familiar with this policy and each of the handbooks, and in

15   evidence are the acknowledgment forms that he signed, that he

16   admitted he signed, and he admitted that he had read these

17   policies and was familiar with them and understood them.  I was

18   only pointing that out to the Court.  But I will point out each

19   one for you, your Honor.  So Exhibit 7, the policy is on page

20   33 through 36.  And then the rest of the handbook can be

21   ignored by the Court.  I'm only offering the handbook for that

22   one policy.

23         THE COURT:  What about the other policy?

24         MR. HAWKS-LADDS:  The other policy, your Honor, is in

25   Exhibit 8.  And that is on page 34 through 37.  And, again,

GCEAWOR1ps

1    this was already discussed with Mr. Ober, and it's in evidence.

2    The rest of the handbook can be ignored.  I'm only offering the

3    handbook for the confidentiality provision, to demonstrate that

4    WorldQuant maintained and protected the secrecy of its

5    confidential information through these methods.  And I'll move

6    on.

7            THE COURT:  Thank you.

8            MR. HAWKS-LADDS:  I would just also point out that

9    there is another handbook on Exhibit 9, which is the most

10   recent handbook.  And that, the only policy I'd like the Court

11   to be aware of is, again, the confidentiality and policy that's

12   on page 33, and it goes through 37 again.

13           And, your Honor, as we went over on Monday, Mr. Ober's

14   acknowledgment that he signed of those, there are two of them,

15   that's Exhibit 10 and Exhibit 11.

16           THE COURT:  Thank you.

17           MR. HAWKS-LADDS:  You're welcome.

18   BY MR. HAWKS-LADDS:

19   Q.  What process does WorldQuant use to determine the price of

20   the data sets that it purchases?

21   A.  So, as I said earlier, after we run our assessment, initial

22   assessment on the trial data -- we've brought it in, we've made

23   it in a form that can be pulled in by our initial assessment

24   team, we've run those assessments, and they give us essentially

25   a scorecard of how valuable we think this data is, how

GCEAWOR1ps

1    predictive can it be, across what set of stocks, in what

2    region, how good are the predictions.  Now, it's an initial

3    assessment.  So it gives us a set of information to work with.

4    And then also and how correlated this would be to our other

5    data sets, does it add value over all.  And there's a

6    discussion, there's much discretion applied, from a human

7    perspective, many discussions around at what price would we be

8    willing, at what maximum price would we be willing to buy this

9    data and bring it on-board and really try and use it.  And we

10   go with a maximum price because there is a negotiation to be

11   had with the vendor and one needs to know the maximum price

12   before you engage.

13             THE COURT:  Can I just ask on that point --

14             THE WITNESS:  Certainly.

15             THE COURT:  Does the vendor, when it turns the data

16   set over to you initially, give you a ballpark figure of how

17   much they're going to charge, or are you the one that comes up

18   with the figure of how much you're going to pay?

19             THE WITNESS:  It varies, your Honor.  Most vendors, I

20   would say, have a list price for the data, sort of like a list

21   price for the car.  It tends to usually be way -- well in

22   excess of what we actually pay for it.  It's very negotiable.

23   And we negotiate very frequently off that list price.  So the

24   list price is a guidepost.  I would say it's rare that,

25   certainly, we pay it.

GCEAWOR1ps

1          THE COURT:  Thank you.

2  Q.  Is the price in a WorldQuant pays confidential and

3  proprietary?

4  A.  The price is very confidential, especially because the

5  vendors themselves, in some cases, don't want other clients to

6  know what we pay, because we do get discounts.

7          THE COURT:  But is it confidential to you?

8          THE WITNESS:  It's confidential internally as well.

9  It's under the same provisions that only the handful of people

10 can see it.  The vast majority of the firm has very little idea

11 of what we pay for data.

12 Q.  Now I want to return to Exhibit D, the attachment to

13 Mr. Ober's e-mail.  Let me know when you have that in front of

14 you.

15 A.  Yes.

16 Q.  This listing here that Mr. Ober provided to Third Point has

17 names of vendors and then data sets.  Right?

18 A.  The types of data sets.

19 Q.  Types of data sets.  Is there any value to making the data

20 sets more user friendly in this fashion?

21 A.  There's a lot of --

22          MR. BUCHDAHL:  Objection, your Honor.

23          THE COURT:  Yes.  I'm not sure I understand what the

24 question is.

25 Q.  Is there any value to the data sets being listed in the way

GCEAWOR1ps

```
 1   that Mr. Ober listed them?
 2   A.  For the data sets that have multiple -- for the vendors
 3   that have multiple types of data sets listing the category by
 4   vendor name as value, because it lets you assess which of the
 5   data sets WorldQuant finds the most valuable.  █████████ would
 6   be an example.  I think I mentioned this on Monday.  So where
 7   there are multiple data-set vendors, this is valuable, the
 8   categorization.
 9   Q.  Do you have any problem with the fact that Mr. Ober
10   released this information to Third Point?
11              MR. BUCHDAHL:  Objection, your Honor, irrelevant.
12              THE COURT:  Yes.  Let's just deal with the issue
13   before me, please.
14   Q.  Why would releasing the information listed in Exhibit D to
15   Third Point harm WorldQuant?
16   A.  The culling, or sort of filtering process to get to 40
17   names, from thousands, represents a tremendous amount of money,
18   effort, and time.  It would take someone else starting from
19   scratch to get to the same 40 names.  That represents a
20   tremendous competitive advantage to someone receiving this
21   information, because they do not have to go through that same
22   arduous, lengthy, extensive process to filter the universe down
23   to a handful.
24   Q.  How does that hurt WorldQuant?
25   A.  If you don't have to spend the time or the money or the
```

1   energy to get to the 40 that are the most interesting, you can

2   get them, get them on-board and negotiate with them much, much

3   faster, and turn a process that took us years into a process

4   that could take months.

5   Q.  So Third Point would gain some sort of advantage in this

6   way?

7   A.  I would say this is a significant competitive advantage if

8   you have this list and you know it's already been preprocessed

9   by someone who's been doing this for a long time, yes.

10  Q.  Do you know Third Point, what Third Point's business is?

11  A.  I have a much better understanding now, yes.

12  Q.  How do you know what Third Point's business is?

13  A.  We've done a lot of, a lot of research on Third Point, what

14  they do, in response to this, this case.

15  Q.  What is Third Point's business?

16  A.  Third Point is an equity hedge fund.  They are typically

17  activists.  They start off, I would say, very fundamental.  And

18  by "fundamental," my definition is, having worked at a

19  fundamental equity hedge fund personally, very deep research on

20  individual companies, looking at company filings, talking to

21  management, developing and --

22           MR. BUCHDAHL:  Your Honor, I'm going to object.  We

23  heard the foundation for this, "I've done a lot of research on

24  Third Point."  But this witness is not competent to testify

25  about Third Point's business.  We had the chief operating

GCEAWOR1ps

1    officer here from Third Point.  Any questions he had about

2    Third Point's business should have been directed to that

3    witness.

4              MR. HAWKS-LADDS:  Mr. Targoff, the general counsel,

5    did testify that they were a fundamental investment advisor and

6    now also moving to quantamental.  But this witness's knowledge

7    of Third Point's business is very important in relation to what

8    Mr. Ober testified this witness said when Ober told him he was

9    going to Third Point.  So his knowledge of what Third Point's

10   business is is very important based on Mr. Ober's testimony,

11   when he said, I told Mr. DeAddio where I was going.  He didn't

12   say anything about efforts.  He didn't complain about efforts.

13   So his knowledge about Third Point and how it evolved is

14   important to refute Mr. Ober's testimony.

15             MR. BUCHDAHL:  If all the purpose here is for

16   Mr. DeAddio to say that when I told Mr. Ober Third Point was a

17   completely different business I didn't know what I was talking

18   about, fine, he can say that.  But now his, the knowledge he

19   claims to have learned, we think, is irrelevant.

20             THE COURT:  I agree with that.  Let's deal with the

21   time frame of this alleged conversation.

22             MR. HAWKS-LADDS:  OK.

23   Q.  In the summer -- and let me just back up and only deal with

24   this topic.  In the summer of 2016, do you know what Third

25   Point's business was?

GCEAWOR1ps

1   A.   Other than hearing the name, no.

2   Q.   In September 2016, when WorldQuant gave Mr. Ober the

3   amended restrictive covenant, which is Plaintiff's Exhibit 2,

4   did you know what Third Point's business was?

5   A.   No.

6   Q.   On November -- on or about November 7, when Mr. Ober quit

7   his employment at WorldQuant, did you know what Third Point's

8   business was?

9   A.   No additional knowledge, no.

10   Q.   When did you find out what Third Point's business was?

11   A.   After he told us where we were going, we then had the

12   responsibility to assess whether or not we thought it was

13   competitive, and that's when we did our research to make that

14   determination.

15   Q.   Before I go a little deeper into that answer, I want to

16   focus on the time that Mr. Ober told you he was quitting and

17   going to Third Point.  Did he ask you whether it was OK to go

18   to Third Point?

19   A.   He said he was going to Third Point and that they didn't

20   compete with us because they were purely fundamental, and so he

21   made a statement.

22   Q.   What did you say?

23   A.   And I said, that sounds OK if that's the case, but we do

24   have to review it further.

25   Q.   And what did you do next?

GCEAWOR1ps

1    A.  After he left, we reviewed Third Point.  We did some

2    research to make a determination.

3    Q.  What was that research?

4    A.  Based on our research, based on reading the investor letter

5    and the rest, we made a determination that they were entering

6    our field or had entered our field of quantitative investment

7    management and it would be a competitive situation.

8    Q.  Now, when you say "investor letter," are you referring to

9    Plaintiff's Exhibit 12?

10   A.  (Pause)  Just making sure it's the one I read.

11            Yes.  That's the one I'm referring to.

12   Q.  And you'll note that there are exhibits that follow Exhibit

13   12 that are web pages, which are exhibits 13, 14, 15, and 16.

14   A.  Yes.

15   Q.  Did you provide those to me?

16   A.  Yes, I did.

17   Q.  Why?

18   A.  Because it was a continued -- it was additional research we

19   had done to develop the determination that we would consider

20   competitive activity.

21   Q.  Now, explain to the judge what it is that you discovered

22   about Third Point after Mr. Ober told you he was going there.

23   A.  That they were embarking on a transition to move their

24   fundamental investment process to be a hybrid.  They call it

25   "quantamental."  Not my word, but we can use it.  In my view

GCEAWOR1ps

1    it's a hybrid.  They will be doing both quan -- they will be

2    adding a quantitative investment process to their original

3    fundamental investment process.

4    Q.  And Mr. Ober did not tell you that.

5    A.  No, he did not.

6    Q.  When -- taking a look at Exhibit D, the list of vendors and

7    data sets --

8    A.  Yes.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GC3JWOR2                        De Addio - direct

1    Q.   If you had known that Mr. Ober had provided that to Third

2    Point in June or July, 2016, what would your reaction have

3    been?

4    A.   That he has divulged confidential information outside the

5    firm.

6    Q.   What would you have done?

7    A.   We would have taken action, had a discussion and determined

8    what other action to take.

9    Q.   Would you have fired him?

10   A.   It would have been --

11          THE COURT:  You know, I think he gave two answers.

12   Are you trying to focus him in on a particular thing?

13          MR. HAWKS-LADDS:  How serious the disclosure of that

14   information was and had Mr. De Addio's boss known about it, how

15   he would have responded because of Mr. Ober's divulging that

16   information to Third Point.

17          MR. BUCHDAHL:  The objection, of course, is leading,

18   and I would make that objection.

19          THE COURT:  Sustained.

20   BY MR. HAWKS-LADDS:

21   Q.   Mr. De Addio, turn to Exhibit A.  You can put away

22   plaintiff's exhibits.

23   A.   Yes.

24   Q.   When was the first time you saw this document?

25   A.   At the end of day Monday.

GC3JWOR2                              De Addio - direct

1   Q.   You reviewed it?

2   A.   I have.

3   Q.   What does this document appear to be to you?

4   A.   This document seemed to be a proposal for the quantitative

5   build-out within Third Point of a data-driven quantitative

6   investment process.

7            THE COURT:  Excuse me.  Are you saying that you didn't

8   see this until after the testimony on Monday?

9            THE WITNESS:  Your Honor, when I was in the witness

10  room sequestered, I didn't have it and I didn't have access to

11  it before, no.

12           THE COURT:  You may continue.

13  BY MR. HAWKS-LADDS:

14  Q.   I am not sure where you left off.  You said it was a --

15  A.   It looks to me in total, based on my review of it, to be a

16  proposal to build-out a full data team and quantitative

17  analysis infrastructure at Third Point.

18  Q.   Do you know this?

19           This is produced in response to a subpoena of Third

20  Point.  Do you know that?

21  A.   I believe so, yes.

22  Q.   Do you know whether Mr. Ober had this before Monday?

23  A.   I do not have any information whether Mr. Ober had it or

24  not.

25  Q.   Do you know whether he had this or any version of this

GC3JWOR2                          De Addio - direct

1   before he quit his employment?

2   A.  I have no knowledge of that.

3   Q.  Does Exhibit A, this document entitled, "Data Effort

4   Discussion," does it cause you any concern regarding --

5        THE COURT:  No, no, wait, wait, wait.  Do you know how

6   to ask an open-ended question?

7        MR. HAWKS-LADDS:  Sure.

8        THE COURT:  Do it.

9   BY MR. HAWKS-LADDS:

10  Q.  Regarding Exhibit A, what do you think about this document?

11        THE COURT:  Thank you!

12  A.  As I read this document, it looks very well-written.  The

13  person who wrote it -- I am actually not aware of the author, I

14  don't believe it is here.  Let me just see.  Whomever wrote it

15  has great knowledge of what it takes to build a data-driven

16  quantitative investment infrastructure and team.

17        It is in some ways -- actually, in most ways --

18  strikingly similar to what has been built at WorldQuant.  It

19  has got an excellent amount of thought on █████████

20  █████████████████████████████████████████████████████████

21  █████████████████████████████████████████████████████████

22  █████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████

24  ███████████████████████████████████████████████

25  █████████████████████████████████████████████████████████

GC3JWOR2                      De Addio - direct

1   ███████████████████████████████

2          It even goes so far as to talk about the culture

3   impacts of such a big change and that many internally will need

4   to be brought in and sort of worked with to start to trust the

5   new part of the investment process and that they would have to

6   take action to help that cultural change occur.

7   Q.  Please explain to the judge what parts of the document that

8   are, as you just described, concerning.

9   A.  Certainly.  So if we start with Page 3.

10  Q.  Let me get there.

11  A.  So we start with Page 3, No. 2 at the top:

12          ████████████████████████████████████████████████

13  █████████████████████████████████

14          ██████████████████████████████

15  ██████████████████████████████████████████████████████

16  ██████████████████████████████████████████████████████

17  ██████████████████

18  Q.  You just went very quickly and I didn't follow you.

19  A.  Okay.  So there are two ways to use data.  One is we do our

20  initial fundamental analysis, and we would like some additional

21  data to help us validate what we're doing is right.  We just

22  want more validation and there is more data out there.  That is

23  a small augmentation.

24          What this says, and other points I will point out, is

25  that this isn't about augmenting the existing fundamental

1   process.  This is about creating a parallel, an integrated

2   process from a quantitative perspective.

3          MR. BUCHDAHL:  I object to this line of questioning.

4   This is argument.  This document is in evidence.  This witness

5   saw it for the first time two days.  We didn't hear any

6   testimony about it.  They're speculating what it means.  There

7   is no foundation for any of it.  If the attorney wants to make

8   this argument to the court, I will respond to it, but I can't

9   cross-examine him on his imaginings about this document.

10         THE COURT:  Yes, this is speculation.

11         MR. HAWKS-LADDS:  Your Honor, this is exactly what Mr.

12  Targoff testified to.  He testified --

13         THE COURT:  He was involved with preparation of the

14  document and worked with it with Third Point.  He saw it Monday

15  for the first time.  He was not present at any of the

16  presentations and he is taking what to him is an advantageous

17  interpretation and giving it to me, so it is not helpful.

18         MR. HAWKS-LADDS:  He is a quant expert.  This is his

19  business.  Mr. De Addio is is in the quant business.  This is a

20  roadmap to quant.  Your Honor, you asked on Monday for us to

21  help you understand what is going on here.

22         THE COURT:  Yes, but he --

23         (Multiple voices)

24         MR. HAWKS-LADDS:  You want to know, you said to us on

25  Monday -- we have it in the transcript -- you are going to have

GC3JWOR2                          De Addio - direct

 1   to help me understand why they are competitors.  That is what

 2   you said.

 3          THE COURT:  I understand that, but can you just wait.

 4   I didn't say ignore the rules of evidence in doing so.  This is

 5   not a document that he has seen before this lawsuit was filed.

 6          MR. HAWKS-LADDS:  He studied it.

 7          THE COURT:  Are you putting him in as expert?

 8          MR. HAWKS-LADDS:  I could qualify him as an expert in

 9   30 seconds, 30 seconds.

10          MR. BUCHDAHL:  He absolutely could not be qualified as

11   an expert on Third Point's business or Third Point's plans.

12          MR. HAWKS-LADDS:  This is quant right here.

13          MR. BUCHDAHL:  We heard unequivocal testimony about

14   the nature of Third Point's plans.  Literally in their own

15   articles they put forth, Mr. Loeb said we are not in quant

16   work.  We do want to use qualitative analysis to support our

17   research.

18          This witness is literally speculating Third Point is

19   going to change its business in a way its chief operating

20   officer said would require to disclose to investors because it

21   is entirely inconsistent with Third Point's existing business.

22          Opposing counsel is free to make argument to the court

23   about what they want you to conclude from this document, but

24   this witness is not free to take the stand and simply speculate

25   about what he imagines is going on.  The extent of his research

GC3JWOR2                          De Addio - direct

1    prior to this document consisted of four newspaper articles all

2    using the word quantamental.  The word qualitative didn't

3    appear in any of those newspaper articles.

4              Again you pointed out on Monday, your Honor, that

5    quantitative models to trade is different from quantitative

6    analysis.  Those are two different things.

7              I object to this witness being asked to read a

8    document that he simply is involved in a lawsuit, he obviously

9    has a bias here, and for him to say here is what I think they

10   meant, what if there should be cross-examination Mr. Targoff,

11   is it true what you really meant here, that is how you handle

12   this, not put on your own friendly witness stand and say what

13   do you think this might be.

14             MR. HAWKS-LADDS:  Your Honor, you want to hear the

15   facts.

16             THE COURT:  He can't give the facts about this

17   document.

18             MR. HAWKS-LADDS:  He is giving the facts how this

19   document is almost identical to WorldQuant's process and

20   WorldQuant's --

21             THE COURT:  Is there a WorldQuant document in evidence

22   that I could see the comparisons so I can make a determination

23   whether this is identical, as you say?

24             MR. HAWKS-LADDS:  Exhibit 18.

25             (Pause)

GC3JWOR2                           De Addio - direct

1          THE COURT:  So what you want me to do is compare the

2     two exhibits?

3          MR. HAWKS-LADDS:  Well, what I was going to do was ask

4     Mr. De Addio for what his concerns are relating to this quant

5     program, and then you will be able to compare his answers to

6     the exhibit that is in evidence, both exhibits in evidence, and

7     see how similar they are and understand his concerns.

8          MR. BUCHDAHL:  It is good argument, your Honor, but

9     not appropriate for this witness.

10         MR. HAWKS-LADDS:  Your Honor, you want facts, right?

11         THE COURT:  Yes, I would like facts, but I don't want

12    facts that are distorted or biased or cannot stand on their

13    own.  If you want to put witnesses on who could explain how

14    this functions because, quite frankly, I have to say to you, I

15    don't know that everyone agrees with your definition of

16    competitor, confidential, you know, but you proceed as you

17    think you need to, but quite frankly, I do not wish to waste

18    the parties' time or my time hearing Mr. De Addio's

19    interpretation of a document that he just saw for the first

20    time on Monday.

21         MR. HAWKS-LADDS:  Okay.  All right.  I will move on.

22    I will point out we also saw it for the first time in this

23    courtroom on Monday, and I crossed Attorney Targoff for the

24    first time after reviewing this for 15 minutes on Monday.

25         I mentioned to the court this was hearsay, that Sharma

1    was not in the room who was the drafter, who would be the

2    person that can explain what is in this, and you allowed full

3    direct by Mr. Buchdahl on Mr. Targoff on this document.

4              THE COURT:  Wasn't Mr. Targoff present for the

5    presentation of the materials here?

6              Didn't he work with him in putting this document

7    together or was put together, or once put together wasn't it

8    fully explained to him by Mr. Sharma who should know because it

9    is his document?

10             MR. HAWKS-LADDS:  Sharma gave it to Targoff as part of

11   the process, and this is what Targoff testified to.  Targoff is

12   COO and general counsel, and Sharma gave it to him as part of

13   developing this idea of moving to a quantitative strategy in

14   support of the fundamental strategy.  That is what Targoff

15   said.

16             MR. BUCHDAHL:  There has been a lot of talk about Mr.

17   Targoff as a witness.  I received a subpoena with Mr. Targoff's

18   name on it.  That is why he was a witness, because he was

19   subpoenaed to testify.  I did not get a subpoena with Mr.

20   Sharma's name on it.

21             Now, it is not that they didn't know about Mr. Sharma.

22   Mr. De Addio sat in a room with Mr. Sharma to discuss whether

23   this would be a problem for Mr. Ober to change firms.

24             MR. HAWKS-LADDS:  That is confidential.

25             MR. BUCHDAHL:  The fact of that meeting is not

GC3JWOR2                          De Addio - direct

1   confidential.  They know each other.  If they wanted Mr. Sharma

2   to be here in this courtroom, Mr. Sharma would have been here.

3   They sent a subpoena for Mr. Targoff.  It is that simple.

4           By the way, there is a provision in this contract for

5   the payment of attorney's fees by the party that doesn't --

6           MR. HAWKS-LADDS:  This is --

7           (Multiple voices).

8           MR. HAWKS-LADDS:  But it is beyond --

9           (Multiple voices).

10          MR. BUCHDAHL:  If they wanted Mr. Sharma to be here

11  today, they could have subpoenaed him for today and I would

12  have produced him.  They did not, so I don't want to hear that

13  the wrong witness is here or that somehow they hadn't been

14  given an opportunity to figure out what Third Point is doing.

15          I will tell you Mr. De Addio does not know.

16  BY MR. HAWKS-LADDS:

17  Q.  When did you meet Mr. Sharma?

18  A.  When we had a settlement conference to see if we could work

19  this out without going to court.

20  Q.  Did Mr. Sharma disclose --

21  A.  No, he did not.

22  Q.  Did he tell you they had this plan to develop quantitative

23  training strategies at Third Point at that --

24          MR. BUCHDAHL:  Objection to form.  Every time he says

25  quantitative trading strategies, I challenge him to show me

1    those words in any document.  It does not exist.

2              MR. HAWKS-LADDS:  The speaking objections are

3    beginning to interfere with my questioning of this witness.  It

4    is relevant.  It goes to exactly what Mr. Buchdahl just said.

5    He didn't know Sharma.  The only time they met was to discuss

6    whether or not they were going to settle, which is not

7    admissible and improper to be brought up in this courtroom.

8              THE COURT:  No, no.  The settlement details are

9    improper, not the fact that you appropriately tried to settle

10   before filing suit.

11             MR. HAWKS-LADDS:  Well, we did and we couldn't.  I'll

12   move on.

13   BY MR. HAWKS-LADDS:

14   Q.  Mr. De Addio, if Third Point was to develop a quant,

15   quantitative methodologies or process for trading, how would it

16   go about doing that?

17   A.  It would go about doing that, in my opinion, exactly as

18   written in this proposal.

19   Q.  Now --

20             (Multiple voices)

21             THE COURT:  Wait, wait.  He is your witness.  Do you

22   want to have him continue or do you wish to have this document

23   and put in?  It is your choice.

24             THE WITNESS:  I just did want to point out while it is

25   true I can only assess what I read here, it does say here as

1    well there is an existing quant effort that exists inside Third

2    Point, which not knowing what it is, is pretty direct and I

3    don't think requires much interpretation.

4              THE COURT:  That is your view.

5              THE WITNESS:  Yes, your Honor.

6    BY MR. HAWKS-LADDS:

7    Q.  Without an opinion, just facts, to put together a quant

8    effort at a new company, explain to the judge the steps that

9    would be taken to do that.

10             THE COURT:  Well, before you do that, I am not sure I

11   understand what you mean by a quant effort, that quant effort.

12   That is too vague and general.  Let me ask you this:

13             Are you suggesting that any time any quantitative

14   information is used, that it is violative of Mr. Ober's

15   contract?  Is that what you're saying?

16             MR. HAWKS-LADDS:  No, no, your Honor.

17             THE COURT:  It seems to me we sort of need to narrow

18   down what you are claiming is confidential and against what

19   restrictive covenants.  Use the terms that are in those

20   restrictive covenants.  That would be helpful.

21             MR. HAWKS-LADDS:  Thank your Honor.

22   BY MR. HAWKS-LADDS:

23   Q.  Is third point, based on the documents in evidence, using

24   quantitative models to trade or planning to --

25             MR. BUCHDAHL:  Objection, your Honor.

GC3JWOR2                          De Addio - direct

```
 1              THE COURT:  Yes, I think that is hard.  That is hard.
 2              Let me put it this way:  What in these documents show,
 3    establish that they are going to use it, quantifying for trade?
 4    BY MR. HAWKS-LADDS:
 5    Q.  In Exhibit A --
 6    A.  Yes.
 7    Q.  -- what aspects of it show that Third Point will be using
 8    quantitative models to trade?
 9    A.  Setting up an infrastructure to do so, being able to digest
10    terabytes of data which they cannot do right now as stated,
11    hiring a head of data science who is able to assess, acquire
12    and even find data that is not for sale, in quotes,
13    participated.
14    ███████████████████████████████████████████████████████████████
15    ███████████████████████████████████████████████████████████
16    ███████████████████████████████████████████████████████████████
17    ███████████████████████████████████████████████████████████
18    ████████████████████████████████████████████████████████████████
19    █████████████████████████████████████████████████████████████████
20    ███████████████████████████████████████
21              THE COURT:  Well, that is so full of your opinion, I
22    am going to pick it apart and see if I can get some help out of
23    it.
24              THE WITNESS:  Certainly.
25              THE COURT:  Are you saying they're going to use it to
```

GC3JWOR2                          De Addio - direct

1    trade?

2              THE WITNESS:  Your Honor, when --

3              THE COURT:  No, no.  That is a yes or no?

4              THE WITNESS:  Of course, yes.

5              THE COURT:  They're going to use it to trade, the

6    quantitative aspects of it?

7              THE WITNESS:  Yes.

8              THE COURT:  Use it directly to trade as you do?

9              THE WITNESS:  They will use it to make trading

10   decisions, yes.

11             THE COURT:  That is not --

12             THE WITNESS:  That is --

13             THE COURT:  -- that is not to trade?

14             THE WITNESS:  Yes, it is.  I am sorry, I must

15   disagree.  It is.  If they did not change the way they trade it

16   based on this information, if they do not make different

17   trading decisions, trade less or more, trade more frequently,

18   if they did not do that, this would have no value because the

19   only way they would monetize this investment is if they traded

20   differently.  It makes no difference if the computer sets the

21   trade in and they enter it into the computer.

22             THE COURT:  I don't know.  One of the things I have

23   learned is it does make a difference.

24             THE WITNESS:  It doesn't make a difference how it is

25   executed if they did not change it.  All they do is trade stock

GC3JWOR2                          De Addio - direct

1   and that is how they make their profits and that is my

2   understanding of what they do and that is what a fundamental

3   hedge fund manager does.

4           If they did not change the trades they make in some

5   way, how could they possibly monetize this investment because

6   it would not change their profits at all.

7   Q.  Can you give an example.

8           THE COURT:  No, I don't need an example.  Move on.

9           In other words, you're saying it is a waste unless you

10  do it the way we do it.  That is what you're saying?

11          THE WITNESS:  No, your Honor I did not say that.

12          I said it would be a waste if all this investment and

13  all this data did not change the way, the number of trades they

14  make, how they traded, how much they traded, when they traded

15  or at what price.  Otherwise, they would not be making any more

16  money, and I think that they would be doing this so they could

17  make more money, and they need to change the way they trade

18  with the information to make more money.

19          That doesn't mean make it electronic, your Honor.  It

20  means instead of buying a million shares today, I see better

21  data and I buy 1.2 million shares today.  That is what I mean

22  by changing the number and the way they trade to monetize this.

23          Why would they spend millions and millions of dollars

24  if they weren't going to try to profit from it?

25          THE COURT:  I am going to leave it at that.  Mr.

 1  Buchdahl, you do have your opportunity to have

 2  cross-examination when direct is over.  Right now we are going

 3  to take a 10-minute break.

 4          (Recess)

 5          THE COURT:  Please be seated.  You may proceed.

 6          MR. HAWKS-LADDS:  Thank your Honor.

 7  BY MR. HAWKS-LADDS:

 8  Q.  Mr. De Addio, turn to Page 9 in Exhibit A.

 9  A.  Yes.

10  Q.  On the first line -- you can put it in front of you if it

11  is easier, whatever is easier to do.

12  A.  Thank you.

13  Q.  On the first line of Exhibit A, Page 9 --

14  A.  Yes.

15  Q.  -- No. 1.

16  A.  Yes.

17  Q.  There is a word there.  Do you see that first word?

18  A.  Yes.

19          THE COURT:  There are several words there.

20          THE WITNESS:  Yes.

21  BY MR. HAWKS-LADDS:

22  Q.  The first word is what?

23  A.  The first word is Millennium.

24  Q.  Do you know what Millennium is?

25  A.  Yes, Millennium is the parent fund that we manage money

GC3JWOR2                         De Addio - direct

1  for.  They're a multi-strategy fund, so they do many and all

2  types of investment strategies.

3  Q.  Please explain the relationship between WorldQuant and

4  Millennium for the Judge.

5  A.  Certainly.  Certainly Millennium provides us the capital,

6  and we are the ones that invest it for them.  They provide us a

7  large amount of capital for us.  So unlike Third Point, we

8  don't directly talk to investors or raise money ourselves to

9  invest.  They do it for us.

10  Q.  The rest of that line there on Page 9 Line 1 has other

11  names.  Do you know what those other names are, Point 72, 2

12  Sigma, DE Shaw?

13  A.  Yes.  So I'll start with 2 Sigma and D.E. Shaw.  These are

14  other large, well-known, quantitative investment managers that

15  are I think would be undisputable would be our direct

16  competitors.

17        Point 72 is now essentially a family office for Steve

18  Cohen, but it is very much like Millennium.  They have multiple

19  different kinds of investment strategies.  They have a very

20  large quantitative effort and very large fundamental effort

21  within their walls.

22  Q.  I don't need a you to opine why they're in here.  These are

23  quantitative investment firms, right?

24  A.  They either are specifically quantitative investment firms

25  or have a very large quantitative investment part to them, yes.

GC3JWOR2                          De Addio - direct

1    Q.   Now, turn to Page 4 of Exhibit A.

2    A.   Yes.

3    Q.   There is a line that has a small A and a parentheses next

4    to it.  Do you see that?

5    A.   Yes.

6    Q.   It starts with systematic/quant funds?

7    A.   Yes.

8    Q.   Those businesses that you just listed from Page 9,

9    including Millennium, do they fall within that definition of

10   systematic/quant funds?

11   A.   They do either completely or in part depending on the firm.

12   Q.   The rest of that line says that these quant funds have been

13   trading on signals from large datasets for decades.  Do you see

14   that?

15   A.   Yes.

16   Q.   Now, that is WorldQuant's business?

17   A.   Yes.

18   Q.   What does that mean?

19   A.   That means that we analyze and come up with ideas from the

20   datasets that we have.  We test them over time and then we

21   invest based on them and trade based on them.

22   Q.   On that same page there is a sentence that has the small B

23   and a parenthesis.  Do you see that?

24   A.   Yes.

25   Q.   There this document says we can choose to ignore this

1  signal, but today this would be like ignoring street research,

2  and at some stage and even today this will be akin to ignoring

3  quarterly results, right?

4  A.  Yes.

5  Q.  What does that mean?

6          MR. BUCHDAHL:  Objection.

7          THE COURT:  Yes.

8          MR. HAWKS-LADDS:  I'll ask a foundational question.

9  BY MR. HAWKS-LADDS:

10 Q.  Do you know what street research is?

11 A.  Yes.

12 Q.  Do you know what signals are?

13 A.  Yes.

14 Q.  What are they?

15 A.  In that order?

16 Q.  Either order.

17 A.  Street research would be research on individual companies

18 or sectors that the big investment banks such as Goldman Sachs,

19 JP Morgan provide to hedge funds to assist in their investment

20 analysis process.  That is street research.

21         Signals are the investment ideas that come from the

22 datasets that one can also trade on.  They are two different

23 types of inputs into the investment process.

24 Q.  What are quarterly results?

25 A.  Every company -- I'll stick with the U.S. -- every company

GC3JWOR2                          De Addio - direct

1    in the United States as a public, a public company you can buy

2    and sell its shares on the stock market must report to its

3    investors, to the public results every quarter on profitability

4    and a whole bunch of other metrics.  These quarterly results

5    drive the stock price in terms of whether they meet or exceed

6    or don't exceed them very materially.

7           They are very important for all investment processes,

8    fundamental and quantitative.

9    Q.  What was the name of the fundamental investment advisory

10   firm you worked at?

11   A.  Elm Ridge Capital.

12   Q.  Did Elm Ridge Capital use street research and quarterly

13   results in order to make investment decisions?

14   A.  Yes, extensively.

15   Q.  Based on your knowledge and experience, do fundamental

16   advisers use street research and quarterly results to make

17   investment decisions?

18   A.  Yes, extensively.

19   Q.  Do fundamental investment advisor firms use signals as

20   well?

21   A.  Typically, no, not in my experience, not from large

22   back-tested datasets as discussed.

23   Q.  So in this page, Third Point said that ignoring this signal

24   would be like ignoring the fundamentals.  Is that right?

25           MR. BUCHDAHL:  Objection, your Honor.  The document

1   speaks for itself.

2          THE COURT:  Yes.  Sustained.  Don't answer it.

3   BY MR. HAWKS-LADDS:

4   Q.  If a fundamental firm is now going to use signals to trade

5   or make investment decisions, how would it go about using those

6   signals?

7          MR. BUCHDAHL:  Objection, your Honor; calls for

8   speculation.

9          MR. HAWKS-LADDS:  He has the experience.  He just

10  testified he worked in the fundamental investment advisory

11  capacity for Elm Ridge Capital.  He knows that line of work and

12  he knows the signals and quants work as well.

13         THE COURT:  But does that mean he can put the two

14  together?

15         MR. HAWKS-LADDS:  Let's find out.

16         THE COURT:  No, because it doesn't necessarily mean

17  that that is what the defendant here is going to do.

18         MR. HAWKS-LADDS:  But counsel can cross-examine on

19  that.  I think, Judge, you want to hear because this is key,

20  this is key.  If Third Point is going to use signals, you need

21  to know that.  You need to know that.

22         MR. BUCHDAHL:  Your Honor, we couldn't agree more, and

23  Mr. Targoff was the proper witness to talk about what Third

24  Point was going to do, not this witness.

25         MR. HAWKS-LADDS:  I can't remember exactly my

GC3JWOR2                         De Addio - direct

1    question.

2                THE COURT:  That is all right.  We can have it read

3    back.

4                MR. HAWKS-LADDS:  Thank your Honor.

5                THE COURT:  I'll do it.

6                "If a fundamental firm is now going to use signals to

7    trade or make investment decisions, how would it go about using

8    those signals?"

9                That is your question?

10               MR. HAWKS-LADDS:  Yes, your Honor.

11               THE COURT:  And you object?

12               MR. BUCHDAHL:  Yes.

13               THE COURT:  I agree with your objection, but you know

14   something?  You do have cross-examination, so you may answer

15   that question.

16               THE WITNESS:  In my experience, what one would do is

17   to identify datasets.

18               THE COURT:  Let me ask you this.

19               THE WITNESS:  Yes.

20               THE COURT:  Working in a fundamental investment firm,

21   did they ever decide to go into using signals while you were

22   there?

23               THE WITNESS:  At my firm, no, we did not.

24               THE COURT:  Do you know of any that has?

25               THE WITNESS:  First-hand, from being inside?

1           THE COURT:  First-hand, do you know of any that have

2      done that, have used signals in their fundamental investment?

3           THE WITNESS:  Having worked at -- I have not worked at

4      any that have done that.  I see much in the press they are

5      doing that, but I have not worked at one that has done that.

6           THE COURT:  Then I will take your testimony with that

7      information.  You may continue.

8           MR. HAWKS-LADDS:  You said you will take the

9      testimony -- I didn't hear what your Honor said?

10          THE COURT:  Yes, he may testify.

11     BY MR. HAWKS-LADDS:

12     Q.  You can now answer that original question.

13     A.  In my experience, having worked at several quantitative

14     investment managers and having worked at a fundamental equity

15     manager, if the fundamental equity manager would want to start

16     to use signals as the quantitative firms do, you would build an

17     infrastructure, identify the datasets that would be most

18     valuable to you, hire computer programmers and/or data

19     scientists to set up a storage infrastructure because this data

20     is expansive and takes a long time to load and store, and then

21     begin to analyze that data and see how it would impact and

22     affect your investment decisions to make better ones or to

23     generate different ideas from the data itself.

24          So it would start very much with an infrastructure

25     that, as it says here, most fundamental investment managers do

GC3JWOR2                    De Addio - direct

1    not have such an infrastructure to begin doing that.

2    BY MR. HAWKS-LADDS:

3    Q.  And that entity would have to hire, you said.  Is that

4    right?

5    A.  Would have to hire people to find the data, digest and

6    store the data, manage that storage and then analyze the data.

7    Q.  Someone like Mr. Ober?

8    A.  Mr. Ober would obviously be a very good candidate for the

9    person to oversee and acquire the data, yes.

10   Q.  Turn to Page 5 of Exhibit A.  I want your opinion.  I want

11   you to read Point 1 B.

12   A.  Page 5, 1 B, so leadership -- so ████████████████████

13   ██████████████████████████████████████████████████████████████

14   ██████████████████████████████████████████████████████████████

15   ███████████████████████

16   Q.  What does ████████████████████████ mean from the

17   quantitative investment advisory role?

18            MR. BUCHDAHL:  Objection, your Honor.

19            THE COURT:  Yes, sustained.

20            MR. BUCHDAHL:  It is irrelevant.

21   BY MR. HAWKS-LADDS:

22   Q.  C, under leadership, discusses ███████████████████████████

23   ████████████████████████  Is that what you referenced in your

24   answer a few minutes ago?

25   A.  That would be something I would say a fundamental manager

GC3JWOR2                         De Addio - direct

1    would have to do, in my experience, to begin using quantitative

2    signals and ideas, yes.

3    Q.  Down on that page under 2 F, where it says ████████████

4    ████████████████████████████████████████████

5            ████████████████████████████████████████████████████

6    ████████████████

7    A.  Some of the most interesting and valuable data to feed into

8    the quantitative process is data from companies that do a

9    different business and don't know yet that the data they

10   acquire in doing that business is valuable for investment

11   purposes.

12           For example, credit card companies, now they know,

13   they've now figured out they can monetize their data and sell

14   it, but a while ago they did not.

15           Another example would be companies that have, let's

16   say, great data on traffic, on how many cars are on the road.

17   It could be an indicator for the auto industry stock prices in

18   the future.  These companies don't know their data is sellable

19   yet, and we strive to find those companies and educate them

20   that their data could be another revenue source that could be

21   sold.

22   Q.  Based on your experience, how would that data that is "not

23   for sale" assist the fundamental investment advisory shop?

24   A.  For the same reasons.  It could be very interesting data

25   that could augment their initial ideas, validate them or add to

GC3JWOR2                          De Addio - direct

1   them.

2   Q.  Why would that be helpful to the fundamental investment

3   advisor?

4   A.  Simply more data for validating data that they didn't have

5   in existence before adds to their thesis.

6   Q.  Turn to the next page, please.  Page 6 under C, and then

7   there is another -- it is E, sorry, hard to read I C and then

8   E, it says web scraping.  What is web scraping?

9   A.  So one can from vendors, vendors that sell data or have

10  data not for sale, one can acquire that data, they can buy it.

11          Web scraping means that one can automatically scrape

12  pages from internet, the internet sites of many companies or

13  vendors, it's data that is freely available, and if you scrape

14  it and put it into a database and develop that technology, you

15  can essentially create your own datasets that are proprietary

16  and no one else has that would give you a significant

17  competitive advantage because they're not purchasable or at all

18  and only accessible to those who build the infrastructure to do

19  so.  Those can be very valuable datasets and it is extremely

20  proprietary because it is not for sale anywhere.

21  Q.  Does WorldQuant do that?

22  A.  We have an extensive effort to do this that was led by Mr.

23  Ober.

24  Q.  Matthew Ober led that effort at WorldQuant?

25  A.  He did.

GC3JWOR2                          De Addio - direct

1    Q.  And it is proprietary?

2    A.  Extremely.  It is not for sale to anyone else.

3    Q.  Turn to Page 7.  You answered a question that I posed a few

4    minutes ago about creating an infrastructure and team.  Does

5    this slide look like what you described earlier?

6    A.  This is a good assessment of what one would have to do,

7    yes, and is along the lines of what I noted, yes.

8    Q.  To create a quantitative trading strategy?

9            MR. BUCHDAHL:  Objection, your Honor.

10           THE COURT:  Yes.

11           MR. BUCHDAHL:  Leading and misleading.

12           THE COURT:  Yes, sustained.  Don't answer it.

13           Move on.

14   BY MR. HAWKS-LADDS:

15   Q.  Turn to the next page, Page 8.  This one is entitled

16   initial roll-out path with time frames of month 1 through 3, 2

17   through 6 and 6 through 12.  The last line, the last section, 6

18   through 12, the first bullet says, ████████████████████████

19   ████████████████████████

20           What does ████████████████ mean in the quantitative

21   of WorldQuant?

22           MR. BUCHDAHL:  Objection, your Honor.

23           MR. HAWKS-LADDS:  It is highly relevant.  Obviously,

24   this witness knows both fundamental and quantitative.

25           THE COURT:  It is not obvious he knows both, okay?

GC3JWOR2                      De Addio - direct

1    You're telling me he knows both.

2              MR. HAWKS-LADDS:  I thought his testimony was that his

3    experience was in both; and, therefore, he can give a good, for

4    the court, a good comparison to both how the quantitative world

5    works, how the fundamental world works and now this

6    quantamental new venture works.  So ███████████████████

7    ████████████████████  this witness is uniquely experienced to

8    explain what that means.

9              MR. BUCHDAHL:  Your Honor, Mr. Targoff would have been

10   the perfect witness to ask what did Third Point mean when it

11   says ████████████████████ -- I cannot believe that they

12   did not take advantage of the opportunity to try to explore

13   what some of these things meant with the entity that created

14   it, but to have this witness guess does not advance the ball.

15             MR. HAWKS-LADDS:  He was a hostile witness.  I only

16   crossed Mr. Targoff.  I didn't know what he was going to say.

17   He was general counsel.  I couldn't ask him questions that

18   were -- it was cross-examination, your Honor.

19             Mr. Sharma, on the other hand, would have been able to

20   answer that question.

21             THE COURT:  You know, look, coulda, woulda, shoulda.

22   I can read the document.  I don't know that Mr. De Addio's

23   interpretation is particularly helpful.  That is his

24   interpretation of what Third Point meant when it wrote this.

25   BY MR. HAWKS-LADDS:

GC3JWOR2                         De Addio - direct

1   Q.   Turn to Page 12 of Exhibit A.

2   A.   Yes.

3   Q.   What is this information on Page 12?

4   A.   A list of data vendors by data type.

5   Q.   How does this information compare to what Mr. Ober provided

6   to Third Point on July 1, 2016?

7   A.   I believe all of the names he provided are here, and then

8   there are 30 more on this slide than those names.

9   Q.   So the 41 vendors and the datasets Mr. Ober provided to

10  Third Point in July 2016 appear in this proposal?

11  A.   Yes, they do.

12  Q.   (Pause)  Why is WorldQuant concerned with Mr. Ober going to

13  work for Third Point during the next year?

14  A.   At the moment Mr. Ober has current and extremely up-to-date

15  information on the vendors and datasets that are most

16  profitable for us, that are most valuable from an idea

17  generation perspective and also knows the datasets that are not

18  valuable and would be a waste of time and effort to pursue from

19  an idea generation and investment perspective.

20          That information will decay over time.  Once he is no

21  longer at WorldQuant, it will evolve.  It evolves slower than a

22  year, but it does evolve.  Having the most current information

23  at present and sharing that information short-circuits a

24  tremendous amount of effort, energy and expense that we have

25  gone through to arrive at this set of vendors that do provide

GC3JWOR2                          De Addio - direct

1    the maximum value, profits and idea generation.

2    Q.  So if Mr. Ober were allowed to become employed at Third

3    Point in the next year, what damage could be done to WorldQuant

4    if that were to occur?

5    A.  One what I would be concerned about is that he would

6    divulge our top 20 datasets that are the most profitable.  I

7    can say that the datasets on the exhibit earlier with the 41

8    contributed hundreds of millions of dollars in profits this

9    year alone.

10   Q.  To WorldQuant?

11   A.  To WorldQuant.  That knowledge, being able to cull the

12   universe and come down to the top 20 that were provided the

13   most value right away without having to go through the culling

14   process would be very detrimental because it would allow Third

15   Point, with their resources, to quickly short-circuit that

16   process, bring them on and change their investment process to

17   reflect that data and trade much more like us.

18   Q.  Okay.  The Judge on Monday asked some questions about the

19   last thing you just raised about how Ober could go to Third

20   Point and whatever trading decisions would impact WorldQuant,

21   how those trading decisions could be changed and how they would

22   impact WorldQuant.

23        Explain to the judge how the trading decisions that

24   are influenced by Ober's bringing this data set, vendor quant

25   package there could impact WorldQuant.

GC3JWOR2                          De Addio - direct

A.  Certainly.  So it is unfortunately a very complicated

world, so I will try to make it, try and not use industry

jargon.

               THE COURT:  If you use it, explain what it means.

               THE WITNESS:  I will, your Honor.  I will try not to

because it can very quickly digress.

               At the moment, assuming that they are not employing

these datasets or any type of quantitative analysis,

quantamental or otherwise, then it would be correct to assume

that their trading, their investments, the trades they make

every day which are hundreds of millions of dollars a day, and

our trading which is hundreds of millions of dollars a day,

impact each other in a way that Matthew Ober has nothing to do

with and it is what it is.

               We're using different investment processes, we're not

correlated, we are not trading the same, and it is as it should

be.  The competition is there.

               If Matthew Ober goes to Third Point with full

knowledge of our top 10 or 20 revenue producing datasets and

lets them know that, and they go after those first without the

process of culling or filtering and they generate ideas from

those datasets, they get very similar ideas to ours and they

will then be trading in a correlative way to ours, and that

will reduce the capacity of our profitability.

               It is not different than more than one miner finding a

GC3JWOR2                         De Addio - direct

1    vein of gold in a mine, there is less for everybody because

2    they are limited.  These ideas that come from these datasets

3    have limited capacity.  The more people who access those

4    datasets and find those ideas, the less profitability there is

5    for everybody.  This is why trading ideas decay.

6          There is something called crowdedness.  Even in the

7    fundamental market which says that if all the fundamental

8    managers have the same idea, the profitability of that idea

9    goes to zero because if everyone believes, for example, Google

10   stock price will be at 20 in a week, it goes to 20 today

11   because everyone believes it.

12         It is no different with datasets.  There is limited

13   capacity.  Overuse of them, if too many people have the same

14   idea, then that idea for profitable perspective decays to zero,

15   which is why both of our firms on a regular basis must continue

16   to find new ideas because the old ideas, eventually everybody

17   figures them out, be they fundamental or quantitative or a

18   hybrid.

19         So if you are starting to trade with the same ideas on

20   the same datasets, very quickly you're getting an unfair

21   competitive advantage to know the top 10 or 20 datasets that

22   are the most profitable to us tomorrow, not a year or two from

23   now.  That will damage us because they have limited capacity

24   for profitability.

25         Third Point is a very smart, very sophisticated

GC3JWOR2                          De Addio - direct

1    investor with a tremendous amount of capacity to spend and

2    invest, and I have nothing but the greatest respect for them,

3    and they will figure this out and that will be damage to us.

4    All I ask or we ask is that we have the time for that knowledge

5    to decay so that they don't get a current, immediate

6    competitive advantage.

7              THE COURT:  Time is money?

8              THE WITNESS:  In every way, your Honor, in every way.

9    BY MR. HAWKS-LADDS:

10   Q.  Turn to Exhibit 19.

11   A.  Yes.

12   Q.  You have it?

13   A.  Yes, I do.

14   Q.  Can you identify this document.

15   A.  Yes.  I put this together as a way to give an example.

16   Q.  What is the example?

17   A.  So if I may -- your Honor, do you have it?

18             THE COURT:  I've got it.

19             THE WITNESS:  I just wanted to give an example of how

20   quantitative signals could help and be merged into a

21   fundamental process, in my opinion.

22             MR. BUCHDAHL:  Your Honor, this really is expert

23   testimony.  This does not go to the question of contracts.

24   This does not go to the question of trade secrets.  This is

25   pure --

1        MR. HAWKS-LADDS:  This is demonstrative evidence of

2   what the witness just testified a moment ago, what he just

3   described to you about how WorldQuant will get hurt by not

4   allowing the information that Mr. Ober will provide to Third

5   Point to decay over time is demonstrated if Mr. De Addio is

6   permitted to testify to this by this document, so it is

7   demonstrative.

8        Secondly, we I have gone around and around about Mr.

9   De Addio being an expert.  You heard him testify over the

10  course of two days now.  I think your Honor realizes, I am --

11       THE COURT:  Thank you.  Don't bother.

12       MR. HAWKS-LADDS:  I won't.  You have seen Mr. De Addio

13  does have an expertise in this field starting in the

14  fundamental field and now being the chief operating officer of

15  a very large quantitative hedge fund.

16       THE COURT:  I think that is bolstering your witness,

17  but go ahead, use this document, ask him about it, have him

18  explain it and then Mr. Buchdahl will do cross-examination.

19  BY MR. HAWKS-LADDS:

20  Q.  Please explain the document to Judge Batts.

21  A.  Certainly.  So let me then describe this simply in support

22  of what I said earlier about how ideas have limited capacity.

23       If someone, anyone believes that a stock starting --

24  and these are months in the month of January are priced at

25  $10.00, and I truly believe after my analysis, whatever I do,

GC3JWOR2                         De Addio - direct

1    in a year's worth of time it will be worth 20.  I buy it at 10

2    now.  In a year's time, it is 20.  I make a hundred percent

3    return, that is phenomenal and that will be great.  If the

4    green line, the stock every month went up nice and smooth,

5    people get their statements at the end of the month, my

6    investment is going up a few percent every month.  That would

7    be great, make everyone feel really well.

8            However, with the green line, if everybody knew today

9    and believed the same thing, the stock would be worth 20 in a

10   year, that profit would be gone because you couldn't buy much

11   of it at 10 because it will all be gone.  Everybody will say

12   they think it is worth 20.  They will bid-up the price, and

13   that profit would be gone if everybody had the same idea and

14   believed the same thing.

15           That is how ideas have very limited capacity.  If it

16   takes time for people to come up with that idea, and you get to

17   it first, you make the most money.

18           (Continued on next page)

19

20

21

22

23

24

25

1   Q.  Give the judge a real concrete example of an idea that

2   impacts profitability like on this Exhibit 19.

3   A.  Sure.  So you could have a belief, let's use Facebook as an

4   example, that when it first came out, people didn't think they

5   could make money.

6           MR. BUCHDAHL:  Objection, your Honor.  WorldQuant does

7   not invest in Facebook.  They don't do that.

8           THE WITNESS:  Yes, we do.

9           MR. BUCHDAHL:  How big is your --

10          MR. HAWKS-LADDS:  They do, your Honor.

11          THE WITNESS:  We do.

12          THE COURT:  Thank you.

13  A.  So my point here is simply that ideas have limited

14  capacity, and timing is extremely important in terms of when

15  you make -- when you formulate your idea, when you trade it,

16  and how long it takes for that to come to fruition.

17          I will leave the redline off so we avoid further

18  objections.

19          THE COURT:  Oh, no, I'm interested in the redline.

20          THE WITNESS:  OK.  So, as we said, it would be great

21  if my thesis was very nice and smooth and everyone got their

22  results every month and it always was positive.  However, that

23  is not the way the world works.  The redline shows that there

24  is variability.  The price goes up and down.  It eventually

25  arrives at that $20, so the person -- or for anyone to have

1    that idea was right.  However, the redline, for most of us,

2    would make us lose a lot of sleep, if you get statements at the

3    end of the month that your thousand dollars is now worth 800.

4    So that bumpiness in the process is what every manager, be it

5    fundamental or quantitative, wants to smooth out, to make

6    people not lose sleep at night.

7              By taking --

8              THE COURT:  I think you're simplifying it beyond

9    belief, but -- I mean, come on.  I mean --

10             THE WITNESS:  Any other question I would be happy to

11   answer, why you think it's simplification.  I'm happy to go

12   deeper or leave it be.

13             MR. HAWKS-LADDS:  Judge, we want you to understand

14   this.  So if Mr. DeAddio can provide facts that will assist the

15   Court --

16             THE COURT:  These are not facts.  This graph is not

17   based on anything that actually happened.  OK.  It is a

18   hypothetical.

19             THE WITNESS:  It is a hypothetical.

20             MR. HAWKS-LADDS:  But it's based on actual happenings.

21   I disagree with your Honor.  He was going to --

22   Q.  Give your Facebook example, so you can explain to the judge

23   exactly how the price can --

24   A.  Simply that.  The volatility, the bumpiness in this, is

25   what all investment managers try to moderate, by trading around

GCEAWOR3ps                    DeAddio - direct

1    it, because this is an uncomfortable way to show your investors

2    returns, even if you're right in the end.  And the quantitative

3    approach, with more data, will help you smooth out this redline

4    so it more closely approximates a smoother path to where you

5    need to get to.  That's called hedging.  That's what all

6    managers do, be they fundamental or quantitative.  And more

7    data helps that.  And the more data makes people trade the same

8    way, which reduces the opportunity set, the more of them do it.

9    That was simply my point.  And simply an example to show that

10   time is money, and that opportunity and ideas is limited.

11   Q.  Turn to our last exhibit, Exhibit 20.  Now, I ask you to

12   take an exhibit that --

13            THE COURT:  Jerry, I'm not getting this.

14            (Pause)

15            MR. BUCHDAHL:  Your Honor, may we take a five-minute

16   break while they're trying to resolve this?

17            THE COURT:  You can take a break, yes, as long as it

18   takes to resolve this.  Yes.  I should have said that.

19            You can step down.

20            (Pause)

21            THE COURT:  Sorry for the interruption, counsel.

22            MR. HAWKS-LADDS:  Are we ready, your Honor?

23            THE COURT:  Yes.

24            MR. HAWKS-LADDS:  Thank you.

25   BY MR. HAWKS-LADDS:

GCEAWOR3ps                        DeAddio - direct

1    Q.  Mr. DeAddio, find Exhibit 20, which is not punched in the

2    binder.  It's loose.

3    A.  Yes.

4    Q.  Did I ask you yesterday to take a look at Defendant's

5    Exhibit I and modify it based on your expected testimony?

6    A.  Yes.

7    Q.  Explain to the judge what Exhibit 20 is.

8    A.  I believe this was an exhibit to compare WorldQuant's

9    business and investment process to Third Point's.

10   Q.  Originally.  And then how did you modify it?

11   A.  So I modified it based on our understanding and our belief,

12   is that on the first -- a little background -- the first row

13   was quantitative versus fundamental.  Our belief and the reason

14   on our analysis we deemed this to be competitive when we

15   reviewed it and had to make a decision, based on Mr. Ober's

16   resignation as to whether we would pursue this or not, is that

17   we are quantitative and Third Point is fundamental and

18   quantitative, that we are both, next row, both investment and

19   trading firms.  We both trade.  We both invest our investors'

20   money.  And we have horizons at both well over nanoseconds,

21   days, or even weeks.

22   Q.  Do you see where it says doesn't matter in the middle of

23   the exhibit twice?

24   A.  Yes.

25   Q.  You wrote that?

GCEAWOR3ps                    DeAddio - direct

1   A.   Yes.

2   Q.   Starting with the first line where it says doesn't matter,

3   computer-driven trades versus manually entered trading doesn't

4   matter.  Why did you -- let me finish the question.  Why did

5   you write that?

6            MR. BUCHDAHL:  Objection, your Honor.  This is

7   argument.

8            THE COURT:  Yes, it is.  But go ahead.  Tell me why

9   you wrote it.

10   A.   Because the actual investment ideas are what matter, not

11   the execution of the trades.  That's for the last two.

12   Thousands of trades a day versus 20s or tens of trades a day,

13   that doesn't matter.  What matters is the amount of money

14   traded.  If you have 23 trades a day at a million shares, or a

15   million trades a day at 23 shares, it's really not the number

16   of trades that matter at all.  It has nothing to do with the

17   amount of stock that's moved or the amount of dollars that are

18   moved.

19            So these distinctions, while correct in fact, don't

20   actually go to the discussion at present here, which is the

21   idea generation being co-opted and being the same data.

22   Q.   Well, under computer-driven trades versus manually entered

23   trades, it's true WorldQuant uses algorithms, right?

24   A.   True, yes.

25   Q.   Do fundamental investment advisors use algorithms?

GCEAWOR3ps                    DeAddio - cross

1   A.  Not stating Third Point here, but some do.

2   Q.  Does it make any difference, regarding investment strategy,

3   whether an algorithm is used?

4   A.  Not in terms of how the trades are executed, which is what

5   I believe this line is saying.

6   Q.  The focus is on signals, correct?

7   A.  The focus is on the idea generation for the investment

8   rationale.

9            MR. HAWKS-LADDS:  Just one minute, your Honor?

10           THE COURT:  Mm-hmm.

11           MR. HAWKS-LADDS:  Nothing further at this time, your

12   Honor.

13           THE COURT:  OK.

14   CROSS EXAMINATION

15   BY MR. BUCHDAHL:

16   Q.  Good afternoon, Mr. DeAddio.

17   A.  Good afternoon.

18   Q.  Am I saying your name properly?  DeAddio?

19   A.  Yes.  Few do.  Well done.

20   Q.  Thank you.

21           So let's start with this question of whether it

22   matters that the trading is computer driven, all right.  Now, I

23   want to start with the contract that WorldQuant is suing on in

24   this case.  So could you please open up your defense binder to

25   Exhibit E.

GCEAWOR3ps                          DeAddio - cross

1   A.  Yes.  I have it.

2   Q.  Now, my first question for you, sir, is, did you work at

3   WorldQuant when this document was signed in May of 2011?

4   A.  No, I did not.

5   Q.  Have you had the opportunity to review this agreement since

6   you started at WorldQuant?

7   A.  Yes, I have.

8   Q.  And are you familiar with its terms?

9   A.  Yes, I have.

10  Q.  And are you familiar in particular with the restrictive

11  covenants on page 6 of this agreement?

12  A.  Yes, I have.

13  Q.  Let's look at those together, please.  So you see on page 6

14  there's a section entitled "Post-Employment Covenants"?

15  A.  Yes, I do.

16  Q.  And you see down about six lines from the bottom of the

17  page there is a sentence that begins "for the avoidance of

18  doubt."  Do you see that?

19  A.  Yes, I do.

20  Q.  And do you see the phrase "quantitative models to trade"?

21  A.  Yes.

22  Q.  That phrase is not defined in that agreement, is it?

23  A.  Not to my knowledge, no.

24  Q.  And after you started, you determined, meaning WorldQuant

25  determined, that it was going to change the language of its

1    restrictive covenant.  Correct?

2    A.   Correct.

3    Q.   And ultimately, that change was memorialized in what we've

4    marked as Defense Exhibit F, a document dated September 28,

5    2016.  Correct?

6    A.   Yes.

7    Q.   Now if you turn with me to page 2, page 2 contains the

8    definitions of "competitive activity," "competitor," but also

9    "quantitative trading and investment strategies."  Do you see

10   how both -- all three of those terms are defined in the second

11   and third paragraphs of page 2 of Defense Exhibit F?

12   A.   Yes, I do.

13   Q.   Mr. DeAddio, did you participate in drafting this language?

14   A.   I participated in the conceptual discussions on it, not the

15   language itself.

16   Q.   Did you have to approve it before it was finalized?

17   A.   I did review it, yes.

18   Q.   Did you approve it yourself?

19   A.   Yes.

20   Q.   Did you feel that you understood it, sir?

21   A.   Yes, I did.

22   Q.   Now, you did not negotiate this language with Mr. Ober,

23   correct?

24   A.   Individually?

25   Q.   Individually.

1    A.  I do not believe so, no.

2    Q.  And Mr. Ober was not invited to propose any language

3    himself, correct?

4    A.  Not to my knowledge.

5    Q.  And Mr. Ober did not in fact make any proposals that were

6    accepted into this agreement?

7    A.  No, he did not.

8    Q.  In other words, this is entirely WorldQuant's drafting.

9    Right?

10   A.  I believe so, yes.

11   Q.  Now, look with me at the bottom of the third paragraph.  Do

12   you see there is again a sentence that says "for the avoidance

13   of doubt"?

14   A.  Yes.

15   Q.  And do you see again it has that phrase "quantitative

16   models to trade"?

17   A.  Yes, I do.

18   Q.  But you didn't build that phrase into the definition of

19   "competitor."  Instead, the phrase you used as part of the

20   definition of "competitor" was the phrase "quantitative trading

21   or investment strategies," right?

22   A.  Yes.

23   Q.  And this time you actually defined what you meant by that.

24   Right?

25   A.  Yes.

GCEAWOR3ps                         DeAddio - cross

1   Q.  And if you look, part of what it says is, it's based upon

2   computer-driven processes.  You see that?

3   A.  Yes, I do.

4   Q.  And one of your examples of how the industry refers to this

5   is "computer-driven trading," right?

6   A.  One, yes.

7   Q.  Now, when you wrote "doesn't matter" next to "computer

8   driven" you didn't mean it didn't matter for purposes of

9   interpreting a contract, right?  You would agree with me that

10  the definition of "computer driven" is pretty important for

11  understanding this contract, right?

12  A.  Um --

13  Q.  I'll withdraw that question, actually.  I'm sorry.

14          Now, let's look at some of the examples that

15  WorldQuant used to define "quantitative trading or investment

16  strategies."  Now, one example it says is algorithmic trading.

17  Do you see that?

18  A.  Yes, I do.

19  Q.  And you would agree with me that for algorithmic trading,

20  you need computers.  Right?

21  A.  Please specify which part of the trading.

22  Q.  Well, you wrote the phrase "algorithmic trading,"

23  WorldQuant did.  And when WorldQuant was talking about

24  algorithmic trading, it was talking about trading done by

25  computers.  Correct?

1    A.  Not entirely, no.

2    Q.  All right.  What about when you said "computer-driven

3    trading"?  That's trading by computers, correct?

4    A.  You have to specify the investment-decision process versus

5    the execution of the trades.  I'm sorry, but there's a

6    difference.

7    Q.  Oh, I understand there's a difference.  So let's go with

8    the execution of the trades.  Algorithmic trading is trading

9    executed by computers, correct?

10   A.  No, it's not.

11   Q.  All right.  Computer-driven trading is trading executed by

12   computers, correct?

13   A.  No, it's not.

14   Q.  Who executes the trades in computer-driven trading?

15   A.  You can execute the trades by human or by computer.

16   Q.  Well, let's talk about how you do it at WorldQuant.  At

17   WorldQuant, the algorithmic trading is executed by computers,

18   correct?

19   A.  That is correct.

20   Q.  At WorldQuant --

21   A.  Most of the time, that is correct.

22   Q.  At WorldQuant, most of the time, the computer-driven

23   trading is executed by computers, correct?

24   A.  That is correct.

25   Q.  At WorldQuant the automated trading is executed by

1    computers, correct?

2    A.  That's correct.

3    Q.  And at WorldQuant, black box trading is executed by

4    computers, correct?

5    A.  Yes.

6    Q.  Now, when you defined all of these terms, you did your best

7    to try to make it clear exactly what would be a competitor and

8    what would not be a competitor.  Right?

9    A.  Yes.

10   Q.  Now, you know that Third Point does not do any automated

11   trading.  Correct?

12            MR. HAWKS-LADDS:  Objection, lack of foundation.

13            THE COURT:  No, I'll allow it.

14   A.  I don't know that, because I don't know how Third Point

15   operates internally, as you've told me before.

16   Q.  So turn with me to tab C.  Tab C is an e-mail that was sent

17   by Josh Targoff to Mr. Ober at his request.  Did Mr. Ober share

18   this e-mail with you when he was discussing his departure from

19   WorldQuant?

20   A.  Yes, he did.

21   Q.  And did you see that Mr. Targoff wrote, "Third Point does

22   not do any systematic or algorithmic trading"?  Do you see

23   that?

24   A.  Yes, I do.

25   Q.  And you saw that back in November, right?

GCEAWOR3ps                    DeAddio - cross

1   A.  I did.

2   Q.  And it says, "We have no intention to build out a

3   quantitative trading effort."  Do you see that?

4   A.  I do see that.

5   Q.  Sir, is it your testimony that this is not true?

6   A.  It is my testimony that the system -- that algorithmic

7   trading, it doesn't say "algorithmic investment strategies."

8   Q.  Neither does the contract, sir.  So I'm asking --

9   A.  It does actually say that.  It says "algorithmic investment

10  strategies."

11  Q.  Hang on a second.

12          THE COURT:  You see, when two people talk at the same

13  time, it's the reporter's choice.

14          THE WITNESS:  I'm sorry.

15  Q.  Mr. DeAddio, I just want to ask you a very simple question.

16  Yes or no, did you believe Mr. Targoff was telling the truth

17  when he wrote this?

18          MR. HAWKS-LADDS:  Objection.  Mr. Targoff, whether he

19  was telling the truth or not, it's not for this witness to

20  opine on.  It's inappropriate.

21          MR. BUCHDAHL:  Let me ask another, slightly different

22  question.

23  Q.  Do you have any evidence at all to suggest that Mr. Targoff

24  was not being completely truthful when he wrote this e-mail?

25  A.  Yes.

GCEAWOR3ps                   DeAddio - cross

1   Q.  So you don't think he was being truthful.

2   A.  I can't opine on whether he was being truthful or not.

3   Evidence suggests otherwise.

4   Q.  All right.  Would you agree with me that the Court would

5   have to conclude that Mr. Targoff was not being truthful here

6   if she were to rule in WorldQuant's favor in this preliminary

7   injunction hearing?

8   A.  Not exactly, no.

9   Q.  To your knowledge, Third Point does not do any black box

10  trading, correct?

11  A.  I don't have that knowledge.

12  Q.  Does WorldQuant do black box trading?

13  A.  Does WorldQuant?  Yes, WorldQuant does black box trading as

14  it is defined.

15  Q.  Now, you also have here, in your employment agreement --

16  let's go back to tab F, please.  I'm sorry.  Yes, no, it's F,

17  page 2.  You also refer here, in your examples, to high-

18  frequency trading.  Correct?

19  A.  Yes.

20  Q.  Now, WorldQuant does not do high-frequency trading, right?

21  A.  It does not do high-frequency trading.

22  Q.  But you nonetheless believed at WorldQuant that a

23  high-frequency trading operation would be a competitor of

24  WorldQuant's, right?

25  A.  It would be a competitive activity of WorldQuant's, given

GCEAWOR3ps                    DeAddio - cross

1  the knowledge required, yes.

2  Q.  And so WorldQuant didn't just define businesses that it was

3  in, but it chose those businesses that it thought were actually

4  in a competitive position to WorldQuant, right?  And that's how

5  you went about crafting this definition.

6  A.  Correct.

7  Q.  Now, nothing in this definition says anything about

8  fundamental investing, correct?

9  A.  It does not.

10 Q.  Bus fundamental investing is not quantitative trading or

11 investment strategies, right?

12 A.  If one was only doing fundamental investing, I would agree

13 with you, yes.

14 Q.  Now, the word "quantamental" also does not appear in this

15 definition, right?

16 A.  Because it's not a real word in any dictionary.

17 Q.  Well, we can agree that it is a word that is used in the

18 investment industry, right?

19 A.  With no definition, I would agree with you.

20 Q.  Well, you were happy to use that word in your own

21 affidavit, right?

22 A.  Because it was used in the investor letter and in other

23 public speaking for Mr. Loeb.  Even though it has no

24 definition.

25 Q.  And, sir, did you believe you understood what Mr. Loeb was

GCEAWOR3ps                    DeAddio - cross

1   talking about?

2   A.  In his definition, yes.

3   Q.  So you didn't have any problem understanding Mr. Loeb.

4   A.  In his writings, in his interpretation of the word, it was

5   quite clear what he was saying that Third Point would be doing.

6   Q.  What did you understand him to be saying?

7   A.  It would be building a quantitative investment process to

8   augment their fundamental process.

9   Q.  And "quantamental" wasn't a new term in November 2016,

10  right?

11  A.  We found some articles going back to maybe 2014, but if,

12  again, the term is not defined, and many people interpret it in

13  different ways.  So it is a term.

14  Q.  But generally speaking the term has been around in the

15  industry for a couple of years, right?

16  A.  Generally speaking.

17  Q.  But you didn't choose to use this term as something that

18  would be a competitor of WorldQuant, right?

19  A.  We did not.

20  Q.  And instead, every example that you use here, after

21  "statistical arbitrage," every single example uses the word

22  "trading," right?

23  A.  True.

24  Q.  You do not say "algorithmic analysis," do you?

25  A.  We do not.

1    Q.   You do not say "quantitative research," do you?

2    A.   We do not.

3    Q.   Every attempt you made to define what "quantitative trading

4    or investment strategies" meant, you used the word "trading,"

5    with the exception of this one statistical arbitrage example,

6    correct?

7    A.   Correct.

8    Q.   Because the focus here in this definition is on trading,

9    isn't it?

10   A.   I think the focus is on quantitative trading or investment

11   strategies.

12   Q.   Right.

13   A.   Which is -- I think, "investment strategies" stands on its

14   own.

15   Q.   So is it your position that any investment strategy that

16   uses quantitative research would be competitive?

17   A.   Yes, it is.

18   Q.   All right.  Now, let me ask you this question.  I'm going

19   to show you paragraph 34 of your affidavit.

20   A.   OK.  Do I have that here?

21   Q.   I'll put it on the screen for you.

22   A.   Thank you.

23          MR. BUCHDAHL:  I'll put it on your screen too.

24   Q.   Do you see paragraph 34 there?

25   A.   Yes, I do.

GCEAWOR3ps                    DeAddio - cross

1    Q.  Now, you make clear in your declaration that Mr. Ober could

2    work at any financial company that does not compete with

3    WorldQuant, in the quantitative investment industry.  Do you

4    see that?

5    A.  I do.

6    Q.  Can you give us some examples?

7    A.  Certainly.  I can say the quan -- a financial company,

8    Bloomberg, financial data companies, of which he knows many.  I

9    could say purely fundamental funds like the one I used to work

10   at.  I could say a credit fund, a credit hedge fund that only

11   trades in debt and in leveraged loans.  They're all fine.

12   Q.  OK.  So if Mr. Ober were being hired to buy data sets, by a

13   fundamental hedge fund --

14   A.  Mm-hmm.

15   Q.  -- would you believe that that was competitive?

16   A.  If they were not intending to create a quantitative data

17   services infrastructure, then, yes.

18   Q.  Then, yes, what?

19   A.  Then it would not be competitive.

20   Q.  It would not be competitive.  So where does it turn into

21   competitive in your mind?  At what stage of the process?

22        Let use another example to give guidance.

23   A.  Do you want me to answer the question?

24   Q.  Yes, but I want to use an example that I think will help us

25   talk about it.

1        THE WITNESS:  I've got J here.

2        MR. BUCHDAHL:  It's not J.  I think we want K.

3   Q.  All right.  Would you look at this chart I put up here.

4   A.  Yes.

5   Q.  So I want your help so I can understand where you think

6   that you become a competitor with WorldQuant.  We agree that

7   WorldQuant does computer-driven trades.  Right?

8   A.  That's true.

9   Q.  All right.  And we agree that there are computer

10  programmers, actual computer scientists, who write the code for

11  algorithms that generate those trades, right?

12  A.  Yes.

13  Q.  And we can agree Mr. Ober doesn't know how to do that,

14  right?

15  A.  Mr. Ober is not a computer programmer.

16  Q.  OK.  And before it gets to the computer programmers, there

17  are research scientists who do research on the data, right?

18  A.  Data and research scientists, yes.

19  Q.  And we can agree that's not Mr. Ober's job either, right?

20  A.  Um, no.  He does a part of it.

21  Q.  But he turns it over to the research team.

22  A.  After two levels of assessment where he does the work of

23  the data scientists.

24  Q.  Yes.  And then it's the researchers who make the decision

25  about whether it's going to move to the next step in the

GCEAWOR3ps                   DeAddio - cross

1    process, right?

2    A.  Our analysts or researchers do that, yes.

3    Q.  And so, have you seen any evidence that Third Point is

4    trying to hire computer programmers?

5    A.  Your Exhibit A says that they're hiring data scientists and

6    developers.

7    Q.  No, I agree with that.  It says computer scientists -- I

8    mean data scientists and developers.  Have you seen any

9    evidence that they're hiring coders, computer scientists?

10   A.  I would have no way to see any evidence of that, no.

11   Q.  And without a computer programmer, you can't do any

12   algorithmic trading, right?

13   A.  That is very true.

14   Q.  And without a computer programmer, you can't do any

15   computer-driven trading, right?

16   A.  That is very true.

17   Q.  And without a computer programmer, you can't do any black

18   box trading, right?

19   A.  Absolutely.

20   Q.  And so all of those examples that you used in the contract

21   require computer programmers in order to do.

22   A.  Of course they do.

23   Q.  And if we look back at Exhibit A, where Third Point charted

24   out all the people it wanted to hire --

25   A.  Mm-hmm.

GCEAWOR3ps                    DeAddio - cross

1   Q.  -- on page 7, there is not a computer programmer among

2   them, is there?

3          MR. HAWKS-LADDS:  On which page?

4          MR. BUCHDAHL:  Page 7.

5   A.  Um, I'm sorry.  "Data engineer" is another word for a

6   computer programmer, because they are responsible for data

7   loading, visualization, and database administration.  That is a

8   computer programmer.

9          I would also add that web scraping, it is required to

10  be a computer programmer to do.  And I would also add that they

11  speak here of an IT team that already exists.  And I don't know

12  if they have computer programmers on or not, but it seems to

13  imply that they do.

14  Q.  OK.  This is all referred to under 1 as the data team

15  personnel hiring management, correct?

16  A.  Yes.

17  Q.  Now, at WorldQuant, the data team brings the data in, turns

18  it over to the research team, who turns it over to computer

19  scientists, who make the code.  Right?

20  A.  No, that's not correct.  The data scientists at WorldQuant

21  are computer programmers.

22  Q.  Are they the computer programmers who code your algorithms?

23  A.  No.  They are the ones who load, clean, and manage the data

24  and the database.

25  Q.  It is an entirely separate group of people who code the

GCEAWOR3ps                    DeAddio – cross

1   algorithms that you call alphas from the data scientists who

2   wrote the data, correct?

3   A.  It is a different group.  They are all computer

4   programmers.

5   Q.  Now, let's go back to the contract, Exhibit F.

6   A.  I'm sorry.  F for Frank?

7   Q.  F for Frank.  Could you turn to the last page.

8   A.  Yes.

9   Q.  Now, paragraph B, do you see a last sentence beginning with

10  "in addition"?

11  A.  Yes.

12  Q.  Now, this says "in addition, the nonprevailing party in any

13  litigation with respect to the restrictive covenants contained

14  in the agreement shall pay the prevailing party all of its

15  reasonable attorney's fees and other legal costs and

16  disbursements expended in the conduct of such litigation."  Do

17  you see that?

18  A.  I do.

19  Q.  Would you agree with me that this is litigation with

20  respect to the restrictive covenant contained in this

21  agreement?

22          MR. HAWKS-LADDS:  Relevance to the covenant issue,

23  your Honor.  That's something that we can argue about later.

24          THE COURT:  Overruled.

25  A.  I'm sorry.  I am not a lawyer, and I can't parse that part

GCEAWOR3ps                         DeAddio - cross

```
 1    of it.
 2    Q.  All right.  So do you believe that you are trying to
 3    enforce with this litigation a restrictive covenant in this
 4    agreement?
 5    A.  Yes, I do.
 6    Q.  Thank you.
 7          At what point, going back now to this chart that I
 8    have on your screen, at what point in this process would you
 9    believe that a company crossed the line and became a competitor
10    of WorldQuant's?
11    A.  When they decide that they are going to start building an
12    infrastructure to consume large data sets that cannot be used
13    in Excel, that require data scientists, computer programmers,
14    and databases to digest and analyze and then make that an idea-
15    generation aspect of their existing -- an idea-generation
16    addition to their existing investment process.
17    Q.  Simply the analysis of large databases, in your mind, would
18    bring you within the definition of "competitor"?
19          MR. HAWKS-LADDS:  Objection.
20    A.  Let me -- I -- go ahead.
21          THE COURT:  Objection overruled.  You may answer the
22    question.
23    A.  I will augment my decision -- my opinion.
24          THE COURT:  Testimony.
25          THE WITNESS:  Thank you.
```

GCEAWOR3ps                 DeAddio - cross

1  A.  -- testimony, and then use the information from that to

2  change the way they trade and invest.

3  Q.  So if Third Point never changed the way it traded but it

4  sometimes made different decisions because it had this

5  additional data, to you that's enough?

6  A.  They are one and the same.  You cannot not change the way

7  you trade but change your decision process, because their

8  decision process always results in buying or selling stock.

9  Q.  So your point is, look, at the end of the day, Third Point

10  has to make a trade in order to invest in a company, so of

11  course it's trading.  Is that the point?

12  A.  Absolutely.

13  Q.  OK.

14  A.  Spot on.

15  Q.  All right.  Now, you acknowledged yesterday that WorldQuant

16  trades in a very large number of stocks.  Do you remember being

17  asked that?

18  A.  Yes, I do.

19  Q.  Now, does WorldQuant trade every single company in the Dow

20  Jones industrial average?

21  A.  Dow Jones industrial average.  I would say on average, yes.

22  Sometimes, sometimes not, but on average yes.

23  Q.  Does WorldQuant trade every company in the S&P 500?

24  A.  On average, most, not always all.

25  Q.  If a company is big enough for Third Point to take a

1   billion dollar position, aren't the chances 99 out a hundred

2   that WorldQuant is trading that stock?

3   A.   The chances are materially high.

4   Q.   Would you agree with me that any company big enough for

5   Third Point to put a billion dollars in is being traded by

6   WorldQuant?

7   A.   The probability is high, but I can't say definitely all the

8   time.

9   Q.   When you say "high," though, we agree it's well north of 90

10  percent, correct?

11  A.   I can't answer the number, but it is -- it is probable.

12  How about that?

13  Q.   And can you tell the Court -- and I'm not asking you to do

14  it -- but would you be able to tell the Court what WorldQuant's

15  biggest position is right now?

16  A.   Today?

17  Q.   Yes.

18          MR. HAWKS-LADDS:  He's not asking you to do it.  He's

19  asking you, could you do it.

20  A.   Could I tell it?  Yes, I could.

21  Q.   In a single-name stock?

22  A.   Yes.

23  Q.   Could you tell the Court what WorldQuant's five top

24  positions are in single-name stocks?

25  A.   Are you asking me, do I have access to that information?

GCEAWOR3ps                    DeAddio - cross

1    How would I be able to tell you from memory?

2    Q.  Let's start with you.  Do you know, sitting here today?

3    A.  As of today, off the top of my head, no.  I would have to

4    look.

5    Q.  Mr. Targoff came in -- you weren't present, but Mr. Targoff

6    explained that Third Point's biggest position was a $2 billion

7    debt in Backster Industries that they've had already for over a

8    year.

9    A.  I'm sorry, $2 billion --

10   Q.  Position in a company called Backster Industries --

11   A.  Yes.

12   Q.  -- that they had made more than a year ago.

13   A.  Mm-hmm.

14   Q.  Has WorldQuant ever made a billion dollar investment in a

15   single-name company and held it for more than a year?

16   A.  No.

17   Q.  What percentage of WorldQuant's profits are generated from

18   trading activity with a time horizon of less than one month?

19   A.  I don't have that information, but it's not a hundred

20   percent.  We have strategies that have more than a one-month

21   holding period.  We have a long-only set of strategies that

22   have many-month holding periods.

23   Q.  I understand that.  You testified yesterday.  I'm trying to

24   allow the Court to figure out, just to get a sense of the

25   percentages.  Would you agree with me that the bulk of

GCEAWOR3ps                    DeAddio - cross

1   WorldQuant's profits is generated by trading activity with a

2   time horizon of less than one month?

3   A.  I don't know.  I don't know.  I don't have, actually, I

4   don't have data that gives me profits by holding period.  That

5   I don't know.

6   Q.  Would you agree with me that the vast majority of

7   WorldQuant's actual alphas have to do with time horizons less

8   than one month?

9   A.  I don't have that information either.

10        We have alphas of all holding periods.

11  Q.  What company does WorldQuant have its biggest stake in

12  right now?

13        MR. HAWKS-LADDS:  Wait a minute.  Just, your Honor, I

14  just need to check with my client to see if that's proprietary

15  and confidential.

16        (Pause)

17        MR. HAWKS-LADDS:  It's a proprietary and confidential

18  trade secret that is not open to the public, and I object to

19  the question.

20        MR. BUCHDAHL:  We would agree that we can seal this

21  portion of the transcript.

22        MR. HAWKS-LADDS:  I don't know what the relevance is

23  either, but --

24        MR. BUCHDAHL:  OK.  I'll withdraw it, just to make it

25  easier.

GCEAWOR3ps                     DeAddio - cross

1   Q.  When did WorldQuant make that investment in its largest

2   holding?

3   A.  When did they make it?

4   Q.  Yes.

5   A.  We have many stocks, and I don't have the timing of each

6   stock, in terms of when we entered the first share or the

7   second share or the third share.  What's the question?

8   Q.  The question was, when did WorldQuant make its investment

9   in its current largest holding?

10  A.  I don't have that information.

11  Q.  Why?  Can you tell me why WorldQuant invested in that

12  company?

13  A.  In terms of the thesis?

14  Q.  Yes.

15  A.  Because our algorithmic trading signals show that that is a

16  stock that's likely going to go up for a variety of reasons

17  based on data sets that we have.

18  Q.  And that was information generated by computer programs,

19  correct?

20  A.  It is information run by a computer program from algorithms

21  that human beings coded.

22  Q.  And computers entered the trades, right?

23  A.  Computers executed the trades, yes.

24  Q.  Even for WorldQuant's biggest position.

25  A.  Right.

GCEAWOR3ps                    DeAddio - cross

1   Q.  Do you know what the time horizon is for that investment?

2   A.  The time horizon, I can't tell you the time horizon,

3   because every day we reassess all of our positions, and change

4   them.  So no time horizon will be known for any stock.

5   Q.  And just so we're clear, when you say "we assess all our

6   positions," what you mean is, computers are running algorithms

7   that spit out answers with regard to all of your positions,

8   correct?

9   A.  It is, that's correct.

10  Q.  There is nobody at WorldQuant who is going to say, you know

11  what, I think we're done with this largest investment and I

12  personally am going to sell.  That doesn't happen at

13  WorldQuant, does it?

14  A.  Discretion at the single-stock level does not happen.

15  Discretion at the size of investments across strategies is

16  discretionary at the human -- at the human level, yes.

17  Q.  Do you have any alphas that relate to only a single stock?

18  A.  Yes.  We developed alphas that relate to single stocks and

19  single sectors and single indices and single ETFs.

20  Q.  What percentage of single-stock alphas does WorldQuant

21  have?

22  A.  I don't have that information.

23  Q.  It's less than 1 percent of your alphas, isn't it?

24          MR. HAWKS-LADDS:  Objection.

25  A.  How would I know that?

1            MR. HAWKS-LADDS:  He says he doesn't know.  If he

2    doesn't know, he doesn't know.

3    A.  I don't know.  I don't know that to be a fact, no.

4    Q.  Well, do you think there's any chance that it's half of

5    your alphas?

6    A.  I don't know the answer to that.  I don't think there's --

7    I don't think half is a reasonable number, but I don't know

8    anything from there.  We don't, we don't calculate those

9    numbers.  I don't have those facts.

10   Q.  So Mr. Ober also wouldn't have any idea what alphas relate

11   to a single company or to bundles of companies, correct?

12   A.  I think we stipulated that he doesn't have knowledge of the

13   actual algorithms themselves.

14   Q.  So Mr. Ober doesn't have any better idea than you do of

15   what the top five holdings are at WorldQuant, right?

16   A.  Um, no, he wouldn't have any better idea than I do; that's

17   correct.

18   Q.  Now, what percentage -- let's start here.  How big is

19   WorldQuant?  What's the assets under management?

20   A.  That I can't give you because, since we manage our managed

21   account for Millennium, there are no assets under management

22   per se that can be pointed out, because we don't have our own

23   file.

24   Q.  How big is Millennium?

25   A.  Millennium --

1          THE WITNESS:  Can I?

2          MR. HAWKS-LADDS:  Yes, go ahead.

3   A.  Millennium is approximately 34 billion in AUM.

4   Q.  And you can't say what percentage of Millennium's assets

5   are made available for WorldQuant's trading strategies?

6   A.  You can't because of the way leverage is commingled.  It's

7   an allocation.  There is no actual number for AUM, no.

8   Q.  So WorldQuant can't make any claims as to the size of its

9   trading.

10  A.  I can make an approximation and tell you what we can say.

11  Q.  Please do that.

12  A.  ███████████████████████████████████████████████████████████

13  ███████████████████████████████████████████And it's unfortunately very

14  esoteric and obtuse.

15  Q.  Approximately how many billion dollars would be associated

16  with that investment?

17          THE WITNESS:  Am I OK?

18          MR. HAWKS-LADDS:  Is that -- just a second.

19          (Pause)

20          MR. HAWKS-LADDS:  That's confidential and proprietary

21  information, your Honor.

22          THE COURT:  All right.

23  Q.  Approximately what percentage of the total assets being

24  traded by WorldQuant are invested in its biggest holding that

25  you described earlier?

1          MR. HAWKS-LADDS:  Just one second.

2          Go ahead.

3          THE WITNESS:  I can answer that one?

4          MR. HAWKS-LADDS:  This is the same question you

5     answered you didn't know.  So you can answer.

6          THE WITNESS:  I can answer?

7          MR. HAWKS-LADDS:  Yes.

8     A.  OK.  On average, our biggest holding usually ██████████

9     ███████████████████████████████████████████

10    Q.  So the top five -- let's do it another way.  The top 20

11    positions at WorldQuant would be ███████████████ of all

12    your assets.

13    A.  Um, it could -- probably, that -- that would probably be

14    true.

15    Q.  You're the chief operating officer of WorldQuant, correct?

16    A.  I am.

17    Q.  How many locations does WorldQuant have around the world?

18    A.  We currently have 22 locations.

19    Q.  How many computer servers does WorldQuant use to make its

20    trades?

21    A.  You can't really measure them in servers anymore, and I

22    apologize for being obtuse.  They're measured in cores, in

23    terms of CPUs.  So we have about 60,000 CPUs.

24    Q.  60,000 CPUs?

25    A.  That's right, yes.

1    Q.  And all of them are in use to generate trading activity,

2    correct?

3    A.  Um, most are.

4    Q.  And approximately how many trades does WorldQuant do in a

5    day?

6    A.  We can do several hundred thousand and peak over a million

7    trades a day.

8    Q.  Now, you said before that it doesn't matter if the computer

9    does it or if a human does it.  Is there any human being on

10   earth that could execute a million trades in a day?

11   A.  Um, it's the number of shares that matter.  But, no, a

12   human could not enter a million trades a day.

13   Q.  How many human beings do you think it would take, if a

14   company is never going to do any computer trading,

15   computer-execution trades, how many people would it take to do

16   a million trade executions in a day?

17   A.  Do you really want me to answer that question?

18   Q.  Would it be more than 500 people?  500 traders?

19   A.  It's not about the number of trades, by the way.  It's the

20   number of shares that trade.

21   Q.  Well, I'm talking about number of trades.  So that's the

22   question.

23   A.  You could not do that many individual trades a day with

24   people, that's correct.

25   Q.  Now, some of those trades are for very short-term horizons,

1   correct?

2   A.  Define "short term."

3   Q.  Less than one day.

4   A.  No.

5   Q.  So none of your trading is designed to move in and out of

6   position in less than a day?

7   A.  We very rarely cross, whether a long or a short, in a

8   single day for any stock.

9   Q.  But a lot of it is within a month.

10  A.  Yes.

11  Q.  And how much of it is within a week?

12  A.  I don't have the stats.  We don't measure that.

13  Q.  Is more of it longer than a week and less than a month, or

14  less than a week?

15  A.  I don't have the stat.  We don't measure that.

16  Q.  Mr. DeAddio, did you participate in drafting the employee

17  handbook?

18  A.  In sections of it.

19  Q.  Could you turn to Plaintiff's Exhibit 9.  That's in the

20  other binder.  I want you to turn to page 34.

21  A.  Yes.

22  Q.  The first paragraph is, by way of illustration and not

23  limitation, it gives nine different examples of confidential

24  information.  Correct?

25  A.  The first paragraph or the bottom?

1    Q.  "Confidential information includes."

2    A.  OK.

3    Q.  Very top of page 35.  Are you with me?

4    A.  Yes.

5    Q.  Nothing in there says anything about vendor lists, correct?

6    A.  "Vendor" is not mentioned there, specifically.

7    Q.  All right.  I want to turn back to the Plaintiff's -- I'm

8    sorry -- back to the defense binder, Exhibit D.

9    A.  Yes.

10   Q.  You have that in front of you?

11   A.  I do.

12   Q.  Now, you will agree with me that this is a vendor list,

13   correct?

14   A.  I would agree with you that this is a vendor list, yes.

15   Q.  Now, as we look at this list, you said there were 41 names

16   on it.  You counted them.  Right?

17   A.  That's correct.

18   Q.  And then when you looked at the Third Point internal

19   presentation, you said there were 30 additional names that

20   Third Point had on its internal list.  Right?

21   A.  Yes.  From the second, the second, yes.

22   Q.  So when Third Point put its list together, it had a much

23   bigger list than what Ober provided, correct?

24   A.  That's correct.

25   Q.  So it certainly doesn't look like Third Point was trying to

1  narrow down based on Mr. Ober's work, right?

2  A.  The bigger list, only 11 were firms we hadn't reviewed.

3  Q.  That wasn't my question.  30 of them were names that had

4  not been provided by Mr. Ober in this list, correct?

5  A.  That is correct.

6  Q.  Out of 71.

7  A.  That's correct.

8  Q.  Now, let's look at exactly what Mr. Ober included in his

9  list.  Now, you said that 40 of these had gone through what you

10  described as WorldQuant's initial screening process.  Right?

11  A.  Yes.

12  Q.  How many of those 40 made it through that initial screening

13  process?

14  A.  I believe 29 or 30.

15  Q.  All right.  So right off the top, Mr. Ober's team concluded

16  that a quarter of them were not valuable enough to WorldQuant

17  to proceed, right?

18  A.  Correct.

19  Q.  And yet here, he wrote, "These are sample vendors I think

20  will be valuable to Third Point."  Right?

21  A.  Yes, he did.

22  Q.  So even though WorldQuant had determined that some of these

23  vendors were not useful to WorldQuant, Mr. Ober still thought

24  they might be useful to Third Point, right?

25  A.  Seemingly so.

1    Q.  And of those 30 or so that made it through the initial

2    screening, how many actually went into production at

3    WorldQuant?

4    A.  I believe that number would be -- doing this from memory --

5    I think it's over 20.

6    Q.  Over 20.

7    A.  Mm-hmm.

8    Q.  And that's at some time in production, not necessarily --

9    A.  They are all currently in production.  OK.  We're into

10   production.  None of these have been decommissioned.

11   Q.  That's, just I will represent to you, that's a larger

12   number than Mr. Ober said, but OK.  So 20 of the 30 actually

13   went into production.  So that's another culling that

14   WorldQuant did, right?

15   A.  Yes.

16   Q.  And yet even the ones that didn't make it there, Mr. Ober

17   included on this list, right?

18   A.  Correct.

19   Q.  So if he was trying to save Third Point time to allow them

20   to get quickly down to what WorldQuant thought mattered, he

21   didn't communicate that, did he?

22   A.  I'm sorry.  Communicate that to Third Point?

23   Q.  He certainly didn't just give Third Point the ones that had

24   made it through these important WorldQuant screens.  He gave

25   them a much bigger universe, including ones that WorldQuant had

GCEAWOR3ps                    DeAddio – cross

1  rejected.  Right?

2  A.  Reviewed and rejected, yes.

3  Q.  OK.  So let's talk about a couple of these.

4         MR. BUCHDAHL:  And I am going to use a couple new

5  exhibits, which I will now hand out.

6         THE COURT:  OK.  You know what, I think this is a good

7  time for us to take our luncheon break.  We will resume at 2

8  o'clock.

9         MR. BUCHDAHL:  Thank you, your Honor.  And if the

10 Court would like, I will give you these exhibits just so you'll

11 have them.

12        THE COURT:  Thank you.

13        (Witness excused)

14        (Luncheon recess)

15        (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1           AFTERNOON SESSION

2           2:00 pm

3              (Hearing resumes)

4              (In open court)

5           THE COURT:  Good afternoon.  Please be seated.  You

6    may resume, Mr. Buchdahl.

7    CROSS-EXAMINATION

8    BY MR. BUCHDAHL:

9    Q.  Mr. De Addio, I asked you a few questions about the size of

10   WorldQuant's operations, and you testified that there were 22

11   locations worldwide.  Is that correct?

12   A.  Correct, yes.

13   Q.  Why do you have locations in different places around the

14   world?

15   A.  We have locations in different places around the world

16   because we find it a better competitive advantage to hire

17   talent outside the U.S. because there is less competition and

18   that way we don't have to worry about A visa situation which is

19   increasingly more difficult to obtain visas for non-U.S.

20   Citizens to work.

21   Q.  And may not get any easier any time soon?

22   A.  I suspect that is correct, sir.

23   Q.  Approximately how many employees does WorldQuant have?

24   A.  Approximately, I would say, 540-plus.

25   Q.  Of those, how many are actually involved in the coding of

GCEJWOR4                        De Addio - cross

```
 1   the alphas, the actual computer scientists writing the code?
 2   A.  About 250.
 3   Q.  Approximately how many people are in the category of
 4   researchers that first receive the data from the data team?
 5   A.  We would have about 30 or so that would be involved in the
 6   data on-boarding process, give or take.
 7   Q.  I don't mean on-boarding so much testing of the data?
 8   A.  The initial testing of the data, the first assessment?
 9   Q.  No.  It doesn't matter what word.  Mr. Ober's group?
10   A.  The acquisition and initial assessment team.  Mr. Ober's
11   group is, if you include internal staff overall, the W, the
12   market data request team I believe would be eight or so people.
13   Q.  How many people are in the level in-between the computer
14   science coders and Mr. Ober's group in that research group in
15   the middle that is testing that assessment?
16   A.  I am sorry.  You make an improper distinction on the way
17   we're organized.
18   Q.  All I can tell you, let me represent to you Mr. Ober
19   testified that when they on-board the data, it is then turned
20   over to a group that would do research so many of these people
21   had PhDs and were scientists that were separated from the
22   people doing actual coding.  Is that accurate?
23   A.  No, that is not accurate.  The researchers do the coding,
24   the 250-people-person group I mentioned to you, that is one and
25   the same.
```

GCEJWOR4                          De Addio - cross

1    Q.  You said before the break there were 60,000 CPUs involved?

2    A.  Approximately, yes.

3    Q.  How much does WorldQuant have to pay for one of those?

4    A.  I don't know.  I am sorry.

5    Q.  Do you know how much money WorldQuant spends to maintain

6    the 60,000 CPUs over the course of a year?

7              MR. HAWKS-LADDS:  Objection on relevance, your Honor.

8              THE COURT:  Yes.  We are getting a little far afield.

9              Sustained.

10   BY MR. BUCHDAHL:

11   Q.  Let me ask one question about that.  CPUs are not the

12   equivalent of a portfolio computer you and I would buy from the

13   Apple store, correct?

14             THE COURT:  I know what a CPU is.

15             MR. BUCHDAHL:  The reason I asked about costs, your

16   Honor, is to give you a sense of the scale of the operation and

17   magnitude of what Third Point would have to spend in order to

18   convert to that type of operation, but I don't need to go any

19   further.

20   BY MR. BUCHDAHL:

21   Q.  Before the break, I put three new exhibits in the flap of

22   your smaller binder.  If you look in the inside cover there

23   should be ones marked L, M and N.  Do you see those?

24   A.  Yes, I do.

25   Q.  Let's start with the one that you've marked as Defense

1    Exhibit L.  It says, "Bloomberg for Enterprise" at the bottom.

2    Do you see that?

3    A.  Yes.

4         THE COURT:  Before we do that, are you putting these

5    in evidence?

6         MR. BUCHDAHL:  Yes.  I apologize.  I would like to

7    offer L, M and N, and I will represent these are simply printed

8    off the internet from the Bloomberg Estimized websites

9    respectively.

10        MR. HAWKS-LADDS:  L, M and N, no objection.

11        THE COURT:  L M and N received in evidence.

12        (Defendant Exhibits L, M and N received in evidence)

13   BY MR. BUCHDAHL:

14   Q.  Now, sir, have you ever been to Bloomberg's web site?

15   A.  Yes, I have.

16   Q.  Do you recognize this advertisement from Bloomberg for his

17   news analytics?

18   A.  I have never seen this one particularly, no.

19   Q.  I want to look at how they describe themselves to potential

20   purchasers.  Now, let's start with volumes of content are

21   growing fast.  Do you see that paragraph?

22   A.  Yes, I do.

23   Q.  It says speed is essential for the event-driven trading

24   strategies, but thousands of stories appear every day and

25   algorithmic applications often require additional context to

1    react appropriately.  Not every story is as important to your

2    firm's strategy as the next and not every story hits the market

3    in exactly the same way.  As algorithmic strategies become more

4    complex, firms need to augment --

5              THE COURT:  What document are you reading from, L?

6              MR. BUCHDAHL:  L, yes.  I think I have already read

7    more than I need to.  Let me just complete that sentence.

8              Contextual details that help differential mundane

9    items from significant market moving events.

10   BY MR. BUCHDAHL:

11   Q.  Mr. De Addio, it is not a secret that Bloomberg is selling

12   news analytics products, correct?

13   A.  It is not a secret.

14   Q.  It is not a secret that Bloomberg itself is offering a

15   product that codes its stories in order to turn it over to

16   firms in the nature of data feed, correct?

17             MR. HAWKS-LADDS:  Objection; foundation.

18             THE COURT:  All right.  Would you lay a foundation,

19   Mr. Buchdahl, for that.

20             MR. BUCHDAHL:  Sure.

21   BY MR. BUCHDAHL:

22   Q.  Let's look under news analytics sharpen the focus.  What

23   this describes, it says Bloomberg news analytics deliver an

24   informative second layer of processing for our industry leading

25   textual news feed.  Then if you look at the next paragraph,

1   analytics provides numerical scores generated from the top tier

2   news wires available through the Bloomberg professional

3   service.

4          Now, sir, are you familiar with this service that

5   Bloomberg provides?

6   A.   Generally, yes.

7   Q.   You understand that what Bloomberg is doing is taking news

8   articles and actually assigning numbers to them based on

9   Bloomberg's own view of what that means for different

10  businesses, correct?

11  A.   Yes, I believe that is what they do.

12  Q.   This is a product that a quant firm can buy and feed

13  directly into its computers, correct?

14  A.   They could, yes.

15  Q.   It is not a secret that this is a service that Bloomberg

16  provides, right?

17  A.   Not a secret at all.

18  Q.   In fact, it is not a secret that Bloomberg is probably the

19  largest source of business news for Wall Street, correct?

20  A.   One of the largest.

21  Q.   Is there a larger one?

22  A.   I think others could compete.  It depends on how you define

23  "large," but no doubt one of the largest, of course.

24  Q.   The other largest would be maybe Dow Jones or Thompson

25  Reuters?

1    A.   Yes.

2    Q.   Can you think of any bigger than those three?

3    A.   That would probably make the top three at least in the U.S.

4    Q.   Let's look for a moment at M and N.  Now, sir, are you

5    familiar with a company called Estimize?

6    A.   Yes, I am.

7    Q.   Is it fair to describe Estimize as a web site that collects

8    estimates from users about companies who --

9    A.   Generally speaking, yes.

10   Q.   Now, if you look -- have you been to the Estimize web site

11   itself?

12   A.   To the web site itself, no, I have not.

13   Q.   If you can see at the top of this printout one M, Exhibit

14   M, you can see there is a bar above the words, "quantitative

15   investors."  Do you see that?

16   A.   Yes.

17   Q.   You can see on N there is a bar above a description for

18   discretionary investors.  Do you see that?

19   A.   Yes, I do.

20   Q.   At least from Estimize's perspective, they are pitching to

21   at least two different audiences, one of which is a

22   quantitative investor, correct?

23   A.   Correct.

24   Q.   And another potential audience would be a discretionary

25   investor, correct?

1    A.   Yes.

2    Q.   You understand from your own work experience that a

3    discretionary investor is one where a human being would have to

4    exercise some discretion about whether to invest in any

5    particular company, correct?

6    A.   That is correct.

7    Q.   You can see that when Estimize is pitching its product to

8    quantitative investors, it is talking about the fact that they

9    are going to have earnings and revenue estimates on over 2,100

10   U.S. listed stocks, and you can see that is the second bullet

11   point down below, correct?

12   A.   Correct.

13   Q.   And you can see they have a quote from Deutsche Bank Quant

14   Research.  Are you familiar with Deutsche Bank Quant Research?

15   A.   No, I am not.

16   Q.   If you look over to Exhibit N, could you turn down to the

17   5th bullet point there.

18   A.   Yes.

19   Q.   You see it says begins with get alerted?

20   A.   Yes.

21   Q.   It says, "Get alerted when a name you care about is likely

22   to miss big or has seen a significant trend in consensus."

23            Do you see that?

24   A.   Yes.

25   Q.   What that means by a name you care about is a company's

1    name that you might be interested in investing in, correct?

2    A.  I would assume that's what they mean.

3    Q.  Now, a discretionary investor or someone who took a single

4    bet in or a large bet in a single company could use Estimize

5    for information about just that single company, correct?

6    A.  I believe so.

7    Q.  But if you were interested in large amounts of data, you

8    could purchase the entire feed and analyze all of it

9    simultaneously, correct?

10   A.  Yes, you could.

11   Q.  In fact, the datasets that WorldQuant is interested in are

12   in nearly every case datasets that involve over a hundred

13   different companies, correct?

14   A.  We have datasets of less than a hundred but, yes, many of

15   them are greater than a hundred.

16   Q.  Nearly all of them was my question, nearly all of them

17   involves over a hundred companies, correct?

18   A.  I cannot answer nearly all of them because I don't know the

19   answer to that.

20   Q.  Would you agree with me it is most of them?

21   A.  I would say most would be fair.

22   Q.  Did you testify -- or maybe your counsel said it -- that

23   you have approximately ■ data vendors that you're using in

24   production?

25   A.  That is correct.

1   Q.  You said that of those ██, you identified 20 on the list

2   that Mr. Ober gave to Third Point?

3   A.  Yes.

4   Q.  So there are over ██ vendors that WorldQuant has

5   identified, screened, tested and put into production that Mr.

6   Ober did not include in his list, correct?

7   A.  That is correct.

8   Q.  And he did include in his list companies that WorldQuant

9   had screened and rejected and had tested and rejected, correct?

10  A.  Correct.

11  Q.  And you'll agree with me that it is certainly easy to think

12  of vendors that might have interest for a fundamental investor

13  that would be of no use to WorldQuant, correct?

14  A.  There could certainly be vendors such as that.

15  Q.  Mr. De Addio, are you aware of any documents that Mr. Ober

16  improperly took from WorldQuant?

17  A.  Any actual documents?

18  Q.  Actual documents?

19  A.  I am aware of nothing from a document perspective.

20  Q.  Is it fair to assume that WorldQuant did a diligent check

21  of his records and e-mail to see whether he had taken anything

22  with him when he left?

23  A.  I would say we have done a check and continues, so the

24  initial check we have worked on.

25  Q.  You have identified nothing.  Is that right?

1    A.  We haven't identified anything, to my knowledge, that he

2    has taken in that way.

3              MR. BUCHDAHL:  One moment, your Honor.

4              (Off-the-record discussion)

5              MR. BUCHDAHL:  Your Honor, I'll pass the witness.

6              THE COURT:  Mr. Hawks-Ladds, do you have any redirect?

7              MR. HAWKS-LADDS:  I do, your Honor.

8    REDIRECT EXAMINATION

9    BY MR. HAWKS-LADDS:

10   Q.  Mr. De Addio, under cross-examination Attorney Buchdahl

11   asked you why quantamental isn't mentioned in the restrictive

12   covenant agreement.  Do you remember that question?

13   A.  Yes, I do.

14   Q.  Why isn't quantamental mentioned in the restricted, the

15   word quantamental mentioned in the restrictive covenant

16   agreement at issue here?

17   A.  Because it is not a real word.  It doesn't have any real

18   definition.  It is not in the dictionary.  It is not anywhere

19   where one can look up what it means.

20   Q.  Did you even know about the word before this litigation?

21   A.  I had heard it.

22   Q.  Now that you've been involved in this litigation, do you

23   have an understanding of what that word means?

24   A.  I think that word can be interpreted in many ways.

25              My interpretation after reading up a lot more on it

1    personally is that it is a hybrid form of investment that

2    marries a quantitative investment process with a fundamental

3    process.

4    Q.   "Fundamental process" would include discretionary

5    investors, right?

6    A.   Yes.

7    Q.   Turn to Exhibit C which is the e-mail from Attorney Targoff

8    to Mr. Ober.

9    A.   Yes.

10   Q.   Now, Attorney Buchdahl asked you questions about whether or

11   not Mr. Targoff was being dishonest or untruthful, or words to

12   that effect in this e-mail.

13            Did you have any reason when this e-mail was shown to

14   you to know whether or not Attorney Targoff was being

15   disingenuous, dishonest or the like?

16   A.   No.

17   Q.   Now, where Attorney Targoff wrote:

18            "We are not currently and do not expect to be a

19   competitor of WorldQuant, as we have no intention to build-out

20   a quantitative trading effort," do you have any reason as you

21   sit here today to dispute that statement now?

22   A.   No.

23   Q.   Well, all of the litigation involves Mr. Ober going to

24   provide Third Point with what?

25            MR. BUCHDAHL:  Objection, your Honor, just the

1    characterization of what this litigation is about.

2              THE COURT:  Objection to form sustained.

3    BY MR. HAWKS-LADDS:

4    Q.  What is this litigation about you're trying to prevent Mr.

5    Ober to go to Third Point?  Why are you doing that?

6    A.  To prevent him from sharing confidential information and

7    trade secrets, to prevent him from giving them an unfair

8    competitive advantage based on our efforts and investments to

9    date and our data sources, the value of them, the value they

10   have in idea generation and their profitability.

11   Q.  Explain the difference to the Judge what you just said and

12   what quantitative trading effort means.

13   A.  Certainly.  I would say there is a nuance here that is

14   important, and we can disagree on it, but I think it is

15   important.

16             Quantitative trading where the computers place the

17   trades is one aspect of our investment process.  We differ

18   there.  I do understand they have human beings placing very

19   large trades into a system manually, that then they execute

20   electronically, but there is a difference.

21             The part that this doesn't say is that he will be,

22   that they will not be embarking on a quantitative investment

23   process, a quantitative way to generate ideas from data versus

24   just the trading itself.  That is the part, the idea generation

25   that they would obtain from Mr. Ober's knowledge of our most

1    profitable datasets, and then that will feed into their

2    investment process, and eventually what trades they choose to

3    execute even if it goes through a discretionary human being at

4    the end, I think that is an important nuance.

5    Q.   Do you have any evidence to support the fact that Third

6    Point intends to engage in high-level, high-density trading

7    like WorldQuant does?

8    A.   In terms of trading lots and lots of small trades a day, I

9    have no evidence of that.

10   Q.   Does that impact your belief in any way that Ober should

11   not be able to work at Third Point?

12   A.   That has nothing to do with whether it is competitive, in

13   my view.  What is competitive is the idea generation part of

14   the investment thesis from the data.

15   Q.   Attorney Buchdahl went through painstakingly WorldQuant's

16   electronic trading process.

17   A.   Yes.

18   Q.   Doesn't that play a role in whether or not Third Point is

19   competing with WorldQuant?

20   A.   In my view, it does not.

21   Q.   Why?

22   A.   Because we choose to trade lots of trades in small size, a

23   hundred shares, 200 shares not because the timing matters.  It

24   doesn't.  We trade in waves per day, not every second, not

25   every minute.  We do that because it gets us the best price for

1   the trades we get.  If you go to the market and say I want to

2   buy a million shares, you can have the market move very quickly

3   against you.

4           We break up our trades over days into small buckets so

5   we get the best execution price.  So the reason we trade so

6   many per day is to get the best execution price, not because

7   we're trading on nanoseconds or trading on data that happened

8   for the last four minutes.  The vast majority of our trading is

9   what we call Day 1 trading, which is on information we received

10  yesterday, not today.  We do some today, but most of our trades

11  are on information we received yesterday, and we are building

12  up or taking down a position over time to minimize how much the

13  market moves against us.

14  Q.  Does it make any difference to your answer whether or not

15  Third Point begins using 6,000 CPUs to do their trades as

16  opposed to two trades?

17  A.  No.

18  Q.  Why?

19  A.  Because again it is the idea generation that is coming from

20  the data, be it algorithmically or someone looking at it and

21  digesting it, that creates the similarity in the investment

22  idea portion of the process.

23  Q.  Now let's take a look at Exhibit D --

24  A.  Yes.

25  Q.  -- and the attachment which has been the source of a lot of

1   testimony.  Are these vendors and the datasets the totality of

2   all the vendors that Mr. Ober knows about?

3   A.  No, they're not.  I would add that those here that he

4   mentioned that we do have in production this year accounted for

5   35 percent, approximately, of our profits.

6   Q.  These on this page accounted for --

7   A.  30 to 35 percent of our profits are reflected by the

8   datasets here that are in production, so we do have ██, but

9   the 30 here are quite disproportionately reflective.

10  Q.  If Mr. Ober were permitted to go to Third Point to work as

11  its chief data scientist immediately with no break, would he be

12  able to recollect those ██ other vendors that you're using?

13           MR. BUCHDAHL:  Objection.

14           THE COURT:  Sustained.

15  BY MR. HAWKS-LADDS:

16  Q.  Mr. De Addio, in order for Ober to do his job at Third

17  Point, he will have access to the knowledge that is within his

18  head, right?

19  A.  Yes.

20  Q.  And that knowledge includes all of the datasets and vendors

21  that he knows right now, right?

22           MR. BUCHDAHL:  Objection; leading.

23           THE COURT:  Yes, it is.

24           MR. HAWKS-LADDS:  I agree with that one, your Honor.

25           THE WITNESS:  I agree.

1    BY MR. HAWKS-LADDS:

2    Q.  You testified on direct earlier that you, WorldQuant, needs

3    the benefit of time.  Why?

4    A.  The datasets that are the most profitable, the most

5    valuable from an idea-generation perspective do evolve over

6    time.  They change.  As new vendors come on the scene, the

7    process evolves.  It must.  Time allows that current knowledge

8    to decay, and by the time it is applied, which I think it

9    inevitably will be, it would be no longer easy to remember or

10   know which ones are top.

11   Q.  Does the market data team which Ober used to co-head

12   consider this list confidential?

13           MR. BUCHDAHL:  Objection, your Honor.

14           THE COURT:  Sustained.

15           MR. HAWKS-LADDS:  I don't know what is wrong with the

16   question, your Honor.

17           THE COURT:  What do you mean, what do they consider?

18           The issue here is the official position of WorldQuant

19   in terms of what the contract says they consider competitive.

20   If you're trying to add in stuff that is not in the contract, I

21   don't want it.

22           MR. HAWKS-LADDS:  Thank you.

23   BY MR. HAWKS-LADDS:

24   Q.  Does WorldQuant consider the information in Exhibit D, the

25   first page of the attachment, confidential?

1    A.  The knowledge of which vendors we trial, review and/or use

2    we consider very confidential.

3    Q.  Now, in the employee handbook which is exhibit -- there are

4    several of them.  I will just look at Exhibit 7, Page 33 is

5    where it starts.  I want to point to the back page.  33, the

6    bottom paragraph, is a partial paragraph?

7    A.  Yes.

8    Q.  Read that first line.

9    A.  "Confidential information includes, by way of illustration

10   and not limitation, information with respect to any investment

11   made or to be made by the company and any transactions in which

12   they have been, are or will be engaged, performance

13   information, financial or other business information."

14   Q.  I won't have you read the whole paragraph.  For the very

15   first line, by way of illustration and not limitation, what

16   does that mean?

17   A.  This is not a comprehensive list.

18   Q.  Turn to Page 35, the very top line.

19   A.  Yes.

20   Q.  How is "sensitive data" defined?

21   A.  P&L information, that is athe profit and loss acronym,

22   timing data, position or trading information, vendor pricing,

23   et cetera.

24   Q.  What does, "et cetera" mean?

25   A.  And other items that we deem sensitive over time.

1    Q.  Including what, for example?

2              THE COURT:  Well, now, come on!

3              If it was specifically in here -- I mean, you can

4    include the whole universe given an opportunity because you

5    said well, it should include this or did include that or we

6    think it includes that.  You know, the contract speaks for

7    itself.

8    BY MR. HAWKS-LADDS:

9    Q.  Let's look at the contract, Mr. De Addio, Exhibit 1.

10   A.  1.

11   Q.  Page 5.

12   A.  Yes.

13   Q.  The middle of the first paragraph that's labeled B 1, does

14   it refer to vendors anywhere?  I'll help you out.

15   A.  I may need to get my glasses.

16   Q.  You need your glasses?

17             THE WITNESS:  Would that be okay?

18             THE COURT:  Actually, I would like to have you at a

19   disadvantage.

20             MR. BUCHDAHL:  I will stipulate the confidential

21   information contains the phrase vendor relationship or terms

22   halfway down.

23             THE COURT:  I see it.

24   BY MR. HAWKS-LADDS:

25   Q.  Do you need your reading glasses, Mr. De Addio?

1    A.  If we are going to go through these, I would.

2    Q.  I don't have a lot more, but I want you to be able to read

3    carefully.

4    A.  Let me just grab it if you don't mind.  It is getting too

5    small.  (Pause)

6    Q.  I am done with that exhibit.  I would like you to look at

7    Exhibit F, Defendant's Exhibit F.

8    A.  Okay, yes.

9    Q.  The second to last paragraph on the page, and this was the

10   subject of both cross and direct examination, but Attorney

11   Buchdahl crossed you on this particular paragraph.

12   A.  The first page?

13   Q.  No.  I am sorry.  The second page.

14   A.  The second page, okay.

15   Q.  It starts, "For the purposes hereof, quantity of trading or

16   investment strategies" --

17   A.  Yes.

18   Q.  Then there are definitions.

19           The last sentence that starts for the avoidance of

20   doubt and continues, a business or person that uses

21   quantitative models to trade shall be considered a competitor

22   irrespective of the products traded by such person or business.

23           What does that modify?

24   A.  What does that modify?

25   Q.  In the document?

GCEJWOR4                          De Addio - redirect

1    A.  This modifies the above.

2    Q.  Which part?

3    A.  It modifies, I believe, the whole part of the above.

4              THE COURT:  What do you mean by the whole part of the

5    above?

6              THE WITNESS:  In my opinion, as to how we drafted

7    this, this section gives a list of terms for the investment

8    process we use and helps describe the main term which is

9    quantitative trading or investment strategies, and at the end

10   it clarifies all of that, that anyone who uses these strategies

11   or methodologies to trade would be considered a competitor.

12             Essentially it encompasses it all and says if you use

13   it at all, we consider you a competitor.  That is my

14   interpretation of this.

15   BY MR. HAWKS-LADDS:

16   Q.  Your interpretation is of WorldQuant's document --

17   A.  Yes.

18   Q.  -- that was the intent of WorldQuant?

19   A.  That is the intent.

20   Q.  In that same exhibit book, turn to Exhibit A, Page 10.

21   A.  Yes.

22   Q.  In cross-examination Attorney Buchdahl asked you questions

23   about programmers versus -- about programmers.  Do you recall

24   that questioning?

25   A.  Yes, I do.

GCEJWOR4                     De Addio - redirect

```
 1   Q.  Do you see anywhere on this page whether there is any
 2   reference to any group of employees at Third Point that could
 3   be considered programmers?
 4   A.  ████████████████████████████████████████████████████
 5   ████████████████████████████████████████████████████████
 6   ███████████████████████████████████████████
 7   ████████████████████████████████████████████████████
 8   ██████████████████████████████████████████████
 9   ██████████████████████████████
10   Q.  So a technology start-up would include computer folks,
11   right?
12          MR. BUCHDAHL:  Objection, your Honor.
13          THE COURT:  Yes.
14          MR. BUCHDAHL:  We are back to this whole idea what
15   could you possibly mean, that they meant by this.
16          THE COURT:  Yes, yes, please!
17   BY MR. HAWKS-LADDS:
18   Q.  Does WorldQuant have information technology people on
19   staff?
20   A.  Yes, we do.
21   Q.  What do they do?
22   A.  Program computers.
23   Q.  They don't just program computers -- withdrawn.
24          They program computers for what?
25   A.  For everything from data on-boarding to data analysis to
```

1     quantitative algorithm development to execution and trade

2     processing.

3     Q.  Attorney Buchdahl asked you questions about the number of

4     trades that WorldQuant makes.  Do you remember that?

5     A.  Yes.

6     Q.  Does the number of trades that an investment advisor make

7     have anything --

8                THE COURT:  Is this going to have an answer of yes or

9     no?

10               MR. HAWKS-LADDS:  Probably not.  I'll start again.

11               THE COURT:  Yes.

12    BY MR. HAWKS-LADDS:

13    Q.  What does the number of trades have to do with the

14    procurement and digesting of data?

15    A.  Nothing.

16    Q.  There were questions somewhere during cross-examination

17    relating to the types of vendor information that Mr. Ober

18    provided to Third Point and whether or not it was valuable to

19    Third Point.  Do you remember that line of questioning?

20    A.  Yes.

21    Q.  Do you know whether or not the information that Ober

22    provided to Third Point could have been valuable to Third

23    Point?

24               MR. BUCHDAHL:  Objection, your Honor.

25               THE COURT:  Yes, sustained.

1   BY MR. HAWKS-LADDS:

2   Q.  Are there non-traditional types of vendors that Mr. Ober

3   has knowledge of other than █████████████████?

4   A.  Yes.  Those would be the providers that data are not for

5   sale.

6   Q.  What does that mean, data, "not for sale"?

7            MR. BUCHDAHL:  Objection.  Are we are repeating direct

8   or --

9            THE COURT:  Yes, we certainly are, aren't we?  Now

10   you're going to be limited to what Mr. Buchdahl asked on

11   cross-examination.

12   BY MR. HAWKS-LADDS:

13   Q.  Mr. Buchdahl asked how much Third Point would have to spend

14   on quantitative strategy.  Do you remember that question?

15   A.  Yes.

16            MR. BUCHDAHL:  Objection.  I was not permitted to go

17   into that, your Honor.

18            MR. HAWKS-LADDS:  Not the amount, but he asked

19   questions about how much to spend was, just not how much the

20   CPUs would cost.

21            THE COURT:  Where are you going with this?  May I have

22   an offer of proof.

23            MR. HAWKS-LADDS:  I am almost done, by the way.

24            I want the witness to tell the court the relevance of

25   whether or not Third Point spending billions of dollars on this

1    new initiative is relevant or not and why, or why not.

2              THE COURT:  Go ahead.

3    BY MR. HAWKS-LADDS:

4    Q.  Can you answer the question?

5    A.  I would say that to start up with 10 or 20 datasets that

6    were known to be valuable would require a fraction of the

7    investment capacity that we would have because it is a small

8    set, it is a good start up place and the investment could be

9    very, very limited and still have impact.

10   Q.  Mr. Buchdahl asked you about Estimize and Bloomberg and

11   whether the fact that they sell data is confidential.  Do you

12   remember that?

13   A.  Yes.

14   Q.  Is the fact that they sell data confidential?

15   A.  No.

16   Q.  What is confidential in relation to what these data

17   providers provide?

18   A.  The fact that we used them, the fact that which products of

19   them we used and how much value they provide to us from a

20   profit perspective.

21   Q.  All of which Ober knows?

22   A.  All of which he is extimately familiar with.

23              MR. HAWKS-LADDS:  Just a minute, your Honor, please.

24              THE COURT:  Take your time.

25              (Off-the-record discussion)

1              MR. HAWKS-LADDS:  Nothing further.

2              THE COURT:  Okay.

3              MR. BUCHDAHL:  Your Honor, we can let the witness go.

4    I don't have any additional cross, but I would appreciate time

5    for closing arguments.

6              MR. HAWKS-LADDS:  Your Honor, we would like to prepare

7    briefs if possible.

8              MR. BUCHDAHL:  Your Honor, we had a motion for a

9    temporary restraining order.

10             THE COURT:  Yes, right.

11             MR. BUCHDAHL:  We had a motion for a preliminary

12   injunction and we have been very patient in the sense there has

13   been no outstanding order.  We have asked Mr. Ober to sit

14   tight.  We have asked him not to to start, but it is time for

15   him to start.

16             We don't think some kind of briefing schedule,

17   particularly with the holidays comings up, makes a lot of

18   sense.  Even if you want briefs, I would still like the

19   opportunity to argue a little bit what the conclusion the court

20   can draw is based on the day and a half testimony we have.  I

21   think the witness can step down.

22             (Witness excused)

23             MR. HAWKS-LADDS:  Whatever your Honor decides,

24   obviously.

25             THE COURT:  Well, would you like to sum up?

1          MR. BUCHDAHL:  I would, your Honor.  May I?

2          THE COURT:  Yes.

3          MR. BUCHDAHL:  So what I think has become clear over

4    the course of the day and a half of testimony is that the

5    definition that WorldQuant is now seeking to apply to its

6    competitors is very different from the definition that is in

7    the contract.

8          The reason I say that is because if you look at the

9    contract, and I will put it back up on the screen, and we're in

10   Exhibit F which is a little easier to read perhaps, but recall

11   that this "for the avoidance of doubt" language, that was

12   already there in 2011.  We already know that, generally

13   speaking, quantitative models to trade was what they were

14   talking about.

15         In 2016, they added a lot more detail.  The question

16   is what did they do?  The court knows when one side drafts a

17   contract, you have to construe it against that party and

18   strictly against that party because Mr. Ober was simply handed

19   this document and asked to sign it.

20         What did he fairly read?  He read something that was

21   very clear, that applied to quantitative trading or investment

22   strategies.  If you look down now in the third paragraph, it

23   says that these are commonly categorized, known and/or referred

24   to in the financial services industry as, and it gives a lot of

25   different things.

1          When Mr. Ober sits there and he reads these things,

2     every single one of these things is about trading.  It is how

3     does the company trade.  It is very clear that this was trying

4     to define what a company like WorldQuant or competitors of D.E.

5     Shaw or 2 Sigma that similarly have computers whirling all

6     around the globe doing trades in and out, that is what this is

7     talking about.  That is exactly what Mr. Ober fairly read.

8          When Third Point came to him and said look, we do

9     things a little differently, we have fundamental shops, we make

10    big bets, but we think you can help us find additional

11    information so we know whether it is a good or bad idea, he

12    fairly read this and said that is not in this definition.

13         Because if you listen to what Mr. De Addio said, he

14    was very clear about what he thinks this means.  He basically

15    says if you look at data, big data, and you analyze it using

16    quantitative methods, then any investment decision you make,

17    any trading decision you make falls within this definition.

18    That can't be right.  That can't be right.  Then if that were

19    the case, literally every investment firm that hires Mr. Ober

20    would be within this, and we already know that they don't think

21    that is the case.

22         He said if you go to a fundamental shop, that wouldn't

23    be a competitor, but what is he going to do there?  He is going

24    to set up a way to analyze data.  Think about what the

25    testimony showed about WorldQuant.  It said they had about

1    eight people in the data team, right?

2         Then they added 250 people doing computer code.  When

3    they say well, look, that's all -- we do it manly, but we want

4    to get good execution, come on!  You don't have 60,000

5    computers and 250 computer programmers in order to simply just

6    get good execution.  Remember they said one of the things we do

7    is we're starting to long-only funds.  That means most of their

8    funds are not long-only.  They're long-short.  They don't have

9    a bias which way the market is going to move.

10        When you heard Mr. Targoff described Third Point's

11   business, they take weeks if not months to analyze a company.

12   They make a big bet on that company.  We also heard whatever

13   company they choose WorldQuant's going to be trading in it.

14   They do every single S&P 500, do you compete.  How is Third

15   Point ever going to make a trade, an investment that won't

16   somehow ripple off their models?  It is impossible, right?

17        So there is nothing Third Point can do to stay out of

18   their way, but it is going to be random.  It is not going to

19   influence this because they're not doing these kind of

20   quantitative triggers from the data that trigger a computer to

21   do this.  There is not one word about hiring the kind of coders

22   who can make algorithms to make computers make decisions.  That

23   is not what they're about.

24        Mr. Ober took that stand and said my job is going to

25   be to look at data and make a chart or graph and it will go to

1   a pitch book to the analyst.  The analyst will say we look, we

2   met with management we think we know what they're doing.  Or in

3   the case of Backster, we have the CEO, he is about to step

4   down.  We think there is an opportunity there to find a better

5   CEO to make this company hum along.

6            What did Mr. Ober add to that?

7            He can say let's look at everything on the web.  What

8   does it tell us about Backster Industries?  And he pulls data

9   from Estimize and from Bloomberg and he gets all the news on

10  Backster, he gets the Estimize estimates on Backster and he

11  relays this to the investment team, and they said you know

12  what, it looks good.

13           Now, according to WorldQuant, that is computer-driven

14  trading?  That would fall within this definition because it at

15  some point somebody looked at a data set?  That is not what the

16  words on the page say.  It is just not a fair interpretation of

17  this contract.  It does not let Mr. Ober do his job anywhere

18  else.

19           Again as I said on Monday morning, a lot of defendants

20  in this context would come and say this is not an enforceable

21  provision.  This is entirely enforceable.  If 2 Sigma or D.E.

22  Shaw or Renaissance was trying to steal one of their guys to go

23  work with another team of 250 computer programmers, then you

24  have a point, right?

25           But Mr. De Addio was a credible, honest witness.  He

1    said if you go through Exhibit D, that list of companies, he

2    said well, the list isn't a secret.  What he said was a secret?

3    Which ones we're using, how profitable they are for us.  He

4    didn't tell Third Point this.  He is not going to share that

5    because they're looking for different things.  You can't simply

6    get an injunction against someone by saying you know something

7    and you might tell them.  The question is why would they care.

8         The reason you know they won't care, they're just not

9    a competitor.  Mr. Ober talked about what he would do for them.

10   Mr. Targoff talked about integrating him into the fundamental

11   approach.  Nobody is hiring 250 computer programmers.  It is a

12   completely different business, and if they decide tomorrow to

13   invest in Exxon/Mobil because Mr. Ober said all the data on

14   Exxon/Mobil looks rosy, that is not anything that is going to

15   harm their business in any kind of specific way.

16        At the end of Monday, the very end of Monday, counsel

17   asked a question, and the court said that is a great question,

18   we'll start with it on Wednesday.  The interesting thing is we

19   did not start there.  I want to read that question.  At the

20   very end of Monday here was the last question.  Counsel was

21   talking about the list of companies, the list of data vendors

22   that Mr. Ober passed along, and counsel asked Mr. De Addio:

23        "Why or how does this information give Third Point any

24   competitive advantage?"

25        And the court said that is a great question, you can

1     ask it the first time we get together again.  We didn't hear

2     that question again, and the reason is because there is no

3     answer to that question.  That list doesn't tell them anything.

4          If you think about what they're afraid of, they claim

5     to be afraid that Mr. Ober is going to allow them to skip all

6     these steps, he is basically going to walk in and say these are

7     our most valuable datasets.  That is the opposite of what he

8     did.  20 of those datasets, according to WorldQuant, provide 35

9     percent of their profit.

10         Now, I don't know how he knew that.  He didn't know

11    any questions about relative profit when I was asking him

12    questions, but he knew that.  If those were so valuable, why

13    was Mr. Ober trying to bury it in all this other information

14    with datasets they rejected?  Mr. Ober was barely answering an

15    interview question, which was what are some of the datasets

16    you're going to look at.

17         Third Point incorporated that along with 30 other

18    vendors in their internal list.  They were asking everyone and

19    they were getting all these ideas.  The fear that they have is

20    that somehow Third Point is going to be doing the same kind of

21    trading is just not a credible, rationale fear based on any

22    evidence at all.

23         Mr. De Addio kept saying things like well, they're

24    going to start to trade more like we do, and that will be bad

25    for us.  There is no evidence that that is ever going to happen

1    because that is not what Mr. Loeb does.  Mr. Loeb does not want

2    to replace his judgment with a raft of supercomputers.

3            He likes to be on the boards of companies, he likes to

4    feel he can make a difference.  He is on the board of Sotheby's

5    right now, he is on the board of Backster Industries, he was on

6    the board of Yahoo.  When he makes an investment, it is not

7    like we'll go here, out in, every day with a computer.  They

8    make a big investment based on fundamentals.  Do they want more

9    data to support that?  Of course, because just like the

10   documents said, they're not going to ignore quarterly earnings,

11   you're not going to ignore street research, nor should you

12   ignore all this other data out there.

13           But WorldQuant does not own that data, they don't.

14   They don't own it.  Mr. Ober is free to go to those same

15   vendors and buy information that Third Point is interested in

16   for Third Point investments.  They can't stop them from doing

17   that because their contract was not written that way.

18           So we would ask the court to deny this motion for a

19   preliminary injunction today so that we can take away the cloud

20   of him not being able to start on time.

21           We also ask that the court put some other measures in

22   place.  The reason I say that is because WorldQuant has made it

23   very clear they are intending to push forward with this

24   litigation regardless of what happens today.  Here is what that

25   is going to mean.  That is going to mean Mr. Ober will have to

1  start work and start interacting with his new colleagues if an

2  injunction is denied.

3        THE COURT:  If an injunction is denied?

4        MR. BUCHDAHL:  If the court permits him to proceed.

5  If an injunction is denied, he would start work and they would

6  have discovery requests, what did you talk about today?  What

7  did you talk about next week?

8        We request you deny the motion for preliminary

9  injunction and limit discovery to what has happened before he

10  starts because they are otherwise just going on a fishing

11  expedition as to what might happen when he gets there.

12        They have a claim in their complaint for

13  misappropriation of trade secrets.  There is nothing we have

14  seen that suggests any trade secret has been misappropriated,

15  but you can't run up a lawsuit prospectively and just say well,

16  you know, we're going to keep checking up on you every month to

17  see what happens.  That is totally unfair to Mr. Ober and it is

18  totally unfair to Third Point.

19        It just casts this -- look, this lawsuit was brought

20  because WorldQuant knows that they've got a problem here

21  because they did not include fundamental hedge funds in their

22  definition.  There are a lot of fundamental hedge funds who are

23  becoming interested in data, and they know that if they're

24  unsuccessful in stopping Mr. Ober, then there is not going to

25  be anything to stop other fundamental hedge funds from hiring

1    away other employees who are all at-will employees and made no

2    promises to them.

3            And so they are determined to try to make this as

4    costly and as much of a hassle as possible for Mr. Ober.  I

5    have more or less been told that.  So we need to have -- the

6    court first needs to make a determination about the injunction,

7    but if you agree that the contract is not being violated by a

8    fundamental investor, we would ask the court to be putting some

9    reasonable limitations in place on discovery so that this

10   doesn't become a way to force essentially Mr. Ober to CC

11   opposing counsel on every communication he has on his new job.

12           Thank you.

13           THE COURT:  Thank you, Mr. Buchdahl.

14           THE COURT:  Mr. Hawks-Ladds.

15           MR. HAWKS-LADDS:  Thank you, your Honor.

16           I'll argue about the extraordinary request that Mr.

17   Buchdahl made at the end regarding limiting discovery in the

18   future litigation later.  The focus here is on whether or not

19   WorldQuant will be irreparably harmed by Mr. Ober going to

20   Third Point.  That is the focus of the court.

21           If the court determines that there will be an

22   irreparable injury because of Mr. Ober's employment by Third

23   Point, then the court should issue an injunction.  The

24   injunction may be for the entire one-year period or there is a

25   blue pencil provision in the contract, you can reduce it.

1          It is obvious, having seen all of the evidence --

2     obvious to me, I should say -- that Third Point and Ober

3     considered the fact that the court was going to enter an

4     injunction because it contemplated that as part of his offer.

5          I would like to put up this first page of Exhibit B.

6          (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              MR. HAWKS-LADDS:  Exhibit B, your Honor, is the offer

2      letter from Third Point to Ober dated November 7, 2016.  The

3      first paragraph contemplates a court order enjoining him from

4      going to work there until May 1, 2017.  It was part of the

5      deal.  They contemplated it.  Why?  Because they knew that

6      there was a very strong likelihood that WorldQuant would

7      protect its legitimate business interests in the unique

8      knowledge that Mr. Ober possesses.

9              Let's talk about that element of the law for a minute.

10     In order for the Court to find that a restrictive covenant

11     should be enforced under New York law, you must determine that

12     the covenant protects a legitimate business interest of

13     WorldQuant, first and foremost.  You have to make a

14     determination, what is the legitimate business interest that is

15     sought to be protected.

16             Under New York law, the protection of confidential

17     information that may inevitably be disclosed to a competitor is

18     uniquely within the province of this Court to protect the

19     employer's interests, uniquely within this Court's power to do

20     that.

21             Why?  Well, there's a couple reasons.  One, because

22     the parties contracted for that.  They contracted for it in

23     2011, when the original employment agreement was executed.  And

24     then, in 2016, Mr. Ober signed the amended agreement reducing

25     the restrictive covenant period from two years to one.  He

1    didn't have to sign that.  He could have said, I'm thinking

2    about going to work for Third Point, I've been talking to them

3    since last March or April, I'm not going to sign this.  But he

4    didn't.  And he didn't disclose to Third Point the fact that he

5    was negotiating actively with their -- he didn't disclose to

6    WorldQuant that he was negotiating with Third Point.

7             So the Court has the obligation to protect these

8    legitimate business interests in the form of confidential

9    information and competitive activity that can cause harm to his

10   former employer.  Mr. DeAddio was on the stand for the better

11   part of today and a little bit of Monday.  And incidentally,

12   with attorneys, I understand it's argument, and argument is

13   argument, but for him to say that I didn't have the last

14   question asked on Monday answered as the first question today?

15   That's true.  But you heard, your Honor.  I asked Mr. DeAddio

16   numerous times how Mr. Ober going to work at Third Point would

17   harm WorldQuant.  So whether it's my first question or my 30th

18   question, the question was asked.

19            Let's talk a little bit about the legitimate business

20   interests and how they will not be protected unless you issue a

21   preliminary injunction enjoining Mr. Ober from going to work at

22   Third Point for a period of time.  On direct of Mister --

23   attorney Targoff, I asked him, "In order to get the

24   quantitative process going, Mr. Ober is going to use the

25   information he currently possesses, right?"  Mr. Targoff said,

1    "Sure."  "And that information, as he said in Exhibit F" --

2    that's Ober said in Exhibit F -- "is valuable information,

3    true?"  "Sure, it's valuable."  This is Mr. Targoff speaking.

4    "Q. And that information is going to be used by Third Point in

5    order to enhance its thesis, as you put it, right?

6    "A. Yes.

7    "Q. And that thesis supports Third Point's fundamental trading

8    strategy, right?

9    "A. Yes.

10   "Q. And the foundation for that information is the data that

11   Mr. Ober, as Third Point's chief data scientist, is going to

12   procure and manage for Third Point, right?"

13          Your Honor, Mr. Targoff gave the best evidence of how

14   Mr. Ober is going to hurt WorldQuant if you do not give

15   WorldQuant the benefit of time -- that's all we're asking

16   for -- the benefit of time, to allow some of his knowledge to

17   become stale.  They don't lose it.  Third Point doesn't lose

18   anything, by six months, seven months, eight months, a year.

19   They don't lose anything.  They still have them.  Well, what

20   does WorldQuant gain by that fair, balanced decision?  The

21   opportunity for a level playing field.  They just lost their

22   co-head of data strategy to a fundamental advisory firm that is

23   starting a quantamental process, brand-new, out of the gate.

24          You heard attorney Targoff say, they hired Sheetal

25   Sharma in March 2016.  Sheetal Sharma was brought in to create

1    this quantitative strategy.  You heard exhaustive evidence on

2    Exhibit A, which we subpoenaed, about the data-effort

3    discussion.  And you heard, from their own witnesses, that this

4    is going to be what Third Point looks like in a matter of time.

5    We don't know how much time.  We just know this is their plan.

6           This, your Honor, is their strategy.  This is their

7    quantamental strategy.  Mr. Loeb's term, "quantitative," and

8    "fundamental."  Why?  Because, as he said in his investor

9    letter, which I'll put on the screen next, they must go in this

10   direction, in order to compete.

11          Who are they competing with?  WorldQuant.  There is no

12   doubt, no doubt, that the market requires them to move from a

13   purely fundamental, which means take large positions, sit on

14   it, and don't use the quants, don't use the data, versus

15   enhance your trading position with these ideas, these signals,

16   to improve the thesis, the idea of when to buy, when to sell,

17   when to long, when to short.

18          There is no doubt that they are competing with

19   WorldQuant.  Now, the question is, and I heard, I heard your

20   questions as you posed them to us, to counsel: if they're a

21   fundamental trading house and they don't do the electronic

22   trading and we do a lot of electronic trading, how are they

23   competitors?  The answer is that once they start trading with

24   the same ideas that we trade with, they are moving the market.

25   Judge, these aren't small companies.  These are billion-dollar

1    entities.

2              The third point, moves the market.  To use

3    Mr. DeAddio's analogy, once that vein of gold is discovered in

4    1949 in San Francisco, how long is it before you have

5    thousands, thousands of 49ers trading off the same information?

6    Your Honor, the idea is where WorldQuant makes its money, and

7    when Third Point starts trading on the same ideas, because

8    Mr. Ober is giving them the data, the vendors, which out of

9    the -- and you know, your Honor, he knows the ███.  He's going

10   to be able to recreate it.  It's inevitable, to do his job, to

11   create, to create this infrastructure.  It is inevitable that

12   he's going to use that data in the next six months to a year to

13   help Third Point move to the quantamental trading strategy.

14             And let's just look at Mr. Loeb's terms, language.

15             Excuse me.  May I approach, your Honor?

16             This is Exhibit 12, your Honor, the bottom of page 2.

17   At the bottom of the page, last paragraph, the middle of the

18   paragraph, "While our analyst team still spends the vast

19   majority of its workday analyzing fundamentals, getting overall

20   portfolio positioning right is equally essential to generating

21   returns.  The macro considerations discussed above must be

22   interpreted correctly and applied successfully.  When we add in

23   the use of data sets and quantamental techniques that are

24   increasingly important to remain competitive while investing in

25   single-name equities, it is clear that our business is rapidly

1    evolving."

2              I respect the fact that Mr. Loeb is making this

3    decision.  I think it's brilliant.  He's obviously a brilliant

4    man.  And his funds do exceedingly well and they move markets.

5    And he has the absolute right to engage in quantamental, which

6    we now know means quantitative and fundamental -- his word --

7    and engage in this strategy.  He has the absolute right.  And

8    he has the absolute right to hire anybody who he wants to, who

9    is not subject to a restrictive covenant intending to protect

10   the legitimate business interests of WorldQuant, which is, as

11   Mr. DeAddio testified to, its unique process that Mr. Ober

12   knows, helped create, helped create for WorldQuant, its data,

13   its vendors and what the vendors provide that is profitable and

14   what the data that the vendors provide that is not profitable,

15   because firms waste their time looking at that as well.

16             Mr. Loeb has the absolute right to pursue this and to

17   hire qualifying people to do it.  But Mr. Ober is subject to a

18   12-month restrictive covenant, a restrictive covenant with one

19   purpose in mind: to level the playing field in fairness.

20             And, your Honor, let's not forget, Mr. Ober is going

21   to get paid.  He's not going to be harmed.  He's going to

22   receive his salary and the job will be wide open.  They're

23   ramping up the staff.  You read Exhibit A.  They're hiring and

24   hiring.  200 --

25             THE COURT:  That wasn't the testimony.

1          MR. HAWKS-LADDS:  The argument, Exhibit A -- this is

2     our argument.  But in Exhibit A -- it is in Exhibit A, is the

3     ramping up.  Do you want me to -- I'll show you.

4          THE COURT:  No, no, no.  What I'm saying isn't that.

5     The only person who was hired to date.  There are very few

6     people who have been hired.  And they only know, once they get

7     these people on-board, whether they're going to need the

8     others.

9          MR. HAWKS-LADDS:  You're right.  Mr. Targoff said

10    they're waiting for Mr. Ober to come on board before they make

11    any other decisions.  You are correct.  Absolutely.

12          And so as part of argument, what's naturally going to

13    come from that?  Ramping up.  Ramping up in their quantitative

14    efforts.  That's the next step.

15          But let's balance the equities for a minute, as the

16    Court must do.  In deciding whether to issue a preliminary

17    injunction under New York law, you must balance the equities

18    between the harm that could befall WorldQuant versus the burden

19    on Ober.  And let's remember, there was a lot of argument -- I

20    didn't object to it -- by Mr. Buchdahl about why we're doing

21    this.  Why is WorldQuant doing this?  The reason is to protect

22    its interests, which it has a right to do.  And in balancing

23    those interests, of the losses that will come when all of this

24    process -- the data, the vendors -- are now shifted to this

25    multibillion-dollar entity, versus Mr. Ober getting paid to sit

1    on the sidelines.

2            And by the way, he can work anywhere he wants -- when

3    he's not working for a competitor, he can work anywhere he

4    wants:  Bloomberg, where he worked at before, Google, any other

5    place, any financial fund that's not doing quantitative trading

6    on new investment ideas.

7            You balance those equities, and the legitimacy --

8    we're not asking for two years, three years.  You heard

9    Mr. DeAddio say that they're using these ███ data sets, or

10   vendors, and it will take years to erode, years to become

11   stale.  We didn't ask -- not only that we're not asking -- we

12   reduced it from two years to one year, in fairness to the

13   employees.

14           When you balance those equities, Judge, between

15   Mr. Ober getting paid to sit on the sidelines, what labor

16   lawyers call tend the garden, on garden leave, versus the harm

17   that is going to occur when you balance those equities, Judge,

18   there's only one decision, we submit.  And that is, in

19   fairness, to level the playing field, let him sit and wait.

20   Let him get paid.  Go to Hawaii, do whatever you want to do.

21   Give WorldQuant the benefit of its argument.  Give them the

22   benefit of the restrictive covenant that is fair and not

23   overbroad, that's limited.

24           That's what this case is about.

25           Now, let me address attorney Buchdahl's extraordinary

1   requests that you knew limit discovery depending on what

2   happens, either way.  It's a preliminary injunction.  As you

3   know, your Honor, preliminary is not permanent.  So a lot can

4   happen between now and whatever happens next.  If you issue the

5   injunction, we're going to have a hearing.  If you don't issue

6   the injunction, we're going to have a hearing.  But limiting

7   discovery to put a veil of secrecy on what Mr. Ober is doing?

8   When that's exactly what we're trying to prevent, is this man

9   coming in and taking our trade secrets and using them against

10  us?  Your Honor, that would be, that would be extraordinary, to

11  say the least.  And I understand Mr. Buchdahl's attempt to get

12  you to consider it, but whether you issue the preliminary

13  injunction or not, discovery should be handled in the normal

14  course, with interrogatories, depositions being handled in the

15  normal course and no edicts being issued before we even know

16  what's going to happen.

17          So in conclusion, we're asking merely that the Court

18  balance the equities, look at the fairness of the situation, on

19  both Mr. Ober and WorldQuant, and issue an injunction.  We

20  would ask, as the contract permits, for one year and, as they

21  contemplated, at least through May 1, 2017.

22          Thank you, your Honor.

23          THE COURT:  Thank you.  We're going to take a --

24  Mr. Buchdahl?

25          MR. BUCHDAHL:  If I could just have three minutes in

1    brief rebuttal, but I don't have to --

2              THE COURT:  No, go ahead, go ahead.

3              MR. BUCHDAHL:  WorldQuant wants you to look at

4    Mr. Loeb's statements.  And we would like you to look at them

5    in context.  Exhibit 12, the investor letter, even the part

6    that opposing counsel read refers to investing in single-name

7    entities.  WorldQuant said they don't have a single investment

8    that's more than 1 percent of their business.  And if you look

9    at Exhibit 16, the Forbes article that they selectively quoted

10   from in their moving papers, the last page of Exhibit 13 has a

11   quote from Mr. Loeb, where he says flat out, in talking about

12   possibly hiring people, on page 3 of the article, Plaintiff's

13   Exhibit 16, it's an article about how Mr. Loeb was worried

14   about the election having unexpected results, and he was

15   worried that the election was going to be a little bit like

16   Brexit, where something different happened than what everybody

17   thought was going to happen.

18             But what Mr. Loeb says about the use of data couldn't

19   be more clear.  He says, on second line of page 3 of the Forbes

20   article, "This isn't to support a quant strategy."  Mr. Loeb

21   has investors.  They have expectations about what he's going to

22   do.  For you to find otherwise, you would have to believe that

23   Mr. Loeb is lying to the public, that Mr. Targoff came in here

24   and lied from the stand, and that Mr. Ober was completely

25   deceived as to what the nature of his responsibilities are

1  going to be, because Third Point could not be more clear that

2  they are not going to do algorithmic trading, quantitative

3  trading, the things in the contract that limit the definition

4  of "competitor."

5          And finally, I understand that WorldQuant is worried

6  about what they believe is proprietary.  But Mr. Ober's e-mail

7  to Third Point should put them at ease.  He did not say, here

8  are our most valuable vendors.  He did not distinguish between

9  vendors that they rejected or that they accepted.  He simply

10  said, here are a lot of vendors and a lot of different areas

11  that might be useful to Third Point.

12          If we didn't see that, if we didn't see that document,

13  I could see them being very concerned about what he was saying

14  to them.  But he made it very clear: general industry

15  information available on the Internet.

16          Thank you, your Honor.

17          THE COURT:  Thank you.

18          (Recess)

19          THE COURT:  As we know, a party seeking a preliminary

20  injunction must show irreparable harm and either likelihood of

21  success on the merits or sufficiently serious questions going

22  to the merits to make them a fair ground for litigation, and a

23  balance of hardships tipping decidedly toward the party

24  requesting the preliminary relief.

25          It seems to me that there are a couple of things I

1    need to put out here.  First of all, in terms of whether or not

2    Mr. Ober is violating the restrictive covenant, looking at

3    Exhibit F, the second page, I felt that there was a moving

4    target here during this hearing about what was supposed to be

5    included.  And it may not be written here, but that's what we

6    meant.  I think that that is a little bit too ambiguous and

7    imprecise for anybody to be able to say he clearly violated the

8    restrictive covenant.  Let's see.  "For purposes hereof,

9    'quantitative trading or investment strategies' shall mean

10   strategies or techniques which make trading and/or investing

11   decisions primarily based upon computer-driven processes and

12   which are commonly categorized, known, and/or referred to in

13   the financial services industry as, among other things,

14   'statistical arbitrage,' 'systematic trading,' 'algorithmic

15   trading,' 'algo trading,' 'computer-driven trading,' 'technical

16   trading,' 'artificial intelligence-based trading,' 'automated

17   trading,' 'black box trading,' and/or 'high-frequency

18   trading.'"  All of those seemed to be much narrower than what

19   the plaintiff is suggesting now, that any time, at any point

20   you use any analytical or quantitative information to

21   eventually arrive at what you would be trading, you are

22   violating this.  It is clearly not a violation, in terms of the

23   way Third Point works.  If they include some information that

24   they obtained quantitatively as one of the factors that they

25   consider in whether or not to invest in a single company, that

1   is, I think, not competitive with what WorldQuant is doing.

2           It is clear that the list that Mr. Ober gave to Third

3   Point was focused on what, based on what he knew or how little

4   he knew about Third Point, he thought would be useful to them.

5   The vendors, the types of things that they have, that's all out

6   in the public.  And as we've heard on cross-examination of

7   Mr. DeAddio, the list that was given includes the losers for

8   WorldQuant as well as potential or possible winners.

9           And it seems to me that the focus has been on what

10  will harm WorldQuant, as opposed to what it is that Third Point

11  has been doing and is trying to enhance, not switch over to be

12  in direct competition with WorldQuant.  The fact that somebody

13  might use quantitative analysis to get additional information

14  that might lead to an idea is too nebulous to expect that it's

15  covered by what's written in this restrictive covenant.

16          So that I do not think that the plaintiff has met its

17  burden here.  I do believe that they are different companies.

18  I asked if there was any company that's gone into quantamental,

19  and I got an answer that there isn't any.  It is speculation on

20  the part of the plaintiff that Third Point is going to use

21  information that is helpful to it in how it functions to get

22  ahead.  Again, I am not convinced that Third Point is getting

23  into competition with WorldQuant, and it is clear to me, as of

24  now, they are not in competition with WorldQuant.  Therefore, I

25  am going to deny the preliminary injunction.

1              In terms of where we go from here, of course it

2    depends on what the plaintiff wants to do, but do you intend to

3    appeal this?

4              MR. HAWKS-LADDS:  I need to confer with my client.

5              THE COURT:  OK.  Why don't you do that, because if

6    you're going to appeal it, then we don't need to go and plan

7    out how the rest of the case goes.  So I'll be back in five

8    minutes.

9              (Recess)

10             THE COURT:  I understand that a decision about where

11   you wish to proceed from this point cannot, in such a rushed

12   period of time, be made.  So you will make that determination

13   and let the Court know what you're doing.  If you're going to

14   appeal, then that takes it out of my hands for quite a while.

15   If you're not going to appeal, then we have to see what is

16   going forward in this case.  All right?

17             MR. HAWKS-LADDS:  Yes, your Honor.

18             THE COURT:  OK.  Anything else we need to do today?

19             MR. BUCHDAHL:  Your Honor, it might be appropriate to

20   schedule a status conference for the first week in January, in

21   the event that we need it, just so we can just all coordinate

22   our calendars.  If you want -- it's just a suggestion, if you

23   would like to do that.

24             THE COURT:  It depends.  If they appeal, I don't have

25   any jurisdiction to go forward.  So I'm hoping that I can find

1    out.  But I'm not rushing the plaintiffs.  Obviously, based on

2    my ruling, I'm not preventing him from starting work.  So they

3    have to decide what they want to do.  So let's just leave it at

4    that.

5             I would appreciate, Mr. Hawks-Ladds, if you let the

6    defendant and the Court know as soon as you can what's going to

7    happen.

8             MR. HAWKS-LADDS:  We will.

9             THE COURT:  All right?

10            MR. HAWKS-LADDS:  Yes, we will, your Honor.

11            THE COURT:  OK.  This matter is adjourned.

12            MR. HAWKS-LADDS:  Thank you.

13                              o0o

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

MICHAEL DeADDIO

Direct By Mr. Hawks-Ladds  . . . . . . . . . . 184

Cross By Mr. Buchdahl  . . . . . . . . . . . 254

Cross By Mr. Buchdahl  . . . . . . . . . . . 287

Redirect By Mr. Hawks-Ladds  . . . . . . . . 297

PLAINTIFF EXHIBITS

Exhibit No.                                    Received

 17, 18, 19, and 20  . . . . . . . . . . . . 184

DEFENDANT EXHIBITS

Exhibit No.                                    Received

 L, M and N   . . . . . . . . . . . . . . . 290